# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

ISMAEL LOPEZ,

       Plaintiff,

vs.                                                                                    No. CIV 15-0193 JB/GBW

DELTA INTERNATIONAL MACHINERY
CORPORATION; DELTA MACHINE
COMPANY, INC.; ROCKWELL
INTERNATIONAL CORPORATION;
ROCKWELL AUTOMATION, INC.;
STANLEY BLACK & DECKER, INC.;
BLACK & DECKER (U.S.), INC.;
PENTAIR, INC.; KEARNEY & TRECKER
CORPORATION and GLH, LLC,

       Defendants.

## MEMORANDUM OPINION[1]

**THIS MATTER** comes before the Court on: (i) Defendants Black & Decker (U.S.) Inc. and

Stanley Black & Decker, Inc.'s Motion and Brief for Summary Judgment, filed December 29, 2015

(Doc. 48)("MSJ"); and (ii) the Plaintiff's Rule 56(f) Motion in Opposition to Defendant Black &

Decker (U.S.) Inc. and Stanley Black & Decker, Inc.'s Motion for Summary Judgment (Doc. 48), or

Alternative Motion to Extend Time to File Response, filed January 15, 2016 (Doc. 53), and the

Plaintiff's Rule 56(f) Motion in Opposition to Defendant Black & Decker (U.S.) Inc. and Stanley

---

[1]On September 16, 2016, the Court issued an Order, filed September 16, 2016 (Doc. 102)("Order"), in which it (i) granted Defendants Black & Decker (U.S.) Inc. and Stanley Black & Decker, Inc.'s Motion and Brief for Summary Judgment, filed December 29, 2015 (Doc. 48); and (ii) denied the Plaintiff's Rule 56(f) Motion in Opposition to Defendant Black & Decker (U.S.) Inc. and Stanley Black & Decker, Inc.'s Motion for Summary Judgment (Doc. 48), or Alternative Motion to Extend Time to File Response, filed January 15, 2016 (Doc. 54). The Court stated that it would "at a later date issue a Memorandum Opinion more fully detailing its rationale for this decision." Order at 1 n.1. This Memorandum Opinion is the promised Memorandum Opinion.

Black & Decker, Inc.'s Motion for Summary Judgment (Doc. 48), or Alternative Motion to Extend

Time to File Response, filed January 15, 2016 (Doc. 54)(collectively, the "MSJ Response/Motion").[2]

The Court held a hearing on March 15, 2016. The primary issues are: (i) whether Defendants Black

& Decker (U.S.), Inc. and Stanley Black & Decker, Inc. (the "Black & Decker Defendants") are

entitled to summary judgment on the Plaintiffs [sic] First Amended Complaint for Personal Injury

Damages, filed December 23, 2015 (Doc. 47-1)("Amended Complaint")[3]; and (ii) whether the Court

should deny the MSJ without prejudice to refiling after discovery concludes, or, in the alternative,

whether the Court should grant Plaintiff Ismael Lopez a two-week extension to draft a response to

the MSJ. The Court will grant the MSJ and deny Lopez' requests.

Lopez brings this products liability action to recover damages for injuries he incurred while

operating an unguarded power table saw at a plant in El Paso, Texas. To resolve the MSJ, the Court

---

[2]CM/ECF -- the Court's electronic filing system -- lists Document 53 as a "Response" to the MSJ, and Document 54 as a "Motion" for an extension of time. Documents 53 and 54, however, are identical. Accordingly, to avoid redundancy in its analysis, the Court will refer to these documents collectively as the "MSJ Response/Motion."

[3]Although the MSJ does not identify a document number or quote an exact document title, it appears that the Black & Decker Defendants drafted the MSJ to respond to the Plaintiffs [sic] Original Complaint, filed March 5, 2015 (Doc. 1-1)("Complaint"). The MSJ, for example, cites the "Plaintiff's Complaint, ¶¶ 13-14, 21-22." MSJ ¶ 11, at 4. Because the Amended Complaint contains only eleven paragraphs, whereas the original Complaint contains twenty-eight paragraphs, the MSJ must be responsive to the original Complaint.
The Amended Complaint, however, is the operative pleading. Before the Black & Decker Defendants filed the MSJ, Plaintiff Ismael Lopez moved to amend his Complaint, see Plaintiff's Unopposed Motion for Leave to File Plaintiff's First Amended Complaint, filed December 23, 2015 (Doc. 47)("Motion to Amend"), and the Court granted his motion, see Order Granting Plaintiff's Unopposed Motion for Leave to File Plaintiff's First Amended Complaint at 1, filed January 8, 2016 (Doc. 50)("Amendment Order"). The original Complaint asserted two claims against seven Defendants, see Complaint ¶ 14, at 7-8; id. ¶ 23, at 9-10; the Amended Complaint asserts the same two claims against only the Black & Decker Defendants, see Amended Complaint ¶ 6, at 2-3. Thus, because the Amended Complaint is the operative pleading, and because it asserts the same claims as the original Complaint against the Black & Decker Defendants, the Court will construe the MSJ as responsive to the Amended Complaint. If necessary, the Court will note any discrepancies between the two pleadings.

*must determine whether the Black & Decker Defendants are liable for Lopez' injuries based on three theories: (i) that they supplied the subject table saw which allegedly caused Lopez' injuries; (ii) that they are liable as the "alter egos" of the corporation that originally manufactured the table saw; and (iii) that they are liable as successors to the table saw's manufacturer.  The Court concludes that the Black & Decker Defendants are entitled to judgment as a matter of law on all three theories, because (i) they did not supply the table saw; (ii) they do not sufficiently control the table saw's manufacturer such that the Court can pierce the corporate veil between them; and (iii) in acquiring the corporation that manufactured the table saw, they did not expressly assume that corporation's liabilities for the table saw.  Accordingly, the Court will grant the MSJ.

With respect to Lopez' request that the Court deny the MSJ without prejudice to refiling after discovery concludes, the Court concludes that further discovery will not yield facts that are material to Lopez' opposition to the MSJ.  As for Lopez' alternative request for a two-week extension of time to respond to the MSJ, the Court concludes that, although Lopez has demonstrated "good cause" for an extension, his request is nevertheless moot, as he has since filed several briefs in opposition to the MSJ.  The Court, accordingly, denies the requests in the MSJ Response/Motion.

## FACTUAL BACKGROUND

The Court provides two factual background sections.  First, the Court will contextualize the MSJ by briefly reviewing the Amended Complaint's factual allegations.  Second, the Court will set forth the undisputed facts based on the parties' briefings for purposes of deciding the MSJ under rule 56(a) of the Federal Rules of Civil Procedure.  Later, in its Analysis section, the Court will decide the undisputed facts' materiality.

### 1.       The Amended Complaint's Factual Allegations.

Lopez is a resident of Sunland Park, New Mexico.  See Amended Complaint ¶ 1, at 1.  Black

& Decker (U.S.), Inc. is a corporation organized under the laws of Maryland and doing business in the State of New Mexico.  <u>See</u> Amended Complaint ¶ 3, at 1-2.  Stanley Black & Decker, Inc. is a corporation organized under the laws of Connecticut and doing business in the State of New Mexico. <u>See</u> Amended Complaint ¶ 2, at 1.  The events giving rise to this litigation occurred in El Paso, Texas.  <u>See</u> Amended Complaint ¶ 5, at 2.

On August 23, 2012, Lopez was sawing wood for 84 Lumber[4] in El Paso with an unguarded table power saw.  <u>See</u> Amended Complaint ¶ 5, at 2.  During the job, the blade jumped,[5] and severed Lopez' left middle and index fingers.  <u>See</u> Amended Complaint ¶ 5, at 2.  Lopez alleges that the table power saw was "manufactured and put in the stream of commerce by the Black & Decker Defendants."  Amended Complaint ¶ 5, at 2.  Lopez accordingly brings product liability claims against the Black & Decker Defendants.  <u>See</u> Amended Complaint ¶ 6, at 2-3.

---

[4]84 Lumber is a "privately held supplier of building materials, building supplies, manufactured components and industry-leading services for single- and multi-family residences and commercial buildings," with over 250 stores in 30 states.  84 Lumber Company, About 84 Lumber Company, <u>available at</u> http://www.84lumber.com/About/About.aspx (last accessed June 20, 2017). 84 Lumber is not a named party in this case.

[5]In his original Complaint, Lopez elaborated that, while he was "cutting a piece of wood," the saw "unexpectedly . . . hit a knot or bum," which caused the blade to "jump back" and sever his fingers.  Complaint ¶ 13, at 7.  The Amended Complaint, by contrast, asserts only that Lopez "severed his left middle finger and index finger while attempting to saw wood with an unguarded table power saw[.]"  Amended Complaint ¶ 5, at 2.  Because the Amended Complaint is the operative pleading, <u>see</u> <u>supra</u> note 3, the Court will rely upon its factual account, which omits the original Complaint's explanation that the saw jumped, because it "hit a knot or bum," Complaint ¶ 13, at 7.

2.    __Undisputed Facts__.[6]

"The events giving rise to this lawsuit . . . occurred entirely in El Paso, Texas."  MSJ ¶ 11, at

---

[6]Consistent with the local rules, the MSJ provides a "concise statement of all of the material facts as to which the movant contends no genuine issue exists."  D.N.M.LR-Civ. 56.1(b).  See MSJ ¶¶ 1-11, at 2-4.  The MSJ numbers these facts, and it refers "with particularity to those portions of the record upon which the movant relies."  D.N.M.LR-Civ. 56.1(b).  See MSJ ¶¶ 1-11, at 2-4.  Lopez contends, in response, that "genuine issues of material fact preclude[e] summary judgment . . . ."  Plaintiff's Supplemental Brief in Support of Rule 56(f) Motion in Opposition to Defendant Black & Decker (U.S.) Inc. and Stanley Black & Decker, Inc.'s Motion for Summary Judgment (Doc. 48), or Alternative Motion to Extend Time to File Response ¶ 10, at 3, filed July 12, 2016 (Doc. 90)("Suppl. Brief").  None of Lopez' briefings, however, contain a "concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist," as D.N.M.LR-Civ. 56.1(b) requires.  MSJ Response/Motion at 1-16; Suppl. Brief at 1-8.  Nor does Lopez number any facts or "state the number of the movant's fact that is disputed."  D.N.M.LR-Civ. 56.1(b).  Lopez, in short, does not "specifically controvert[]" the MSJ's factual assertions.  D.N.M.LR-Civ. 56.1(b).  Under the local rules, a summary judgment motion's statement of facts "will be deemed undisputed unless specifically controverted."  D.N.M.LR-Civ. 56.1(b).

When deciding a summary judgment motion, a district court may decline to consider factual assertions which do not conform to the court's local rules.  See Certain Underwriters at Lloyd's London v. Garmin Int'l, Inc., 781 F.3d 1226, 1231 (10th Cir. 2015)("The burden rests with the lawyers desiring to practice before a court to submit evidence in conformity with the rules of that court[.]").  Nevertheless, the Court "generally does not grant dispositive motions on procedural defaults alone."  Tapia v. City of Albuquerque, 2014 U.S. Dist. LEXIS 44192, *54-55 (D.N.M. 2014)(Browning, J.)(citations omitted).  See Two Old Hippies, LLC v. Catch the Bus, LLC, 807 F. Supp. 2d 1059, 1061 (D.N.M. 2011)(Browning, J.)("[T]he Tenth Circuit has encouraged district courts to decide motions for summary judgment on the merits.")(citation omitted).  Here, Lopez' briefings purport to dispute -- albeit circuitously -- some of the MSJ's basic factual assertions.  See, e.g., Suppl. Brief ¶ 12, at 4 (purporting to dispute the MSJ's statement that The Black & Decker Corporation acquired "shares and outstanding stock" in Delta Intl., arguing that the transaction also involved "membership interests and other ownership interests").  To the extent Lopez' disputations logically respond to the MSJ's factual assertions, the Court will not disregard those disputations simply because they are not numbered, or because they do not explicitly identify the numbered facts to which they are responsive.  In other words, where Lopez' argument is logically responsive to a fact, the Court will not ignore that argument based on a technicality.  At the same time, the Court will not credit Lopez' factual assertions which do not specifically identify support in the record, as the Federal Rules of Civil Procedure require.  See Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . .").  Nor will the Court, on its own, generate a dispute by searching the record for evidence which contradicts the MSJ's factual assertions.  See Roska ex rel. Roska v. Peterson, 328 F.3d 1230, 1246 n.13 (10th Cir. 2003)("[W]e will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury.")(citations and internal quotation marks omitted).

4 (asserting this fact).  See MSJ Response/Motion at 1-16 (not disputing this fact); Suppl. Brief at 1-8 (not disputing this fact).

The Black & Decker Defendants "did not design, manufacture, market or sell the subject table saw."  MSJ ¶ 1, at 3 (asserting this fact).  See MSJ Response/Motion at 1-16 (not disputing this fact); Suppl. Brief at 1-8 (not disputing this fact).  "The subject table saw, a Delta Unisaw Model 36-812, serial number 01E31821, was manufactured by Delta International Machinery Corp. []<sup>[7]</sup> in May of 2001."  MSJ ¶ 2, at 3 (asserting this fact).  See MSJ Response/Motion at 1-16 (not disputing this fact); Suppl. Brief at 1-8 (not disputing this fact).  On July 16, 2004,[8] The Black & Decker

---

[7]Delta Intl., a Minnesota corporation, was originally a named Defendant in this case.  See Complaint ¶ 2, at 2.  On May 4, 2015, Delta Intl. filed a motion to dismiss for lack of personal jurisdiction.  See Defendant Delta International Machinery Corp.'s Motion to Dismiss for Lack of Personal Jurisdiction at 1, filed May 4, 2015 (Doc. 7).  At a hearing on September 18, 2015, the Court granted the motion and dismissed Delta Intl. from the case.  See Clerk's Minutes for Proceedings Before District Judge James O. Browning (taken September 18, 2015) at 1, filed September 18, 2015 (Doc. 97)("Sept. 18, 2015, Hearing Minutes").  Later, on March 15, 2016, the Court issued a Memorandum Opinion, filed March 15, 2016 (Doc. 77)("Delta MOO"), detailing its rational for dismissing Delta Intl.

[8]In the MSJ, the Black & Decker Defendants assert that The Black & Decker Corporation and Pentair, Inc. entered into an agreement in "October of 2004."  MSJ ¶ 3, at 3 (citing Affidavit of Theodore C. Morris ¶¶ 7-8, at 2 (executed December 17, 2015), filed December 29, 2015 (Doc. 48-2)("Morris Aff.")).  Lopez' Suppl. Brief, however, asserts that The Black & Decker Corporation and Pentair, Inc. executed their agreement on July 16, 2004.  See Suppl. Brief ¶ 11, at 4 (citing Purchase Agreement between The Black & Decker Corporation and Pentair, Inc. at 1 (dated July 16, 2004), filed July 12, 2016 (Doc. 90-1)("Purchase Agreement").  The Purchase Agreement is indeed dated July 16, 2004.  See Purchase Agreement at 1.  In their Response to the Suppl. Brief, the Black & Decker Defendants do not dispute that the Purchase Agreement was executed on July 16, 2004, nor do they mention the October 2004 date or explain that date's significance.  See Black and Decker Defendants' Response to Plaintiff's Supplemental Brief [Doc 90] (Filed Under Seal) at 1-5, filed July 29, 2016 (Doc. 94)("Suppl. Brief Response").  Based on this apparent concession, and in light of the Purchase Agreement's express terms, it appears that the operative date is July 16, 2004, and not October 2004.  The Court thus deems undisputed the fact that The Black & Decker Corporation and Pentair, Inc. executed an agreement on July 16, 2004.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Corporation executed an agreement with Pentair, Inc.[9] to acquire of Pentair, Inc.'s and its affiliates'

certain "Intellectual Property" and "all of the[ir] outstanding shares of capital stock, membership

interests and other ownership interests (the 'Equity Interests')" in several "Transferred Subsidiaries."

Suppl. Brief ¶ 12, at 4 (asserting this fact)(quoting Purchase Agreement at 1).[10]  One of the

transferred subsidiaries in which The Black & Decker Corporation acquired equity interests is Delta

Intl.  See MSJ ¶ 3, at 3 (asserting this fact); MSJ Response/Motion at 1-16 (not disputing this fact);

Suppl. Brief at 1-8 (not disputing this fact).[11]  "Delta continues to exist as a separate and distinct

---

[9]Pentair, Inc., a Minnesota corporation, was originally a named Defendant in this case.  See Complaint ¶ 7, at 4.  On May 13, 2015, Pentair, Inc. moved to dismiss the Complaint for lack of personal jurisdiction.  See Defendant Pentair, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction at 1, filed May 13, 2015 (Doc. 15).  The Court granted Pentair, Inc.'s motion at its September 18, 2015, hearing.  See Sept. 18, 2015, Hearing Minutes at 1.

[10]Citing the Morris Aff., the MSJ asserts that The Black & Decker Corporation acquired the subsidiaries' "shares and outstanding stock . . . ." MSJ ¶ 3, at 3 (citing Morris Aff. ¶¶ 7-8, at 2).  In his Suppl. Brief, Lopez quotes the Purchase Agreement, which provides that The Black & Decker Corporation acquired "Intellectual Property" and "all of the outstanding shares of capital stock, membership interests and other ownership interests (the 'Equity Interests') held by [Pentair, Inc.] and its Affiliates in each of the Transferred Subsidiaries[.]" Suppl. Brief ¶ 12, at 4 (quoting Purchase Agreement at 1).  Lopez' characterization of the Purchase Agreement's terms does not controvert the MSJ's assertion that The Black & Decker Corporation acquired the subsidiaries' "shares and outstanding stock," MSJ ¶ 3, at 3; it simply adds that The Black & Decker Corporation also acquired "Intellectual Property"; and "membership interests and other ownership interests," which it collectively refers to as "Equity Interests," Suppl. Brief ¶ 12, at 4.  The Black & Decker Defendants' Suppl. Brief Response, in turn, does not dispute the language that Lopez quotes from the Purchase Agreement; it agrees that "The Black & Decker Corporation acquired all of the equity interests of [Pentair, Inc.] . . . and its affiliates in 'each of the Transferred Subsidiaries.'" Suppl. Brief Response at 2 (quoting Purchase Agreement at 1).  Accordingly, the Court deems undisputed the fact that The Black & Decker Corporation acquired "Intellectual Property" and all of Pentair, Inc.'s and its affiliates' "outstanding shares of capital stock, membership interests and other ownership interests (the 'Equity Interests')" in several "Transferred Subsidiaries[.]" Suppl. Brief ¶ 12, at 4 (quoting Purchase Agreement at 1).  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[11]The MSJ asserts, moreover, that, under the Purchase Agreement's terms, The Black & Decker Corporation did "not assume[] or otherwise become legally responsible for historic liabilities of Delta related to the design and manufacture of the Delta Unisaw Model 36-812 manufactured in 2001." MSJ ¶ 4, at 3 (citing Morris Aff. ¶ 10, at 2).  Lopez purports to dispute this assertion, arguing that The Black & Decker Corporation "assumed successor liability" for Delta's Unisaw Model 36-

legal entity" and, as of 2004, "as an indirect subsidiary of The Black & Decker Corporation." MSJ ¶ 3, at 3 (asserting this fact). See MSJ Response/Motion at 1-16 (not disputing this fact); Suppl. Brief at 1-8 (not disputing this fact).[12]

In the Purchase Agreement, The Black & Decker Corporation and its "Affiliates" agree to purchase from Pentair, Inc. and its "Affiliates designated on Schedule 1.1 (each a 'Seller'[)] . . . the Equity Interests" and "the U.S. Intellectual Property[.]" Suppl. Brief ¶ 13, at 4-5 (asserting this fact)(emphases omitted)(quoting Purchase Agreement ¶ 1.1, at 1). See Suppl. Brief Response at 1-5 (not disputing this fact). Schedule 1.1, in turn, lists Pentair Tools Group, Inc. (DE) -- Pentair, Inc.'s affiliate -- as the "Seller" of "Equity Interests" in Delta Intl., and Delta Acquisition Corp. -- The Black & Decker Corporation's affiliate -- as the "Purchaser" of those interests. Schedules to Purchase Agreement Between The Black & Decker Corporation and Pentair, Inc. (the "Agreement") at 2, filed July 12, 2016 (Doc. 90-2)("Schedules").[13] Schedule 3.1(c) specifies that Delta Intl. is a

---

812 "under the Transferred Liabilities provisions in the [Purchase] Agreement." Suppl. Brief at 8. Whether The Black & Decker Corporation is liable under the Purchase Agreement as a successor to Delta Intl., however, is a question of law which turns on choice-of-law and contract-interpretation principles. The Court reserves such legal determinations for its Analysis section.

[12]Lopez does not dispute that Delta Intl. exists as an indirect subsidiary, but argues that there is a genuine issue of fact whether The Black & Decker Corporation "[c]ontrol[s] [] Delta" and can thus be held liable under an "alter ego" theory. Suppl. Brief at 5 n.3 (citing Edgar v. Fred Jones Lincoln-Mercury, Etc., 524 F.2d 162, 166 (10th Cir. 1975); Cruttenden v. Mantura, 1982-NMSC-021, 640 P.2d 932). Lopez does not, however, identify which facts in the record create such a factual issue. The Court, accordingly, deems undisputed the fact that Delta Intl. exists as an indirect subsidiary of The Black & Decker Corporation. See Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ."). As with successor liability, the Court will address the legal question whether the undisputed facts support an alter-ego theory of liability in its Analysis section.

[13]Lopez attaches the Schedules to his Suppl. Brief, but does not specifically assert in his brief that Pentair Tools Group, Inc. (DE) is the "Seller" of "Equity Interests" in Delta Intl., or that Delta Acquisition Corp. is the "Purchaser" of those interests. Suppl. Brief at 1-8. Nevertheless, pursuant to rule 56(c)(3), the Court includes this contractual provision as an undisputed fact for purposes of

wholly owned subsidiary of Pentair Tools Group, Inc. (DE), and that Delta Intl. has 5,000 authorized shares and 1,000 outstanding shares of common stock or their "[e]quivalent." Schedule 3.1(c), at 4.[14] The Schedules, moreover, outline the intellectual property -- including trademark and patent rights -- which transfers with the Purchase Agreement. See Schedule 3.1(r), at 33-91.[15] Schedule 1.1 names The Black & Decker Corporation as the "Purchaser" of the "U.S. Trademark Rights" from "All Holders of U.S. Trademark Rights," and Black & Decker (U.S.), Inc. as the "Purchaser" of the "U.S. Patent Rights" from "All U.S. Holders of U.S. Patent Rights." Schedule 1.1, at 2.[16]

In its "Definitions" section, the Purchase Agreement states that "'Affiliate' shall have the meaning ascribed to such term in Rule 12b-2 of the Securities Exchange Act of 1934, as amended." Suppl. Brief ¶ 14, at 5 (asserting this fact)(emphasis omitted)(quoting Purchase Agreement ¶ 11.17, at 52).[17] Rule 12b-2, in turn, defines "Affiliate" as "a person that directly, or indirectly through one

---

deciding the MSJ. See Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

[14]Pursuant to rule 56(c)(3), the Court includes these contractual provisions, which are part of the record, as undisputed facts for purposes of deciding the MSJ. See Fed. R. Civ. P. 56(c)(3).

[15]Pursuant to rule 56(c)(3), the Court includes these contractual provisions, which are part of the record, as undisputed facts for purposes of deciding the MSJ. See Fed. R. Civ. P. 56(c)(3).

[16]Pursuant to rule 56(c)(3), the Court includes these contractual provisions, which are part of the record, as undisputed facts for purposes of deciding the MSJ. See Fed. R. Civ. P. 56(c)(3).

[17]In their Suppl. Brief Response, the Black & Decker Defendants argue that "the definition of affiliate" is not "important here," reasoning that "Delta is not . . . an 'affiliate within the meaning of the agreement, but rather a 'subsidiary.'" Suppl. Brief Response at 2 n.1. The assertion that the definition of "affiliate" is not "important" -- or material -- does not, however, create a genuine issue of fact. Walton v. N.M. State Land Office, 49 F. Supp. 3d 920, 924 n.2 (D.N.M. 2014)(Browning, J.)("Contending that a fact is not relevant is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record.")(citing D.N.M.LR-Civ. 56.1(b)), aff'd sub nom., Walton v. Powell, 821 F.3d 1204 (10th Cir. 2016). Materiality is a legal question and not a factual one. If necessary, the Court will later address materiality in its Analysis, but will deem the fact of the "Affiliate" definition undisputed for the Factual Background. O'Brien v. Mitchell, 883 F.

or more intermediaries, controls, or is controlled by, or is under common control with, the person specified." Suppl. Brief ¶ 15, at 5 (asserting this fact)(emphases and footnote omitted)(quoting 17 C.F.R. § 240.12b-2).[18]

The Purchase Agreement's "Purchase Price" is $775,000,000.00, subject to "[a]n increase equal to the amount, if any, by which the Net Asset Value as reflected on the Estimated Closing Statement is greater than the Agreed Base Equity," and "[a] decrease equal to the amount, if any, by which the Net Asset Value as reflected on the Estimated Closing Statement is less than the Agreed Base Equity." Purchase Agreement ¶ 2.1, at 1-2.[19] The Purchase Agreement provides that, five days before closing, Pentair, Inc. shall prepare a reasonable "estimate of the Net Asset Value to be reflected on the Closing Statement and the Purchase Price . . . ." Purchase Agreement ¶ 2.2, at 2.[20] Within forty-five days after closing, Pentair, Inc. shall prepare an "unaudited consolidated combined balance sheet of the Subsidiaries (the 'Closing Statement'), which shall set forth the Net Asset Value

Supp. 2d 1055, 1058 n.1 (D.N.M. 2012)(Browning, J.)(stating that the proper course is to determine relevance in the analysis section rather than in the factual background section).

[18]As discussed supra note 17, The Black & Decker Defendants purport to dispute this definition's "importan[ce]." Suppl. Brief Response at 2 n.1. Again, this assertion of unimportance - - or immateriality -- does not create a genuine issue of fact. See Walton v. N.M. State Land Office, 49 F. Supp. 3d at 924 n.2. If necessary, the Court will address the legal question of materiality in its Analysis, but will deem the fact of the "Affiliate" definition undisputed for the Factual Background. O'Brien v. Mitchell, 883 F. Supp. 2d at 1058 n.1.

[19]Pursuant to rule 56(c)(3), the Court includes this contractual provision, which is part of the record, as an undisputed fact for purposes of deciding the MSJ. See Fed. R. Civ. P. 56(c)(3).

[20]Lopez mentions, for the first time, the Purchase Agreement's provision concerning an "Estimated Closing Statement" in his Suppl. Brief Reply ¶ 7, at 5-6 (quoting Purchase Agreement ¶ 2.2, at 2). Lopez does not expressly refer to this provision as an "additional undisputed fact" which the Court should consider in deciding the MSJ. Nevertheless, pursuant to rule 56(c)(3), the Court includes the estimated-closing-statement provision -- which has been part of the record since Lopez submitted the Purchase Agreement with his Suppl. Brief -- as an undisputed fact for purposes of deciding the MSJ. See Fed. R. Civ. P. 56(c)(3).

as of the Closing Date . . . ."  Purchase Agreement ¶ 2.2, at 2.[21]

In the Purchase Agreement, The Black & Decker Corporation, as the "Buyer," makes certain "Representations and Warranties" to Pentair, Inc., the transferred subsidiaries' "Parent," including that it has "'Authority' to make the 'valid and binding agreements enforceable in accordance with their respective terms[.]'"  Suppl. Brief ¶ 16, at 5-6 (asserting this fact)(emphases omitted)(quoting Purchase Agreement ¶ 3.2, at 14).  See Suppl. Brief Response at 1-5 (not disputing this fact).  The Purchase Agreement provides that The Black & Decker Corporation shall "indemnify" Pentair, Inc. for "all Losses . . . resulting from [] the breach of the representations and warranties of [The Black & Decker Corporation] . . . ."  Suppl. Brief ¶ 18, at 6 (asserting this fact)(alterations added)(emphasis omitted)(quoting Purchase Agreement ¶ 8.2, at 41).  See Suppl. Brief Response at 1-5 (not disputing this fact).  Pentair, Inc. also makes certain "Representations and Warranties" to The Black & Decker Corporation.  Purchase Agreement ¶ 3.1, at 5-13.[22]  In the event of "Losses . . . resulting from [] any breach of any of the representations and warranties of [Pentair, Inc.] . . . or [] any Indemnified Liability," the Purchase Agreement provides that Pentair, Inc. shall indemnify The Black & Decker Corporation.  Purchase Agreement ¶ 8.1, at 39-40 (alterations added).[23]  In its "Definitions" section, the Purchase Agreement defines "Indemnified Liabilities" to include "all liabilities 'of the

---

[21]As with the Purchase Agreement's "Estimated Closing Statement" provision, discussed supra note 20, Lopez cites the "Closing Statement" provision for the first time in his Suppl. Brief Reply ¶ 7, at 6 (quoting Purchase Agreement ¶ 2.2, at 2).  Likewise, Lopez does not label this provision an "additional undisputed fact."  Under rule 56(c)(3), however, the Court will consider the Purchase Agreement's closing-statement provision as undisputed "other material[] in the record" for purposes of deciding the MSJ.  Fed. R. Civ. P. 56(c)(3).

[22]Pursuant to rule 56(c)(3), the Court includes this contractual provision, which is part of the record, as an undisputed fact for purposes of deciding the MSJ.  See Fed. R. Civ. P. 56(c)(3).

[23]Pursuant to rule 56(c)(3), the Court includes this contractual provision, which is part of the record, as an undisputed fact for purposes of deciding the MSJ.  See Fed. R. Civ. P. 56(c)(3).

Subsidiaries' other than 'Transferred Liabilities.'"  Suppl. Brief Response at 3 (asserting this fact)(quoting Purchase Agreement ¶ 11.17, at 56).  See Plaintiff's Reply in Support of His Supplemental Brief in Support of His Rule 56(f) Motion in Opposition to the Black & Decker Defendants' Motion for Summary Judgment (Doc. 48), or Alternative Motion to Extend Time to File Response (Doc. 54) at 1-12, filed August 12, 2016 (Doc. 95)("Suppl. Brief Reply")(not disputing this fact).

The Purchase Agreement defines "Transferred Liabilities" to include, among other things, any "liabilities and obligations of the Subsidiaries arising out of bodily injury, death or other damage relating to products manufactured prior to the Closing, including all Third Party Claims relating to such bodily injury, death and other damage, whether or not such Third Party Claims are successful . . . ." Suppl. Brief ¶ 19, at 6-7 (asserting this fact)(emphases omitted)(quoting Purchase Agreement ¶ 11.17, at 60-61).  See Suppl. Brief Response at 1-5 (not disputing this fact).  The "Subsidiaries" whose liabilities transfer with the Purchase Agreement include "any corporation or entity engaged in the Business of which securities or other ownership interests having ordinary voting power to elect a majority of directors or other persons performing similar functions are directly or indirectly owned by [Pentair, Inc.] . . . ."  Suppl. Brief ¶ 21, at 7 (asserting this fact)(alteration added)(emphases omitted)(quoting Purchase Agreement ¶ 11.17, at 59).  See Suppl. Brief Response at 1-5 (not disputing this fact).  With respect to these subsidiaries' businesses, the Purchase Agreement provides that The Black & Decker Corporation "will be able to continue to conduct the Business after Closing in the manner in which the Business has been conducted by the Subsidiaries."  Purchase Agreement ¶ 3.1, at 9-10.[24]

_____

[24]In his Suppl. Brief Reply, Lopez asserts, for the first time, that the Purchase Agreement states that The Black & Decker Corporation "'will be able to continue to conduct the Business after Closing in the manner in which the Business has been conducted by the Subsidiaries.'"  Suppl. Brief

The Purchase Agreement provides that its provisions "shall be construed and interpreted according to the internal laws of the State of Delaware, excluding any choice of law rules that may direct the application of the laws of another jurisdiction." Purchase Agreement ¶ 11.4, at 49.[25]

In March 2010, "The Black & Decker Corporation merged with a wholly owned subsidiary of The Stanley Works and The Black & Decker Corporation became a wholly owned subsidiary of The Stanley Works." MSJ ¶ 5, at 3 (asserting this fact).  See MSJ Response/Motion at 1-16 (not disputing this fact); Suppl. Brief at 1-8 (not disputing this fact).  "The Stanley Works changed its name to Stanley Black & Decker, Inc. on March 12, 2010." MSJ ¶ 5, at 3 (asserting this fact).  See MSJ Response/Motion at 1-16 (not disputing this fact); Suppl. Brief at 1-8 (not disputing this fact).[26] "Stanley Black & Decker, Inc. does not design, manufacture or sell Delta Unisaws, it was not [in] existence in 2001, and it did not design, manufacture, or sell the subject Delta Unisaw Model 36-812, which was manufactured in 2001." MSJ ¶ 9, at 4 (asserting this fact).  See MSJ Response/Motion at 1-16 (not disputing this fact); Suppl. Brief at 1-8 (not disputing this fact).

Reply ¶ 9, at 8 (quoting Purchase Agreement ¶ 3.1, at 9-10).  Although Lopez does not stylize this provision as an additional undisputed fact, the Court nevertheless considers it as undisputed "other material[] in the record" pursuant to rule 56(c)(3).

[25]The MSJ and the Response discuss choice-of-law principles, but neither brief mentions the Purchase Agreement's choice-of-law provision.  See MSJ at 5-7 (arguing that Texas law applies); Response at 6-13 (arguing that Texas law does not apply).  Moreover, neither the Suppl. Brief nor the Suppl. Brief Response proffer the choice-of-law provision as an additional undisputed material fact, as local rule 56.1(b) allows.  See Suppl. Brief at 1-8; Suppl. Brief Response at 1-5.  Lopez, for the first time, mentions the choice-of-law provision in his Suppl. Brief Reply ¶ 10, at 8-9.  Nevertheless, because the Purchase Agreement has been in the record since Lopez attached it to his Suppl. Brief, the Court will treat the choice-of-law provision as undisputed "other material[] in the record" under rule 56(c)(3).

[26]The MSJ further asserts that "Stanley Black & Decker, Inc. has not assumed or otherwise become legally responsible for historic liabilities of Delta related to the design and manufacture of the Delta Unisaw Model 36-812 manufactured in 2001." MSJ ¶ 6, at 3.  As discussed supra note 11, however, the successor-liability issue is a question of law which the Court reserves for its Analysis section.

"Black & Decker (U.S.) Inc. has no corporate relationship with Delta other than that, as of October of 2004, both of these separate and distinct entities are both subsidiaries of The Black & Decker Corporation."  MSJ ¶ 7, at 3 (asserting this fact).  See MSJ Response/Motion at 1-16 (not disputing this fact); Suppl. Brief at 1-8 (not disputing this fact).[27]  "Black & Decker (U.S.) Inc. did not design, manufacture or sell Delta Unisaws at any time prior to October of 2004 and it did not design, manufacture, or sell the subject Delta Unisaw Model 36-812, which was manufactured in 2001."  MSJ ¶ 10, at 4 (asserting this fact).  See MSJ Response/Motion at 1-16 (not disputing this fact); Suppl. Brief at 1-8 (not disputing this fact).

**PROCEDURAL BACKGROUND**

Lopez commenced this action in the Third Judicial District Court, Dona Ana County, State of New Mexico on January 13, 2015.  See Complaint at 1.  In his original Complaint, Lopez named seven Defendants, along with a variety of related entities, whom he believed were responsible for his injury.  See Complaint ¶¶ 3-9, at 2-6.  The original Complaint appeared to assert two claims: (i) strict products liability, see Complaint ¶ 14, at 7-8; and (ii) negligence, including one or more of sixteen alternative theories,[28] see Complaint ¶ 23, at 9-10.  Lopez sought compensatory damages for medical

---

[27]The MSJ asserts, moreover, that "Black & Decker (U.S.) Inc. has not assumed or otherwise become legally responsible for historic liabilities of Delta related to the design and manufacture of the subject Delta Unisaw Model 36-812, which was manufactured in 2001."  MSJ ¶ 8, at 3.  Again, whether Black & Decker (U.S.), Inc. has successor liability is a legal question which the Court will resolve in its Analysis section.

[28]Lopez asserts the following sixteen theories:

1.  Failing to instruct in the safe use of the table saw.
2.  Failing to provide guards and safety devices to prevent injury.
3.  Failing to warn of the danger of using the table saw.
4.  Representing the table saw was safe when it was not.
5.  Negligent design of the table saw.
6.  Negligent manufacturing of the table saw.
7.  Failure to recall the product.

care, lost wages, inability to perform household duties, and pain and suffering.  See Complaint ¶¶ 24-26, at 10.  Lopez also requested punitive damages based on the Defendants' alleged "reckless, willful, fraudulent, wanton or in bad faith conduct."  Complaint ¶ 27, at 10-11.  On March 5, 2015, the Black & Decker Defendants removed the case to federal district court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.  See Notice of Removal at 1, filed March 5, 2015 (Doc. 1).

On September 18, 2015, the Court dismissed from the case all Defendants -- except for the two Black & Decker Defendants -- for lack of personal jurisdiction.  See Sept. 18, 2015, Hearing Minutes at 1.  On December 23, 2015, Lopez moved to file an Amended Complaint asserting claims against only the Black & Decker Defendants, see Motion to Amend at 1, and, on January 8, 2016, the Court granted the motion, see Amendment Order at 1.  The Amended Complaint asserts the same two claims as the original Complaint: (i) negligence, including sixteen alternative theories; and (ii)

---

8.  Advertising and representing the product was safe when it was not.
9.  Failure to use due care in testing and inspecting the table saw.
10. Failure to warn Plaintiff of the risks associated with operating the table saw.
11. Failure to advise potential buyers and users of the hazards involved in the operation of the table saw.
12. Failure to supply safety equipment or devices to assure the product would operate safely.
13. Failure to keep reasonably informed and advised of available public and private reports, complaints, studies, statistics and other information concerning the type, nature and frequency of injury whole [sic] using the table saw and the number, nature and severity of injuries and [sic] resulting from the same.
14. If defendants claim to have such knowledge and information aforesaid, then the failure to act as a reasonably prudent manufacturer would act when so informed, to so design, market manufacture and use such product which would eliminate or reduce the frequency or severity of such accidents and collisions and the injuries resulting from the same.
15. Failure to discover the problems of using the product before supplying it to Plaintiff.
16. Other negligence.

Complaint ¶ 23, at 9-10.

strict products liability.[29]  See Amended Complaint ¶ 6, at 2-3.  The Amended Complaint also seeks the same compensatory and punitive remedies as the original Complaint.  See Amended Complaint ¶¶ 7-11, at 3-4.

### 1.    The MSJ.

On December 29, 2015, the Black & Decker Defendants moved for summary judgment.  See MSJ at 1.  The Black & Decker Defendants' central thesis is that "they did not design, manufacture, market, or sell the subject table saw," and that "they are not subject to successor liability for any acts or omissions on the part of their predecessor under the law applicable to this case."  MSJ at 1-2.  After reviewing the undisputed facts and the legal standard for a summary judgment motion, see MSJ at 2-4, the Black & Decker Defendants advance two primary arguments: (i) that they did not supply the subject table saw; and (ii) that they are not subject to successor liability, see MSJ at 4-7.

First, the Black & Decker Defendants argue that, under New Mexico law, a products liability claim requires a showing "that the defendant actually supplied the product alleged to have caused the plaintiff's injury."  MSJ at 4 (citing, among others, Trujillo v. Berry, 1987-NMCA-072, ¶ 8, 738 P.2d 1331).  Thus, they argue, Lopez must establish that they: "(1) designed the product in question, (2) manufactured the product in question, (3) marketed the product in question, (4) sold or leased the product in question, or (5) owed Plaintiff a legal duty."  MSJ at 5 (citing Pacific Indem. Co. v. Therm-O-Disc, Inc., 476 F. Supp. 2d 1216, 1223-24 (D.N.M. 2006)(Hansen, J.)).  They assert that, here, they "did not design, manufacture, market or sell the subject table saw at issue in this lawsuit."

---

[29]In a section entitled "Facts," the original Complaint alleged that the "Defendants are strictly liable."  Complaint ¶ 14, at 7-8.  Later, the original Complaint alleged sixteen alternative theories of negligence under the heading "Negligence of Defendants."  Complaint ¶ 23, at 9-10.  The Amended Complaint, by contrast, groups these two claims under the heading "Count 1- Product Liability of the Black & Decker Defendants."  Amended Complaint at 2.  The Amended Complaint also switches the order of these claims, alleging negligence first, see Amended Complaint ¶ 6, at 2-3, and then strict liability, see Amended Complaint ¶ 6, at 3.

MSJ at 5 (citing MSJ ¶ 1, at 2; id. ¶¶ 9-10, at 4).  As a result, they conclude, "the Black & Decker Defendants cannot be held liable to Plaintiff under any theory."  MSJ at 5.

Second, the Black & Decker Defendants contend that, because the events giving rise to this litigation occurred in Texas, "Texas law applies to determining the question of successor liability . . . ."  MSJ at 5 (citing Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 749 F. Supp. 2d 1235, 1258 (D.N.M. 2010)(Browning, J.)).  They stress that Texas "'strongly embraces the non-liability rule' for corporate successors," MSJ at 6 (citing E-Quest Mgmt., LLC v. Shaw, 433 S.W.3d 18, 23 (Tex. App. 2013); Lockheed Martin Corp. v. Gordon, 16 S.W.3d 127, 139 (Tex. App. 2000)), and argue that a successor corporation "incurs no liability of the predecessor unless the successor expressly assumes that liability," MSJ at 6 (emphasis omitted)(citing Tex. Bus. Orgs. Code. Ann. § 10.254 (Vernon Supp. 2012); Lockheed Martin Corp. v. Gordon, 16 S.W.3d at 135).  They contend that the only other circumstance in which a successor corporation incurs the predecessor's liabilities is when "the acquisition results from a fraudulent conveyance to escape liability for the debts or liabilities of the predecessor."  MSJ at 6 (citing United States v. Americus Mortg. Corp., 2013 U.S. Dist. LEXIS 132150, at *4 (S.D. Tex. 2013)(Hanks, M.J.)).

Turning to this case's facts, the Black & Decker Defendants aver that they "did not expressly assume any of Delta's liabilities in connection with the subject table saw."  MSJ at 7 (citing MSJ ¶¶ 4, 6, & 8, at 3).  Further, they argue, "The Black & Decker Corporation acquired Delta nearly eight years *before* the events giving rise to this lawsuit."  MSJ at 7 (emphasis in original)(citing MSJ ¶ 3, at 3; Complaint ¶ 13, at 7).  They conclude that "there is no basis on which Plaintiff could argue that the Black & Decker Defendants fraudulently acquired Delta's assets to avoid liability for the injuries alleged . . . that were caused by a table saw designed, manufactured, and sold by Delta."  MSJ at 7.

###### 2.    The MSJ Response/Motion.

Lopez responded to the MSJ on January 15, 2016.  See MSJ Response/Motion at 1.  Rather than engage the MSJ's merits, Lopez makes two alternative requests.  First, Lopez requests that the Court, pursuant to rule 56(d) of the Federal Rules of Civil Procedure,[30] deny the MSJ without prejudice to refiling after discovery concludes.[31]  See MSJ Response/Motion at 5-13.  Second, in the alternative, Lopez requests that the Court, pursuant to rule 6(b)(1)(A) of the Federal Rules of Civil Procedure, grant him a two-week extension of time to draft a brief in opposition to the MSJ's merits.  See MSJ Response/Motion at 13-15.  The Court will review these two requests in turn.

###### a.    Lopez' Rule 56(d) Motion.

Lopez notes that, under rule 56(d), a court may deny a summary judgment motion "[i]f a party opposing the motion . . . shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition[.]"  MSJ Response/Motion at 5 (quoting Fed. R. Civ. P. 56(d)).  Lopez contends that "[d]iscovery is strongly favored and generally 'denying the right to have full discovery on all pertinent issues before a summary judgment is granted would be error, particularly in the face of a Rule 56(d) affidavit.'"  MSJ Response/Motion at 5 (quoting Miller v. United States, 710 F.2d 656, 666 (10th Cir. 1983)).  Lopez argues that, here, he "has not yet had a meaningful opportunity to conduct discovery on issues relevant to the grounds asserted in the Black & Decker

---

[30]Lopez purports to move "[p]ursuant to Rule 56(f)."  MSJ Response/Motion at 1.  Rule 56(f), which concerns "Judgment Independent of the Motion," Fed. R. Civ. P. 56(f), is inapposite.  Presumably, Lopez intends to cite rule 56(d), which concerns "When Facts are Unavailable to the Nonmovant."  Fed. R. Civ. P. 56(d).  Indeed, Lopez quotes rule 56(d)'s language while citing rule 56(f).  See, e.g., MSJ Response/Motion at 5.  Accordingly, the Court will construe Lopez' references to "rule 56(f)" as references to rule 56(d).  Within the quoted text, the Court will alter Lopez' references to "rule 56(f)" to reflect this construction.

[31]At the time Lopez filed his MSJ Response/Motion, the Court had set the discovery deadline for May 23, 2016.  See Scheduling Order at 1, filed December 10, 2015 (Doc. 41).

Defendants' motion," including deposing the "Defendants' Rule 30(b)(6) witness(es), as well as meaningful discovery of the relevant documents relating to whether the Black & Decker Defendants placed the subject table saw into the stream of commerce and/or whether the Black & Decker Defendants may have potential successor liability . . . ." MSJ Response/Motion at 6 (citing Affidavit of Joseph G. Isaac in Support of Plaintiff's Rule 56(f) Motion in Opposition to Defendants Black & Decker (U.S.) Inc. and Stanley Black & Decker, Inc.'s Motion for Summary Judgment (Doc. 48) or Alternative Motion to Extend Time to File Response (executed January 15, 2016) at 1-2, filed January 15, 2016 (Doc. 53-1)("Isaac Aff.")).

Lopez then responds to the MSJ's contention that Texas law governs the successor-liability issue. See MSJ Response/Motion at 6. Lopez avers that "successor liability does not involve the underlying facts that give rise to a defendant's potential liability for a defective product, but instead addresses matters of corporate liability related to, but separate and apart from the underlying facts, as several New Mexico courts have indicated in related issues." MSJ Response/Motion at 6. Lopez notes, as an example, that, in Billingsley v. JEA Co., Inc., 1992-NMCA-058, 836 P.2d 87, the Court of Appeals of New Mexico applied Arizona law to a workers' compensation claim stemming from an Arizona truck driver's injury at a truck stop in Gallup, New Mexico. See MSJ Response/Motion at 6 (citing Billingsley v. JEA Co., Inc., 1992-NMCA-058, ¶ 2, 836 P.2d at 89). Lopez notes that, despite that the injury occurred in New Mexico, the Court of Appeals of New Mexico applied "Arizona law, . . . because Arizona had the greater interest in the related but separate issue of whether the injured worker's claim was limited or modified under the relevant worker's compensation laws." MSJ Response/Motion at 6 (citing Billingsley v. JEA Co., Inc., 1992-NMCA-058, ¶ 11, 836 P.2d at 90). Lopez avers that this approach accords with that of other states which, "like New Mexico, generally apply the *lex loci delicti* choice-of-law rule as to torts, [but] have

similarly recognized that questions arising under a legal issue related to, but separate and apart from, the underlying facts of a claim, may warrant a different choice-of-law rule." MSJ Response/Motion at 7 (alteration added)(citing Shaw v. Lyton Constr. Co., Inc., 872 P.2d 1059, 1063-64 (Utah Ct. App. 1994); Braxton v. Anco Elec., Inc., 409 S.E.2d 914, 915-16 (N.C. 1991); Hauch v. Connor, 453 A.2d 1207, 1210 (Md. 1983)).

According to Lopez, "the issue of a corporation's potential successor liability in a products liability claim is a 'hybrid' question that 'present[s] unique policy questions since the process is neither tort nor contract' but a hybrid of contract and corporate law." MSJ Response/Motion at 9. Lopez asserts that "[t]his issue has particular significance in [this] case since many jurisdictions, including New Mexico, appear to have adopted broader rules to protect its citizens from injury due to defective products than has Texas." MSJ Response/Motion at 9. See id. at 9-10 (collecting New Mexico court cases which, Lopez reasons, demonstrate that New Mexico courts are more protective of citizens than are Texas courts). As an example, Lopez notes that Pennsylvania courts use the "product line" exception to impose tort liability on successor corporations. MSJ Response/Motion at 10 (citing Dawejko v. Jorgensen Steel Co., 434 A.2d 106, 107-12 (Pa. Super. 1981)). Lopez asserts that, under this exception, "a successor corporation may acquire liability when (1) the purchase expressly or impliedly agrees to assume obligations, (2) the transaction amounts to a consolidation or merger, (3) the transaction is merely a 'continuation' of the former business, or (4) the transaction is fraudulently entered into to escape liability." MSJ Response/Motion at 10 (quoting Dawejko v. Jorgensen Steel Co., 434 A.2d at 107). Lopez adds that the product-line exception is "fact-specific and based on principles of equity[.]" MSJ Response/Motion at 11.

Here, Lopez argues, "the *lex loci delicti* choice-of-law rule [may] point[] to Texas law to determine the underlying question of whether the unguarded table power saw in question was

defective as marketed, designed, and/or manufactured[.]"  MSJ Response/Motion at 12.  Lopez

reasons, however, that "the related but separate issue of a corporation's potential successor liability

should not be controlled by *lex loci delicti* but by other more relevant policy considerations in order

to more fully implement 'the social policies underlying strict product liability[.]'"  MSJ

Response/Motion at 12.  Lopez posits that this case's facts warrant application of the product-line

exception, which "focus[es] on corporate *activity* and equitable principles rather than corporate

form."  MSJ Response/Motion at 13 (emphasis in original).  Lopez stresses that, "at a minimum,

whether the Black & Decker Defendants may have potential successor liability . . . is an issue of fact

that should further be developed in discovery of the case."  MSJ Response/Motion at 13.  Lopez thus

requests that the Court deny the MSJ without prejudice to refiling after discovery concludes.  See

MSJ Response/Motion at 13.

> ### b.    Lopez' Alternative Rule 6(b) Motion.

In the alternative, Lopez requests that the Court grant him a two-week extension of time to

respond to the MSJ's merits.  See MSJ Response/Motion at 13.  Lopez notes that rule 56(d) "permits

a court to 'issue any other just order' when a party submits a Rule 56([d]) motion and affidavit in

response to a motion for summary judgment."  MSJ Response/Motion at 13.  Lopez notes that rule

6(b)(1)(A), in turn, allows a court, "for good cause, [to] extend the time for when an act may or must

be done within a specified time 'with or without motion or notice if the court acts, or if a request is

made, before the original time or its extension expires . . . .'"  MSJ Response/Motion at 14-15.

Lopez notes that rule 6(b)(1)(B) "permits an extension of time . . . upon a further showing of

excusable neglect."  MSJ Response/Motion at 15 (citing Fed. R. Civ. P. 6(b)(1)).  Lopez asserts that

these "are equitable standards that require[] a court to consider all relevant circumstances, and may

be found where the relevant circumstances reveal inadvertent delays, mistakes, or carelessness, so

long as a movant shows good faith and a reasonable basis for noncompliance." MSJ Response/Motion at 15 (citing In re Paine-Webber LP's Litig., 147 F.3d 132, 135 (2d Cir. 1998); Bennett v. City of Holyoke, 362 F.3d 1, 5 (1st Cir. 2004)).

Here, Lopez notes, the Black & Decker Defendants filed their MSJ on December 29, 2015, "in the middle of the traditional holiday season," and, a few days earlier, Lopez' "lead counsel . . . announced his intention to leave the law firm" representing Lopez. MSJ Response/Motion at 13-14 (citing Isaac Aff. at 2). Lopez therefore contends that he "would be unfairly prejudiced in having to both invoke [his] rights under Rule 56([d]) and be required to draft a full-blown response on the merits to the Black & Decker Defendants' motion for summary judgment based only on partial discovery completed to date." MSJ Response/Motion at 14. Lopez posits that the Black & Decker Defendants' only reason to "force Plaintiff to incur the time and expense to develop a response to their motion . . . on the merits based on partial discovery completed" is to "seek an improper 'tactical' advantage by requiring Plaintiff to devote time and resources to respond," thus "tak[ing] time away from Plaintiff's efforts to complete the deposition of Defendant's Rule 30(b)(6) witness(es) and take other measures needed to undertake and to complete other discovery as needed in this case within the discovery termination date of May 23, 2016." MSJ Response/Motion at 15. For these reasons, Lopez requests that the Court grant him a two-week extension of time to draft a response to the MSJ's merits. See MSJ Response/Motion at 15.

### 3. The MSJ Reply.

The Black & Decker Defendants replied to the MSJ Response/Motion on January 29, 2016. See Defendants Black & Decker (U.S.) Inc. and Stanley Black & Decker, Inc.'s Reply in Support of their Motion for Summary Judgment at 1, filed January 29, 2016 (Doc. 58)("MSJ Reply"). The Black & Decker Defendants note that Lopez does not dispute the MSJ's proffer of undisputed facts;

rather, they contend, Lopez "argues that he has not had an opportunity to conduct discovery and he asks the Court to deny the [MSJ] on that basis." MSJ Reply at 1 (citing MSJ Response/Motion at 5-6). According to the Black & Decker Defendants, Lopez "fails to tell the Court what supporting facts he believes are essential to his opposition and what specific reasons prevent him from presenting those facts to the Court as required by Fed. R. Civ. P. 56(d)." MSJ Reply at 1-2 (citing MSJ Response/Motion at 5-6). Lopez' inability to identify any supporting facts, the Black & Decker Defendants posit, is "due to the absence of any such facts, as established by the straightforward record that supports the [MSJ]." MSJ Reply at 2. They assert that "[n]o amount of discovery can change" this record. MSJ Reply at 2.

The Black & Decker Defendants advance three primary arguments. First, they contend that Lopez fails to establish a genuine dispute as to a material fact. See MSJ Reply at 2-3. They argue that, under rule 56(c)(1), a "party opposing summary judgment must make an affirmative showing through specific evidentiary facts that a material fact issue is in dispute." MSJ Reply at 2 (citing Fed. R. Civ. P. 56(c)(1)). Here, they assert, Lopez "fails to cite any materials in the record to dispute the fact that the Black & Decker Defendants did not design, manufacture, market or supply the subject table saw at issue in this lawsuit." MSJ Reply at 3. They note that Lopez, instead, contends that he needs additional time to "conduct discovery on issues relevant to the grounds asserted" in the MSJ. MSJ Reply at 3 (citing MSJ Response/Motion at 6). They further note that Lopez "merely states his unsubstantiated belief that 'the evidence obtained in discovery will create material facts to demonstrate that the Black & Decker Defendants may be potentially liable . . . .'" MSJ Reply at 3 (quoting Isaac Aff. at 2). According to the Black & Decker Defendants, Lopez "essentially restat[es] the allegations and legal standard set forth in his Complaint." MSJ Reply at 3 (citing Complaint ¶ 14, at 7-8). They contend that "'it is not enough for the party opposing a properly supported motion

for summary judgment to rest on mere allegations or denials of his or her pleadings.'" MSJ Reply at 3 (brackets omitted)(quoting Wells Fargo Bank v. Se. N.M. Affordable Hous. Corp., 877 F. Supp. 2d 1115, 1131 (D.N.M. 2012)(Browning, J.)).

Second, the Black & Decker Defendants argue that Lopez fails to establish a basis for relief under rule 56(d). See MSJ Reply at 3-10. They stress that rule 56(d) permits a court to defer its decision on a summary judgment motion "if the party opposing the motion 'shows by affidavit or declaration that, *for specified reasons*, it cannot present *facts essential to justify its opposition*.'" MSJ Reply at 4 (emphasis in original)(brackets omitted)(quoting Fed. R. Civ. P. 56(d)). However here, they argue, Lopez "does not identify the probable facts he expects to obtain in discovery but which are now unavailable to him, nor does he explain what steps he has taken to obtain these facts." MSJ Reply at 4 (citing Garcia v. U.S. Air Force, 533 F.3d 1170, 1179 (10th Cir. 2008)). Indeed, they contend, Lopez "has in fact had ample opportunity in this case to discover facts material to the [MSJ.]" MSJ Reply at 4. See id. at 4-5 (noting that Lopez served twenty-one interrogatories and seventy-one requests for production, and that the Black & Decker Defendants already responded). As to Lopez' assertion that he needs time to depose rule 30(b)(6) witnesses, see MSJ Response/Motion at 4-6, the Black & Decker Defendants state that Lopez has not asked them to identify any such witnesses, nor has he "served notice of a 30(b)(6) deposition stating with reasonable particularity the matters for examination as required by the Federal Rules of Civil Procedure," MSJ Reply at 5-6 (citing Fed. R. Civ. P. 30(b)(6)). In short, they contend that Lopez "has had ample time to attempt through discovery to generate some basis for keeping the Black & Decker Defendants harnessed to this litigation." MSJ Reply at 6. They assert that it is "unfair" for Lopez to "wait[] for a very predictable dispositive motion and [] respond[] by essentially saying 'maybe something will turn up in discovery.'" MSJ Reply at 6 (alterations added).

The Black & Decker Defendants contend, moreover, that the Court should deny Lopez' rule 56(d) request, because Lopez "has not established how any specific evidence he seeks will create a material issue of fact . . . ." MSJ Reply at 7. They stress that rule 56(d)'s "provision for discovery of facts 'essential to justify' opposition to summary judgment extends only to evidence that is *material* to the motion." MSJ Reply at 7 (emphasis in original)(citing 11 J. Moore et al., Moore's Federal Practice § 56.102[3] (3d ed. 2015); Bldg. & Constr. Dep't v. Rockwell Int'l Corp., 7 F.3d 1487, 1496 (10th Cir. 1993)). Here, they argue, the Isaac Aff., upon which Lopez' rule 56(d) motion rests, "does not contain a statement of how the evidence sought . . . will create material issues of fact as to the matters raised in the [MSJ.]" MSJ Reply at 8 (citing Isaac Aff. at 1). They note that Lopez does not argue that "if he were able to discover specific additional facts he would be able to prove the contrary of the Black & Decker Defendants' showing, i.e., that the[y] . . . did in fact design, manufacture, market, or supply the subject table saw at issue in this case." MSJ Reply at 8. Rather, they argue, Lopez' "Rule 56(d) affidavit only sets forth vague assertions that additional discovery will produce needed, but unspecified facts." MSJ Reply at 8 (citing Isaac Aff. at 2). They argue that such vague assertions do not demonstrate that further discovery would establish a genuine issue of material fact. See MSJ Reply at 8-9.

Finally regarding Lopez' rule 56(d) motion, the Black & Decker Defendants note that Lopez "indicates an intention to pursue further discovery in order to learn about the 'potential liability of . . . . *other parties*[.]" MSJ Reply at 9 (emphasis in original)(citing Isaac Aff. at 1). In their view, rule 56(d) does not "permit[] a plaintiff to hold an improperly named defendant captive in order to seek discovery about other potentially liable defendants." MSJ Reply at 9. They assert that "[s]uch an interpretation of Rule 56(d) would contravene both basic fairness and federal caselaw." MSJ Reply at 9 (citing Reflectone, Inc. v. Farrand Optical Co., 862 F.2d 841, 843 (11th Cir. 1989)). Indeed,

they aver, "courts routinely deny requests where . . . a party seeks to use Rule 56(d) as a platform to learn the identity of other potential defendants, without carrying his or her burden to establish how the discovery sought would create a genuine issue of material fact . . . ."  MSJ Reply at 9 (citing, among others, Free v. City of Seattle, 177 F. App'x 650, 651-52 (9th Cir. 2006)).

Third, the Black & Decker Defendants contend that Lopez' legal argument about applicable choice-of-law principles does not create a genuine issue of fact.  See MSJ Reply at 10.  Regardless, they argue that Texas law applies to the successor-liability issue.  See MSJ Reply at 11.  They reason that the Complaint "sounds in tort, the injury occurred in Texas, and New Mexico courts apply the doctrine of *lex loci delicti commissi* . . . ."  MSJ Reply at 11 (citing MSJ at 5).  Here, they argue, the undisputed facts demonstrate that "neither exception to the general rule of corporate successor non-liability under Texas law" -- i.e., when a successor corporation expressly assumes liabilities, or in cases of fraud -- applies.  MSJ Reply at 11 (citing MSJ at 7).  As to Lopez' assertion that successor liability is a "hybrid" issue, they argue that Lopez cites no legal authority describing such liability as a "'hybrid question' for purposes of choice-of-law analysis or stating what different choice-of-law rule applies."  MSJ Reply at 11 (citing MSJ Response/Motion at 9).  They contend that, similarly, Lopez cites no "authority from New Mexico, the District of New Mexico, or the Tenth Circuit to show that New Mexico courts would not apply the doctrine of *lex loci delicti* to determine the conflict-of-law question of successor corporate liability in this case."  MSJ Reply at 12.  Further, they argue, Lopez "filed a workers' compensation claim in Texas in connection with his workplace injury in Texas," meaning that, "even under Plaintiff's own analysis . . . , Texas law should apply to the conflict-of-laws issue [] because Plaintiff was employed in Texas, he was covered under the Texas workers' compensation statute, and he filed his workers' compensation claim in Texas."  MSJ Reply at 13 (citing Shaw v. Lyton Constr. Co., Inc., 872 P.2d at 1063-64).  They conclude that,

"[n]otwithstanding Plaintiff's purely legal argument concerning the choice-of-law rules applicable to this case . . . , Plaintiff sets forth no factual issues over which there is a genuine dispute."  MSJ Reply at 13 (citing MSJ Response/Motion at 6-12).

      **4.**        **The Rule 6(b) Motion Response.**

      On January 29, 2016, simultaneously with their MSJ Reply, the Black & Decker Defendants also filed a separate brief responding to Lopez' rule 6(b) motion.  See Defendants Black & Decker (U.S.) Inc. and Stanley Black & Decker, Inc.'s Response in Opposition to Plaintiff's Motion to Extend Time to File Response at 1, filed January 29, 2016 (Doc. 59)("Rule 6(b) Motion Response").  The Black & Decker Defendants argue that Lopez fails to show good cause for an extension of time to respond to the MSJ, as rule 6(b) requires.  See Rule 6(b) Motion Response at 2.  First, they assert that, although they filed the MSJ during the holiday season, Lopez "fails to explain why he could not fully respond to the . . . [MSJ] within the standard period of time allowed by the Local Rules for the District of New Mexico."  Rule 6(b) Motion Response at 2 (citing D.N.M.LR-Civ. 7.4).  Second, they aver that, although Lopez' counsel apparently "announced his intention" to leave his firm, he is "still listed as counsel of record for Plaintiff" and has "not filed a motion to withdraw as Plaintiff's counsel from this case."  Rule 6(b) Motion Response at 3 (citing D.N.M.LR-Civ. 83.8).  Regardless, they argue, Lopez has had other counsel of record since the Black & Decker Defendants removed the case to federal district court in early 2015.  See Rule 6(b) Motion Response at 3.  They contend that either of Lopez' counsel of record capably can draft a timely response to the MSJ.  See Rule 6(b) Motion Response at 3.  Third, they assert that, while Lopez is correct that drafting a response to the MSJ's merits would be burdensome, he "fails to demonstrate why his compliance with the ordinary and straightforward procedures set forth in Rule 56 . . . for responding to a motion for summary judgment creates an *unfair prejudice* in this case."  Rule 6(b) Motion Response at 4 (emphasis in

original)(citing <u>Progressive Nw. Ins. Co. v. Weed Warrior Servs.</u>, 2008 U.S. Dist. LEXIS 125085, at *1 (D.N.M. 2008)(Hererra, J.)).

The Black & Decker Defendants then turn to rule 56's "specific requirements for stating and responding to a motion for summary judgment." Rule 6(b) Motion Response at 4. They note that, while the MSJ sets forth eleven undisputed material facts, Lopez "failed to cite any particular parts of the record to establish a genuine dispute as to any of those facts, or show that the materials relied upon by the Black & Decker Defendants do not actually establish the absence of any genuine dispute of fact," as rule 56 requires. Rule 6(b) Motion Response at 5-6. Further, they note, although rule 56 anticipates that a party may not yet have facts available to respond to a summary judgment motion, Lopez fails to "present any probable facts essential to [his] opposition to the [MSJ] . . . , nor does [he] specify the reasons why such facts are unavailable to [him]," as rule 56(d) requires. Rule 6(b) Motion Response at 5 (citing <u>Garcia v. U.S. Air Force</u>, 533 F.3d at 1179). Finally, they contend, rule 56 does not "relieve[] a party from addressing the assertions of fact presented by another party." Rule 6(b) Motion Response at 5. Thus, they conclude, Lopez' "claim that he is 'unfairly prejudiced' by being expected to follow the procedures set forth in the Federal Rules of Civil Procedure for every party who responds to a motion for summary judgment is legally and factually unsupported." Rule 6(b) Motion Response at 6.

Next, the Black & Decker Defendants argue that an extension of time for Lopez to respond to the MSJ is unnecessary. <u>See</u> Rule 6(b) Motion Response at 6. They reiterate that Lopez already served written discovery requests along with his original Complaint and note that they responded to Lopez' written discovery in November 2015. <u>See</u> Rule 6(b) Motion Response at 6-7. They note, moreover, that Lopez "did not proceed under Rule 37 of the Federal Rules of Civil Procedure within the time permitted by local rule concerning any issues he may have had with the Black & Decker

Defendants' answers and responses." Rule 6(b) Motion Response at 6 (citing D.N.M.LR-Civ. 26.6).

They note that Lopez "has no pending discovery related to the facts established in the [MSJ]," and

contend that, "even if the Court granted [Lopez] the requested relief, [he] would still not have any

additional evidence with which to support any contentions he might make in further response." Rule

6(b) Motion Response at 8. They stress that they "should not be required to defend this case through

trial simply because Plaintiff harbors shadowy hope that discovery might yield something helpful,

not to mention directly contrary to sworn testimony in the record." Rule 6(b) Motion Response at 8.

In their view, Lopez "should have developed a threshold basis for suing" them, "grounded in some

factual support, *before* filing suit." Rule 6(b) Motion Response at 8 (emphasis in original)(citing

Mosely v. Titus, 762 F. Supp. 2d 1298, 1315 (D.N.M. 2010)(Browning, J.)). They conclude their

argument by asserting that "[t]he bottom line is that Plaintiff sued the wrong defendants" and that

"[t]he Court should not allow Plaintiff to compound that error through further delay." Rule 6(b)

Motion Response at 9.

        5.    **The MSJ Surreply.**

        On February 16, 2016, Lopez filed a surreply to the MSJ. See Plaintiff's Reply in Support of

His Rule 56(f) Motion in Opposition to Defendant Black & Decker (U.S.) Inc. and Stanley Black &

Decker, Inc.'s Motion for Summary Judgment (Doc. 48), or Alternative Motion to Extend Time to

File Response at 1, filed February 16, 2016 (Doc. 63)("MSJ Surreply"). Lopez first addresses the

choice-of-law issue. See MSJ Surreply at 1. Lopez asserts that the Supreme Court of New Mexico

has concluded that "the rules governing successor liability in a product liability claim are grounded

in *contract* law, not tort law[.]" MSJ Surreply at 1-2 (emphasis in original)(citing Garcia v. Coe

Mfg. Co., 1997-NMSC-013, ¶ 17, 933 P.2d 243, 248). Lopez contends, moreover, that the Supreme

Court of New Mexico has adopted the "'product-line' exception for product liability claims (without

discussion of the *lex loci delecti* choice-of-law rule) and also made clear that its application turns on

the underlying facts of a particular case[.]"  MSJ Surreply at 2 (citing Garcia v. Coe Mfg. Co., 1997-

NMSC-013, ¶ 23, 933 P.2d at 249-50).  Lopez adds that, in his view, "'the initial step in conflicts

analysis is characterization: deciding the area of substantive law -- e.g., torts, contracts domestic

relations -- to which the law of the forum assigns a particular claim or issue.'"  MSJ Surreply at 3

(emphases omitted)(quoting Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 11, 142 P.3d

374, 377).  "For these reasons," Lopez contends,

> it is not clear that New Mexico courts would apply Texas law to the issue of
> successor liability in a products liability claim because the issue of successor liability
> does not involve the underlying facts that give rise to a defendant's liability for a
> defective product, but addresses matters of corporate liability under contract law
> separate and apart from the underlying facts which calls for a different choice-of-
> law rule, as New Mexico courts and other courts applying *lex loci delecti* to tort claims
> have done in related "hybrid" choice-of-law issues.

MSJ Surreply at 4 (relying on, among others, Billingsley v. JEA Co., Inc.).

Lopez then reiterates his earlier assertion that "potential successor liability in a products

liability claim is a 'hybrid' question that the New Mexico Supreme Court has indicated is primarily

an issue of contract law and 'present[s] unique policy questions since the process is neither tort nor

contract' but a hybrid of tort and corporate/contract law."  MSJ Surreply at 4 (alteration in original).

Lopez also reiterates his view that "[t]his issue has particular significance in our case since in many

instances New Mexico has adopted broader rules than has Texas to protect its citizens from injury

due to defective products."  MSJ Surreply at 4 (citing, among others, Chairez v. James Hamilton

Constr. Co., 2009-NMCA-093, 215 P.3d 732).  Regarding the Black & Decker Defendants' assertion

that Texas law applies, because Lopez "was covered under the Texas workers' compensation statute

and he filed his workers' compensation claim in Texas," MSJ Reply at 13, Lopez argues that, while

Texas law would apply to a workers' compensation claim, it does not apply to the successor-liability

issue, see MSJ Surreply at 5.  Lopez posits that, "[i]f anything, Texas favors the application of New Mexico law on the issue of corporate successor liability in this case in order to permit reimbursement for worker's compensation benefits paid to Plaintiff who was injured in Texas."  MSJ Surreply at 6. Lopez reasons, moreover, that, "in choice-of-law issues that involve the ability of an injured party to recover, the issue 'is primarily a concern of the state in which the plaintiff is domiciled' in seeing that its citizens may seek recovery according to its laws . . . ."  MSJ Surreply at 6 (quoting Calhoun v. Yamaha Motor Corp., U.S.A., 216 F.3d 338, 347 (3d Cir. 2000)).

Lopez concludes his argument by reasoning that, although further "discovery may show that . . . the *lex loci delicti* choice-of-law rule points to Texas law to determine the underlying question of whether the unguarded table power saw in question was defective as marketed, designed, and/or manufactured," the "separate issue" of successor liability "is not controlled by *lex loci delicti* but by contract choice-of-law rules and policy considerations to more fully implement 'the social policies underlying strict product liability' and other similar rules that focus on corporate *activity* rather than corporate form."  MSJ Surreply at 7 (emphasis in original).  Lopez asserts that "whether the Black & Decker Defendants may have potential successor liability . . . is an issue of fact that should further be developed in discovery of the case."  MSJ Surreply at 7 (citing Garcia v. Coe Mfg. Co., 1997-NMSC-013, ¶ 23, 933 P.2d at 249-50).  Lopez accordingly requests that the Court deny the MSJ without prejudice to refiling after discovery concludes.  See MSJ Surreply at 7-8.

### 6.    The Hearing.

The Court held a hearing on March 15, 2016.  See Transcript of Motion Proceedings (taken March 15, 2016), filed July 20, 2016 (Doc. 92)("Tr.").  The Black & Decker Defendants began by recapping their arguments about their compliance with Lopez' discovery requests and by reasserting their view that Lopez' requests are largely irrelevant to the successor-liability issue.  See Tr. at 3:6-

5:11 (DeCandia).  The Black & Decker Defendants also reiterated their view that "there are no facts

that could be uncovered in discovery that would affect [their] entitlement to summary judgment."

Tr. at 5:11-14 (DeCandia).  Turning specifically to the MSJ, the Black & Decker Defendants averred

that the undisputed facts demonstrate that they did not "design, manufacture, or sell the table saw at

issue."  Tr. at 5:22-6:2 (DeCandia).  The Black & Decker Defendants stated that Stanley Black &

Decker, Inc. "was not even in existence in 2001," that Black & Decker U.S., Inc. "was not even a

corporate affiliate of Delta until 2004," and that "Delta, which did make the saw, is still in existence

as a separate legal entity."  Tr. at 6:2-11 (DeCandia).  The Black & Decker Defendants reminded the

Court that Lopez originally named Delta Intl. as a Defendant, but that the Court dismissed Delta Intl.

for lack of personal jurisdiction.  See Tr. at 6:11-15 (DeCandia).  According to the Black & Decker

Defendants, Lopez "does not even argue [] that additional discovery would help him show that the

Black & Decker defendants had any role in the design, manufacture, or sale of the saw at issue."  Tr.

at 6:16-19 (DeCandia).

As to successor liability, the Black & Decker Defendants asserted that, "under the lex loci

delicti rule, . . . Texas law applies to this case."  Tr. at 6:20-22 (DeCandia).  The Black & Decker

Defendants noted Lopez' argument that the product-line exception applies under New Mexico law,

but countered that Lopez "cites no cases where a Court applied one state's law for the underlying

products claim, and another state's law for the issue of successor liability."  Tr. at 7:1-9 (DeCandia).

According to the Black & Decker Defendants, Lopez' "cases show that with respect to New Mexico

law on successor liability, that doctrine is tied very closely to the policies underlying strict liability."

Tr. at 7:10-13 (DeCandia).  The Black & Decker Defendants argued that strict liability's policies, in

turn, counsel "against segregating the successor liability issue from the underlying products issue for

purposes of a conflicts analysis."  Tr. at 7:13-20 (DeCandia).  As to Lopez' argument that further

discovery is needed to determine whether the product-line exception applies, the Black & Decker Defendants contended that "choice of law issues are matters of law, not fact," and posited that the Court's choice-of-law analysis will "determine whether [the exception] applies in the first place." Tr. at 7:25-8:7 (DeCandia). The Black & Decker Defendants stated, moreover, that Lopez "provides no analytical basis for applying New Mexico law to successor liability." Tr. at 8:8-10 (DeCandia). The Black & Decker Defendants noted that Lopez "has not identified any contract that was executed in New Mexico or has any relationship with New Mexico," Tr. at 8:16-18 (DeCandia), and argued that this case's "only connection to New Mexico . . . is that plaintiff now claims to live here," Tr. at 8:21-23 (DeCandia). Indeed, the Black & Decker Defendants contended, Lopez has not identified which "state's law he thinks should apply," meaning that he "can't show that there is any conflict between Texas law and the law of this hypothetical state." Tr. at 9:2-7 (DeCandia).

Assuming for argument's sake that New Mexico law applies, the Black & Decker Defendants contended that Lopez has not proffered facts "to show that the product line exception would impose liability on the[m.]" Tr. at 9:23-10:2 (DeCandia). The Black & Decker Defendants said that they did not expressly assume Delta Intl.'s liabilities; that The Black & Decker Corporation's acquisition of Delta Intl. did not "amount[] to a consolidation or merger"; that the transaction was not "a mere continuation of the former business"; and that the transaction was not "fraudulently entered into to escape liability." Tr. at 10:2-14 (DeCandia)(referencing Garcia v. Coe). Thus, the Black & Decker Defendants stated, the product-line exception does not apply under any theory. See Tr. at 10:15-19 (DeCandia).

The Court then directed Lopez to argue. See Tr. at 11:11-13 (Court). Lopez began by noting that the Black & Decker Defendants did not produce the Purchase Agreement until February 26, 2016. See Tr. at 12:11-18 (Isaac). Lopez argued that this "very lengthy" agreement "may create fact

issues with regard to whether they assumed liabilities." Tr. at 12:25-13:4 (Isaac). Lopez noted, for example, that the Purchase Agreement has a section on "transferred liabilities." Tr. at 13:4-5 (Isaac). Lopez conceded that he had not yet read the Purchase Agreement, but asserted that discovery "needs to be done on it" before he can respond to the MSJ's merits. Tr. at 13:10-17 (Isaac).

Turning to successor liability, Lopez argued that "New Mexico law is clear . . . that successor liability in a products liability claim is grounded in contract law." Tr. at 13:18-24 (Isaac). Thus, Lopez asserted, the first issue is whether the contract contains a choice-of-law provision. See Tr. at 14:6-9 (Isaac). Lopez was unsure whether the Purchase Agreement has such a provision; the Court, however, speculated that the parties "certainly . . . didn't choose New Mexico." Tr. at 14:7-13 (Isaac, Court). Lopez agreed and argued that New Mexico courts would effectuate a choice-of-law provision, unless the law of the state to which it points "offends New Mexico public policy." Tr. at 14:16-19 (Isaac). The Court queried, however, how New Mexico public policy is relevant when the Court is not enforcing the Purchase Agreement. See Tr. at 14:20-23 (Court). Lopez answered that, under the applicable case law, public policy is relevant to the successor-liability analysis. See Tr. at 14:24-15:1 (Isaac). The Court interjected, countering that the successor-liability cases upon which Lopez relies involve asset sales and not stock transactions involving subsidiary organizations. See Tr. at 15:5-7 (Court). The Court posited that, consequently, it would have to create a "lot of new law to get to a point of ever finding Black & Decker to be liable for anything in this case[.]" Tr. at 15:7-12 (Court). Lopez argued, in response, that The Black & Decker Corporation purchased "a lot more than" stock in the Purchase Agreement. Tr. at 15:24-25 (Isaac). See id. at 15:25-16:1 (Isaac)("[The Purchase Agreement] talks about purchasing benefit plans and purchasing facilities and products."). Lopez asserted, moreover, that the relevant inquiry for successor liability is whether "a company has the same ability as its predecessor to assess, control, and distribute the risks[.]" Tr. at 16:19-25

- 34 -

(Isaac).  Here, Lopez contended, The Black & Decker Corporation assumed Delta Intl.'s ability to "assess, control, [and] distribute the risk[.]"  Tr. at 17:5-11 (Isaac).

The Court interjected and posited that The Black & Decker Corporation is not a "successor" to Delta Intl., but rather "another corporation."  Tr. at 17:12-14 (Court).  Lopez retorted that, in his view, The Black & Decker Corporation is the successor to Delta Intl., because it "purchased the saw and technology and designs and patents from Pentair."  Tr. at 17:19-21 (Isaac).  Regardless, Lopez asserted, "discovery is necessary to determine . . . if they assumed the liabilities of Pentair, who manufactured and designed this table saw, when they purchased it in July of 2004."  Tr. at 17:23-18:2 (Isaac).  The Court interpolated, observing that the parties have already conducted extensive discovery over a lengthy period.  See Tr. at 18:5-14 (Court).  Despite that discovery, the Court noted, the parties "don't seem to be making any progress here."  Tr. at 18:21-24 (Court).  Lopez countered that two months remain before the Court's discovery deadline, and reiterated his view that further discovery is necessary to respond to the successor-liability issue.  See Tr. at 21:5-14 (Isaac).  Lopez, evidently having discovered the Purchase Agreement's choice-of-law provision, then informed the Court that the contract points to the "internal laws of the State of Delaware."  Tr. at 22:3-6 (Isaac).  Nevertheless, Lopez contended, New Mexico law may apply "under the public policy rationales."  Tr. at 22:6-8 (Isaac).  If New Mexico law applies, Lopez asserted, the Black & Decker Defendants are likely liable under the product-line exception, given the Purchase Agreement's express provision for "transferred liabilities."  Tr. at 22:13-19 (Isaac).  In any event, Lopez stressed, there are genuine factual issues as to the successor-liability issue that preclude summary judgment at this stage.  See Tr. at 23:9-24:9 (Isaac).

The Court queried why Lopez is "so intent on bringing this case in New Mexico rather than, say, wherever Delta Machinery can be sued[.]"  Tr. at 24:15-17 (Court).  Lopez explained that he

first brought suit against "two Delta entities" in El Paso, Texas, and that that case was dismissed on summary judgment. Tr. at 24:24-25:25 (Isaac, Court). The Court inquired as to the grounds upon which summary judgment was granted, to which Lopez answered that the named defendants were not liable for his injury. See Tr. at 26:1-15 (Isaac, Court)(noting that he did "[n]ot [name] the right company."). Lopez added that the "Texas statute of limitations[ ] has already run." Tr. at 27:6-10 (Isaac). Lopez then reiterated his view that further discovery is necessary to determine whether the Black & Decker Defendants "assumed the liabilities contained in their purchase agreement," whether "Delaware law allows the case to move forward," and whether "New Mexico law trumps Delaware law." Tr. at 28:2-7 (Isaac).

Turning to the Black & Decker Defendants, the Court asked whether The Black & Decker Corporation purchased assets in addition to stock with the Purchase Agreement. See Tr. at 31:13-17 (Court)("Mr. Isaac also mentioned that there was the purchase of plants, which sounds to me more in the asset category, than stock."). The Black & Decker Defendants admitted that they "don't recall whether a plant was going to be purchased," but noted that "there is something in there about closing a plant[.]" Tr. at 31:18-23 (DeCandia). The Black & Decker Defendants then reiterated that "Delta still exists," Tr. at 32:1-3 (DeCandia), and speculated that, although Lopez sued the wrong entities in the Texas suit, Delta Intl., the entity which Lopez originally sued in this case, is "the entity that made this table saw," Tr. at 33:6-19 (Court, DeCandia). As to the applicable statute of limitations for Lopez' claims, the Black & Decker Defendants noted that, in New Mexico, the limitations period is three years, whereas Texas has a two-year limitations period. See Tr. at 34:2-11 (Court, DeCandia).

The Black & Decker Defendants then pivoted to discuss various relevant provisions in the Purchase Agreement. See Tr. at 34:22-24 (DeCandia). First, they noted, the Purchase Agreement "talks about purchasing all outstanding shares of capital stock," Tr. at 35:9-14 (DeCandia), i.e.,

"equity shareholder interests, [or] the equivalent," Tr. at 37:6-12 (DeCandia).  See id. at 35:19-22

(Isaac)(interjecting that "it goes on to say more than just stock membership interests, and other

ownership interests . . . .").  Next, they noted that Pentair, Inc. is Delta Intl.'s "Parent," and that Delta

Intl. "is a wholly owned subsidiary[.]" Tr. at 36:11-23 (DeCandia, Court).  They clarified that, under

the agreement, Delta Intl. is a "subsidiary that gets transferred." Tr. at 37:12-15 (DeCandia).  See id.

at 38:1-3 (DeCandia)(stating that "the subsidiaries are transferred, they go over, by virtue of the

acquisition of the stock").  With respect to successor liability under the Purchase Agreement, the

Black & Decker Defendants asserted that Lopez must establish "that the entities before the Court . . .

agreed to assume Delta's liabilities[] for a saw made before this transaction," i.e., Lopez must "show

an actual acquisition of those liabilities in this document." Tr. at 38:4-17 (DeCandia).  They argued

that, pursuant to the agreement, Pentair, Inc. has a "preexisting liability" to indemnify The Black &

Decker Corporation if "a saw made before the date of this transaction [] causes injury before the date

of this transaction[.]" Tr. at 38:18-23 (DeCandia).  They explained, however, that, if a saw "made

before the transaction" causes injury "after the transaction, then the sub[sidiary] that made the saw is

still on the hook for that, even though it[] now . . . has different parent companies." Tr. at 38:24-

39:8 (DeCandia).  In short, they stated, "indemnified liabilities stay with Pentair." Tr. at 39:13-14

(DeCandia).  As to the Purchase Agreement's "transferred liabilities" provision, they noted that the

provision states that "transferred liabilities shall mean liabilities and obligations of the subsidiaries."

Tr. at 39:19-24 (DeCandia).  The Black & Decker Defendants interpreted this provision to mean

that, if "the subs[idiaries] had these transferred liabilities, [] then they still have those liabilities after

they're transferred, . . . not the acquiring entity." Tr. at 39:24-40:23 (DeCandia).  They stressed that

the agreement contains "no language . . . that says the acquiring entity takes on the liabilities of the

subs[idiaries]." Tr. at 40:3-5 (DeCandia).

Ultimately, the Black & Decker Defendants posited, Lopez appears to be arguing a "veil-piercing theory," because Delta Intl. is a separate legal entity. Tr. at 42:8-12 (DeCandia). The Court agreed, see Tr. at 42:13 (Court), and added that Lopez' product-line-exception cases are inapposite, because they involve asset purchases, whereas here, a corporation "purchas[ed] [a] holding company that has stock in subsidiaries," Tr. at 42:22-43:4 (Court). The Court stated that, on these facts, Lopez likely will have to argue a veil-piercing theory, which is difficult to prove. See Tr. at 43:4-6 (Court).

Lopez again took up argument, asserting that the Black & Decker Defendants "admitted that Delta, which is the subsidiary, . . . has the liability for this incident." Tr. at 43:20-23 (Isaac). The Court interposed and queried whether Lopez "really think[s] [he] can pierce the corporate veil of Black & Decker[.]" Tr. at 44:4-5 (Court). In response, Lopez stated: "I don't know, Your Honor. I'm not going to pretend I can, but I don't know." Tr. at 44:6-8 (Isaac). The Court pressed Lopez to explain why he would go through the trouble of trying to pierce the corporate veil when Delta Intl. is a "viable defendant," if sued in a proper jurisdiction. Tr. at 44:9-14 (Court). Lopez conceded that veil-piercing will be difficult, see Tr. at 44:25-45:1 (Isaac), and that it "would be ideal" to sue Delta Intl. in a proper jurisdiction, Tr. at 45:7-14 (Isaac).

The Court concluded the hearing by noting its inclination to grant the MSJ. See Tr. at 45:23-24 (Court). The Court expressed that it will first review the Purchase Agreement, but maintained that it will likely grant the MSJ, see Tr. at 45:24-46:2 (Court), because it appears that Lopez is suing the wrong company, see Tr. at 48:19-21 (Court). As for further discovery, the Court expressed skepticism that more time will be productive. See Tr. at 46:3-9 (Court). The Court noted, however, that it will consider additional relevant materials, should the parties choose to supplement the record. See Tr. at 49:7-17 (Court).

7.      **The Suppl. Brief**.

Following the hearing, on July 12, 2016, Lopez filed a Suppl. Brief in opposition to the MSJ and in support of his MSJ Response/Motion.  See Suppl. Brief at 1.  After briefly recounting this case's relevant procedural history, Lopez asserts that, at the hearing, the Black & Decker Defendants "reluctantly admitted that under the Purchase Agreement, Delta . . . would have successor liability for the Plaintiff's incident."  Suppl. Brief ¶ 9, at 3 (emphases omitted).  Lopez contends that genuine issues of material fact remain whether the Black & Decker Defendants also are liable under the Purchase Agreement.  See Suppl. Brief ¶ 10, at 3.  In support of this contention, Lopez reviews several provisions in the Purchase Agreement which, he posits, demonstrate that the Black & Decker Defendants have successor liability.  See Suppl. Brief ¶¶ 11-22, at 3-8.

Lopez first notes that, under the Purchase Agreement, The Black & Decker Corporation is "the sole 'Buyer,'" Suppl. Brief ¶ 11, at 4 (citing Purchase Agreement at 1), and that, as the Buyer, The Black & Decker Corporation "acquire[d] the stock [and] also 'membership interests' and 'other ownership interests' of Pentair," Suppl. Brief ¶ 12, at 4 (citing Purchase Agreement at 1).  Lopez adds that The Black & Decker Corporation is also "a 'Purchaser' responsible for paying the purchase price[.]"  Suppl. Brief ¶ 13, at 4 (citing Purchase Agreement ¶ 1.1, at 1).  Next, Lopez stresses the "importan[ce] . . . of the definition of 'Affiliate' in" the Purchase Agreement, noting that "Affiliate" has "'the meaning ascribed to such term in Rule 12b-2 of the Securities Exchange Act of 1934[.]'" Suppl. Brief ¶ 14, at 5 (quoting Purchase Agreement ¶ 11.17, at 52).  Finally, Lopez notes that The Black & Decker Corporation, as the Buyer, makes "certain 'Representations and Warranties' to the seller, including that it had 'Authority' to make the 'valid and binding agreements . . . enforceable in accordance with their respective terms . . . .'"  Suppl. Brief ¶ 16, at 5-6 (quoting Purchase Agreement ¶ 3.2, at 14).  Lopez notes that, in the event of a breach of these representations and warranties, The

Black & Decker Corporation agrees to "'indemnify, defend, and hold harmless Parent [Pentair] . . . from and against all Losses asserted against, resulting to, imposed upon or incurred . . . .'" Suppl. Brief ¶ 18, at 6 (alteration in original)(quoting Purchase Agreement ¶ 8.2, at 41).

Turning specifically to "Transferred Liabilities" under the Purchase Agreement, Lopez notes that such liabilities include, in relevant part, "'liabilities and obligations of the Subsidiaries arising out of bodily injury, death or other damage relating to products manufactured prior to the Closing, . . . other than [certain Specified Liabilities.]'" Suppl. Brief ¶ 19, at 6-7 (quoting Purchase Agreement ¶ 11.17, at 60-61). Lopez contends that his "claims in this case fall squarely within [this] paragraph . . . , since they arise out of bodily injuries relating to the subject table saw manufactured prior to the Closing date of the purchase agreement, and because they are not covered by the . . . Specified Liabilities," i.e., "(i) injuries occurring before the closing; (ii) injuries resulting from presence of or exposure to Potentially Harmful Substances or Conditions; and (iii) corrective actions required by the Consumer Product Safety Commission." Suppl. Brief ¶ 20, at 7 (citing Purchase Agreement ¶ 11.17, at 63). As to the Black & Decker Defendants' assertion that Delta Intl.'s liabilities transferred with it "as a 'subsidiary' of the Black & Decker Defendants," Lopez contends that "this is plainly incorrect since the term 'subsidiary' is defined to mean only the subsidiaries of Pentair, Inc. . . . , not the subsidiaries of Black & Decker[.]" Suppl. Brief at 7 (citing Purchase Agreement ¶ 11.17, at 59).

In light of the above contractual provisions, Lopez asserts that "there are genuine issues of material fact that the entity that purchased the subject table saw line from Pentair, Inc. was the Black & Decker Defendants." Suppl. Brief at 8. Further, Lopez argues, "the Purchase Agreement clearly shows a genuine issue of material fact that it was the Black & Decker Defendants who assumed successor liability for Plaintiff's incident and injuries under the Transferred Liabilities provision in the Agreement." Suppl. Brief at 8. Finally, Lopez contends, "the Black & Decker Defendants can

also be held liable even as a parent corporation since it represented that it controls, is controlled by, or is under common control with Delta." Suppl. Brief at 8. Accordingly, Lopez requests that the Court deny the MSJ "and allow the parties to engage in full discovery on the merits of this case." Suppl. Brief at 8.

8.    **The Suppl. Brief Response.**

The Black & Decker Defendants responded to the Suppl. Brief on July 29, 2016. See Suppl. Brief Response at 1. The Black & Decker Defendants advance two primary arguments. First, they aver that The Black & Decker Corporation acquired in the Purchase Agreement Delta Intl.'s stock and not its liabilities. See Suppl. Brief Response at 2-4. They argue that the Purchase Agreement refers to "equity interests" in Delta Intl., that Delta Intl. "continues to exist as a separate and distinct corporate entity," and that, accordingly, "The Black & Decker Corporation simply acquired the stock of Delta which came in as a wholly owned subsidiary." Suppl. Brief Response at 2 (citing Morris Aff. ¶ 8, at 2)(footnote omitted). As for the "Transferred Liabilities" provision, the Black & Decker Defendants aver that the provision does not "somehow transfer[] [the subsidiaries' liabilities] *to The Black & Decker Corporation*," but, rather, that "the liabilities simply transferred over, and remained, with the subsidiaries." Suppl. Brief Response at 3 (emphasis in original). The Black & Decker Defendants explain that, in their view, the "term 'transferred liabilities' is a definitional explanation of which liabilities would not have to be indemnified by Pentair, Inc." Suppl. Brief Response at 3 (citing Purchase Agreement ¶ 11.17, at 56). Accordingly, they argue, "'Transferred Liabilities' is [] a defined term with no operative significance other than as a reference for which liabilities remained with the subsidiaries and are not subject to indemnity from Pentair." Suppl. Brief Response at 3. The Black & Decker Defendants stress that "[t]he key point is that the plaintiff has not been able to identify any passage in the Agreement in which The Black & Decker Corporation itself agreed to be

obligated for the liabilities of the wholly owned subsidiaries that it was purchasing." Suppl. Brief Response at 3. Indeed, they assert, "[n]o such passage exists." Suppl. Brief Response at 3. As to this issue, they conclude, Lopez "has not carried his burden of showing the contrary or creating a genuine issue of material fact on that point." Suppl. Brief Response at 4.

Second, the Black & Decker Defendants contend that Lopez "has no basis for piercing the corporate veil between Delta and its parent corporation." Suppl. Brief Response at 4-5. They assert that veil-piercing requires that Lopez "show 'instrumentality or dominion, improper purpose and proximate causation.'" Suppl. Brief Response at 4 (quoting Scott v. AZL Res., Inc., 1988-NMSC-028, ¶¶ 6-7, 753 P.2d 897, 900). To establish "'instrumentality' or 'dominion,'" they argue, Lopez must demonstrate "'that the subsidiary or other subservient corporation was operated not in a legitimate fashion to serve the valid goals and purposes of that corporation but it functioned instead under the domination and control and for the purposes of some dominant party.'" Suppl. Brief Response at 4 (quoting Scott v. AZL Res., Inc., 1988-NMSC-028, ¶ 7, 753 P.2d at 900). They note that "New Mexico decisions refer to the 'instrumentality' or 'domination' requirement as the 'alter ego doctrine,'" and contend that "'mere control by the parent corporation is not enough to warrant piercing the corporate veil.'" Suppl. Brief Response at 4 (brackets omitted)(quoting Scott v. AZL Res., Inc., 1988-NMSC-028, ¶¶ 7, 9, 753 P.2d at 900). Here, they aver, "[t]he record contains no evidence whatsoever on these points, as Plaintiff's counsel effectively conceded at the hearing[.]" Suppl. Brief Response at 5.

9.    **The Suppl. Brief Reply**.

Lopez replied to the Suppl. Brief Response on August 12, 2016. See Suppl. Brief Reply at 1. Lopez begins by discussing the Purchase Agreement's transferred-liabilities provision. See Suppl. Brief Reply at 1. Lopez argues that, contrary to the Black & Decker Defendants' assertion that this

provision has no "operative significance," "[t]he specific and detailed description of 'Transferred

Liabilities' in a $775 million dollar Purchase Agreement . . . means just what it says." Suppl. Brief

Reply ¶ 2, at 2. To support this argument, Lopez reiterates the Suppl. Brief's arguments about (i) the

Purchase Agreement's "Purchase and Sale" provision; (ii) the term "Equity Interests"; (iii) the terms

"Affiliate" and "Subsidiary"; and (iv) the "Transferred Liabilities" provision. Suppl. Brief Reply ¶¶

1-6 at 1-5. In light of these provisions and terms, Lopez contends that:

> "Transferred Liabilities" . . . describes the liabilities transferred from "Parent"
> (Pentair) and "Sellers" (its Subsidiaries listed on Schedule 1.1, including Delta Int'l
> Machinery Corp.) to "Buyer" (The Black & Decker Corporation) and its "Affiliates"
> under its control, as part of the "Equity Interests" (which by definition consists of
> assets, less liabilities) "held by Parent and its Affiliates in Each of the Transferred
> Subsidiaries" in the Purchase and Sale provision of the [Purchase Agreement.]

Suppl. Brief Reply ¶ 4, at 3-4 (alteration added). Lopez reiterates that "the liability from [his] claim

is a 'Transferred Liability' . . . because it is a '[] liabilit[y] and obligation of [a] Subsidar[y] arising

out of bodily injury, death or other damage relating to products manufactured prior to the Closing.'"

Suppl. Brief Reply ¶ 6, at 5 (first alteration added)(quoting Purchase Agreement ¶ 11.17, at 60-61).

Lopez asserts that "[t]he idea that such a detailed description of 'Transferred Liabilities' in the

Purchase Agreement would have no 'operative significance' has no factual or legal basis in the

record." Suppl. Brief Reply ¶ 6, at 5.

Next, Lopez argues that other provisions in the Purchase Agreement "make clear that assets

*and* liabilities of the Parent and its Subsidiaries were transferred to Buyer/Purchasers under its

control . . . ." Suppl. Brief Reply at 5 (emphasis in original). Lopez notes, for example, that, in a

provision titled "Estimated Closing Statement," the Purchase Agreement states that, five days before

closing, Pentair, Inc. shall prepare a reasonable "estimate of the Net Asset Value to be reflected on

the Closing Statement and the Purchase Price . . . ." Suppl. Brief Reply ¶ 7, at 6 (quoting Purchase

Agreement ¶ 2.2, at 2). Lopez adds that the Purchase Agreement's "Closing Statement" provision

states that, within forty-five days after closing, Pentair, Inc. shall prepare an "unaudited consolidated combined balance sheet of the Subsidiaries (the 'Closing Statement'), which shall set forth the Net Asset Value as of the Closing Date . . . ." Suppl. Brief Reply ¶ 7, at 6 (quoting Purchase Agreement ¶ 2.2, at 2). "To state the obvious," Lopez explains, "'Net Asset Value' of the Subsidiaries, 'to be reflected on the Closing Statement' and used to determine 'the Purchase Price payable by Buyer at the Closing,' plainly includes a valuation of transferred assets *and* liabilities of the Subsidiaries." Suppl. Brief Reply ¶ 7, at 6 (emphasis in original). Lopez buttresses this argument by noting that a separate provision in the Purchase Agreement refers to a "determination or valuation of assets and liabilities (including reserves and accruals) included on the Final Closing Statement . . . ." Suppl. Brief Reply ¶ 7, at 7. Finally, Lopez notes that the Purchase Agreement expressly contemplates that The Black & Decker Corporation will "'be able to continue to conduct the Business after Closing in the manner in which the Business has been conducted by the Subsidiaries[.]'" Suppl. Brief Reply ¶ 9, at 8 (citing Purchase Agreement ¶ 3.1, at 9-10). Lopez contends that this provision "demonstrates that 'Transferred Liabilities' . . . means just what it says and may also be additional grounds for successor liability under Delaware law[.]" Suppl. Brief Reply ¶ 9, at 8.

Turning to the choice-of-law issue, Lopez contends that the Purchase Agreement "expressly provides that Delaware law applies to the parties' agreement[.]" Suppl. Brief Reply ¶ 10, at 8 (citing Purchase Agreement ¶ 11.4, at 49). Lopez argues that, under Delaware law,

> a purchaser may be liable for the obligations of the selling corporation in any one of the following four situations: (1) the purchaser expressly or impliedly assumes such obligations; (2) the transaction amounts to a consolidation or merger of the seller into the purchaser; (3) the purchaser is merely a continuation of the seller; or (4) the transaction has been entered fraudulently.

Suppl. Brief Reply ¶ 11, at 9 (emphases in original)(quoting Elmer v. Tenneco Resins, Inc., 698 F. Supp. 535, 540-41 (D. Del. 1988)(Wright, J.)). Lopez then notes that the Court "applies New

Mexico choice-of-law rules in this diversity case," Suppl. Brief Reply ¶ 12, at 9 (citing Klaxon Co. v. Stentor Elec. Mfr. Co., Inc., 313 U.S. 487 (1941)), and that New Mexico courts hold that "the rules governing successor liability in a product liability claim are grounded in *contract* law, not tort law," Suppl. Brief Reply ¶ 12, at 9 (emphasis in original)(citing Garcia v. Coe Mfg. Co., 1997-NMSC-013, ¶ 17, 933 P.2d at 248).  According to Lopez, the Supreme Court of New Mexico has "adopted the 'product-line' exception for product liability claims and made clear its application turns on the underlying facts of a particular case."  Suppl. Brief Reply ¶ 12, at 10 (citing Garcia v. Coe Mfg. Co., 1997-NMSC-013, ¶ 23, 933 P.2d at 249-50).  Lopez further asserts successor liability "presents unique policy questions since the process is neither tort nor contract."  Suppl. Brief Reply ¶ 13, at 10 (brackets and internal quotation marks omitted).  Here, Lopez contends,

> New Mexico courts would likely give effect to the parties' choice-of-law provision and apply Delaware law, or alternatively apply New Mexico law to protect the interests of its citizens (if Delaware law was [sic] contrary to New Mexico public policy), but under no scenario would New Mexico courts apply Texas law to the issue of successor liability in this case.

Suppl. Brief Reply ¶ 13, at 10.

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d at 891).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that

would entitle it to a directed verdict if not controverted at trial." Celotex Corp. v. Catrett, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[32] Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotation marks omitted). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir.

---

[32]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law. See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

1980)("However, once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.")(citation and internal quotation marks omitted).  Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. Co. v. Omer, 2008 U.S. Dist. LEXIS 45838, at *1 (D. Kan. 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 U.S. Dist. LEXIS 45838, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

    To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial.  See

- 47 -

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249. Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Anderson v. Liberty Lobby, Inc., 477 U.S. at 254. Third, the court must resolve all reasonable inferences and doubts in favor of the nonmoving party, and construe all evidence in the light most favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Fourth, the court cannot decide any issues of credibility. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified immunity arena. In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts. 550 U.S. at 378-81. The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of

> *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . . When
> opposing parties tell two different stories, one of which is blatantly contradicted by
> the record, so that no reasonable jury could believe it, a court should not adopt that
> version of the facts for purposes of ruling on a motion for summary judgment.

Scott v. Harris, 550 U.S. at 380 (emphases in original). Applying these standards to a factual dispute over whether the plaintiff-respondent "was driving in such fashion as to endanger human life," the Supreme Court held that the plaintiff-respondent's "version of events is so utterly discredited by the record that no reasonable jury could have believed him." 550 U.S. at 380. Thus, the Supreme Court concluded, "[t]he Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by [a] videotape" which showed the plaintiff-respondent driving extremely dangerously. 550 U.S. at 381.

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a
> plaintiff's version of the facts must find support in the record: more specifically,
> "[a]s with any motion for summary judgment, when opposing parties tell two
> different stories, one of which is blatantly contradicted by the record, so that no
> reasonable jury could believe it, a court should not adopt that version of the facts."
> York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott [v.
> Harris], 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511
> F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312 (brackets omitted). "The Tenth Circuit, in Rhoads v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),] explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony[.]" Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.)(citation omitted), aff'd, 499 F. App'x 771 (2012).

> In evaluating a motion for summary judgment based on qualified immunity, we take
> the facts "in the light most favorable to the party asserting the injury." Scott v.
> Harris, 550 U.S. 372, 377 (2007). "[T]his usually means adopting . . . the plaintiff's
> version of the facts," id. at 378, unless that version "is so utterly discredited by the

> record that no reasonable jury could have believed him," id. at 380. In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events. 550 U.S. at 379. Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony. There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury. And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility . . . . Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation. If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted). See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92). In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes, United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal question of qualified immunity and "determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court," before inquiring into whether there are genuine issues of material fact for resolution by the jury. 584 F.3d at 1326-27 (Holmes, J., concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts").

## LAW REGARDING RULE 56(d)

Rule 56(d) provides:

(d) When Facts Are Unavailable to the Nonmovant.

If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

   (1) defer considering the motion or deny it;

   (2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).[33]  "A party who seeks relief under subdivision (d) may seek an order deferring the time to respond to the summary-judgment motion."  Fed. R. Civ. P. 56(d) advisory committee committee's note to the 2010 amendments.  The rule permits a nonmovant to show by affidavit or declaration the need for additional discovery; a formal affidavit is thus not required.  See Fed. R. Civ. P. 56(d).  The rule permits a "written unsworn declaration, certificate, verification, or statement subscribed in proper form as true under penalty of perjury to substitute for an affidavit."  Fed. R. Civ. P. 56(c) advisory committee committee's note to the 2010 amendments.

When a party files an affidavit or declaration, and moves for additional discovery time under rule 56(d), the party invokes the court's discretion.  See Jensen v. Redevelopment Agency of Sandy City, 998 F.2d 1550, 1553-54 (10th Cir. 1993).  "Unless dilatory or lacking in merit," a party's 56[(d)] application "should be liberally treated."  998 F.2d at 1554 (internal quotation marks and citations omitted).  "The general principle of Rule 56(d) is that summary judgment should be refused where the nonmoving party has not had the opportunity to discover information that is essential to [its] opposition."  Price ex rel. Price v. W. Res., Inc., 232 F.3d 779, 783 (10th Cir. 2000).  Rule 56(d) does not require, however, that summary judgment not be entered until discovery is complete.  See Price ex rel. Price v. W. Res., Inc., 232 F.3d at 784.

"Rule 56[(d)] is not a license for a fishing expedition . . . ."  Lewis v. Ft. Collins, 903 F.2d 752, 758 (10th Cir. 1990).  To invoke rule 56(d) the party filing the affidavit or declaration must state with specificity how the desired time would allow it to meet its burden in opposing summary judgment.  See Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554.  Rule 56(d) may

---

[33]Before 2010, this rule was rule 56(f); rule 56(d) "carries forward without substantial change the provisions of former subdivision (f)."  Fed. R. Civ. P. 56(d) advisory committee committee's note to the 2010 amendments.

not be invoked based solely upon the assertion that discovery is incomplete or that specific facts necessary to oppose summary judgment are unavailable.  See Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554.  Moreover, while the summary judgment movant's exclusive control of information weighs heavily in favor of relief under 56(d), see Price ex rel. Price v. W. Res., Inc., 232 F.3d at 783, merely asserting such is insufficient to justify denial of summary judgment, see Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554.  Furthermore, "if the party filing the Rule 56[(d)] affidavit has been dilatory, or the information sought is either irrelevant to the summary judgment motion or merely cumulative, no extension will be granted."  Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554 (denying a 56(d) request stating "the record reflect[ed] that plaintiffs were dilatory in pursuing discovery prior to the filing of their 56[(d)] affidavit").  See Johnson v. Holmes, 377 F. Supp. 2d 1039, 1044-45 (D.N.M. 2004)(Browning, J.)(denying a 56(d) request where plaintiff did not explain why, during the discovery period that the court allowed, he did not obtain the discovery sought in his motion).  The Tenth Circuit has summarized rule 56(d)'s requirements as follows:

> A prerequisite to granting relief pursuant to Rule 56[(d)] is an affidavit furnished by the nonmovant.  Although the affidavit need not contain evidentiary facts, it must explain why facts precluding summary judgment cannot be presented.  This includes identifying the probable facts not available and what steps have been taken to obtain these facts.  In this circuit, the nonmovant also must explain[, with specificity,] how additional time will enable him to rebut movant's allegations of no genuine issue of fact.

Price ex rel. Price v. W. Res., Inc., 232 F.3d at 783 (citations and internal quotation marks omitted).  See Tadlock v. Lahood, 2013 WL 6284428, at *5 (10th Cir. 2013)(unpublished)(citing Price ex rel. Price v. W. Res., Inc. for the requirements of rule 56(d) after the 2010 amendment); Douglass v. United Auto Workers Local Union 31, 188 F. App'x 656, 658 (10th Cir. 2006)(stating that the affidavit must state how additional time will enable the party to meet its burden "with specificity").

A rule 56(d) affidavit or declaration must state, with specificity, exactly what additional discovery is believed necessary. See Burke v. Utah Transit Auth. and Local 382, 462 F.3d 1253, 1264 (10th Cir. 2006); Chavez v. Perry, 142 F. App'x 325, 334 (10th Cir. 2005)("To resist summary judgment on this basis (56[(d)]), a party must specifically identify what facts it seeks to discover and show how those facts would materially aid its case on the dispositive issues."). If a party does not file an affidavit or declaration, a district court does not abuse its discretion in denying discovery. See Tadlock v. Lahood, 2013 WL 6284428, at *5.

## LAW REGARDING EXTENSIONS OF TIME

Rule 6(b) of the Federal Rules of Civil Procedure governs the circumstances under which a court can grant a party an extension of time to perform a specific act. The rule states:

(b) Extending Time.

(1) *In General*. When an act may or must be done within a specified time, the court may, for good cause, extend the time:

(A) with or without motion or notice if the court acts, or if a request is made, before the original time or its extension expires; or

(B) on motion made after the time has expired if the party failed to act because of excusable neglect.

(2) Exceptions. A court must not extend the time to act under Rules 50(b) and (d), 52(b), 59(b), (d), and (e), and 60(b).

Fed. R. Civ. P. 6(b). "Good cause," necessary for an extension under rule 6(b)(1)(A), "generally means a substantial reason amounting in law to a legal excuse for failing to perform an act required by law." Black's Law Dictionary 692 (6th ed. 1990). See Black's Law Dictionary 251 (9th ed. 2009)("*good cause*. . . . A legally sufficient reason."). Showing good cause is not a particularly demanding requirement. See United States v. Bd. of Cnty. Comm'rs, 2010 WL 965607, at *4 (D.N.M. 2010)(Browning, J.)(granting an extension for good cause when "many of the impediments

to timely filing a response . . . were the result of poor decision-making" by counsel, while "others were seasonal circumstances that a party filing a dispositive motion on Christmas Eve might foresee the opposing party raising"); United States v. Portillo-Quezada, 2010 WL 396309, at *1 (D. Kan. 2010)(Lungstrum, J.)(finding good cause where attorney argued only that he "needs additional time to contact a witness for the Government at the trial of this case who may recant or change her testimony in material respects," and where "[c]ompletion of research and drafting of the memorandum in support is also needed"); Weingarten v. Optima Commc'n Sys., Inc., 544 F. Supp. 2d 193, 196 n.1 (S.D.N.Y. 2008)(Scheindlin, J.)("Under Rule 6(b)(1)(A) . . . the court may, for good cause, extend the time to move if a request is made before the original time period expires.").

On the other hand, "a finding of excusable neglect under Rule 6(b)[(1)(B)] requires both a demonstration of good faith by the parties seeking the enlargement and also it must appear that there was a reasonable basis for not complying within the specified period." In re Four Seasons Sec. Law Litig., 493 F.2d 1288, 1290 (10th Cir. 1974). See Putnam v. Morris, 833 F.2d 903, 905 (10th Cir. 1987)("[S]ome showing of good faith on the part of the party seeking the enlargement and some reasonable basis for noncompliance within the time specified is normally required.")(emphasis and internal quotation marks). "[I]t is well established that inadvertence, ignorance of the rules, and mistakes construing the rules do not constitute excusable neglect for purposes of Rule 6(b)." Quigley v. Rosenthal, 427 F.3d 1232, 1238 (10th Cir. 2005). Excusable neglect, therefore, is a higher burden than good cause.

## LAW REGARDING DIVERSITY JURISDICTION AND CHOICE OF LAW

When a court's jurisdiction rests on diversity of citizenship under 28 U.S.C. § 1332, the court should look to the forum state's choice-of-law rules to determine which state's substantive law to apply. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. at 496-97; Pepsi-Cola Bottling Co. v.

PepsiCo., Inc., 431 F.3d 1241, 1255 (10th Cir. 2005). In New Mexico, choice-of-law analysis is a two-step process. See Mosely v. Titus, 762 F. Supp. 2d at 1314 (citing Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 14, 142 P.3d at 377). "First, the Court must characterize the 'area of substantive law -- e.g., torts, contracts, domestic relations -- to which the law of the forum assigns a particular claim or issue.'" Mosely v. Titus, 762 F. Supp. 2d at 1314 (quoting Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 11, 142 P.3d at 377). The next step is to apply New Mexico's choice-of-law rule. See Mosely v. Titus, 762 F. Supp. 2d at 1314 (citing Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 15, 142 P.3d at 377).

"In tort actions, New Mexico courts follow the doctrine of lex loci delicti commissi and apply the law of the place where the wrong took place." Mosely v. Titus, 762 F. Supp. 2d at 1314 (citing Torres v. State, 1995-NMSC-025, ¶ 13, 894 P.2d 386, 390). The place of the wrong is the location of the last act necessary to complete the injury. See Mosely v. Titus, 762 F. Supp. 2d at 1314 (citing Torres v. State, 1995-NMSC-025, ¶ 13, 894 P.2d at 390). "Where the elements of the underlying claim include harm, the place of the wrong is the place where the harm occurred." Mosely v. Titus, 762 F. Supp. 2d at 1314 (citing First Nat'l Bank v. Benson, 1976-NMCA-072, ¶ 6, 553 P.2d 1288, 1289).

Under Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"), a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007). Accord Mem. Hosp. v. Healthcare Realty Trust Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance Endodontics, LLC v. Dentsply Intern., Inc.,

708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.). "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an Erie prediction should look first to the words of the state supreme court." Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[34]  If the Court finds only an opinion from the Court of Appeals of New Mexico, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." Mosley v. Titus, 762 F. Supp. 2d at 1332 (noting that where the only opinion on point is "from the Court of Appeals, [] the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it")(citing Wade v. EMCASCO Ins. Co., 483 F.3d 657, 666

---

[34]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M. 2014)(Browning, J.). Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with state-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme court precedent usually binds state trial courts. The factors to which a federal court should look before making an Erie prediction that a state supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the state supreme court decision from which the federal court is considering departing -- the younger the state case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state courts -- especially the state supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the state supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times. See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17. See also Spurlock v. Townes, 2016-NMSC-014, ¶¶ 16-20, 368 P.3d 1213, 1217-18 (adopting the Court's Erie prediction in Peña v. Greffet). In short, a state supreme court case that a federal court Erie predicts will be overruled is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

(10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state")).[35]  The Court may also rely

---

[35]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

> . . .  We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

> . . . .

>      The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Trust Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).  The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A James Wm.

on decisions by the Tenth Circuit interpreting New Mexico law.  See Anderson Living Trust v. WPX

Energy Prod., LLC, 27 F. Supp. 3d at 1243 & n.30.[36]  Ultimately, "the Court's task is to predict what

---

Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Moore's")("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions.")(emphasis and title case omitted).

[36]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges.  If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes that a state's law in the ensuing years have undergone, then parties litigating state law claims will be subject to a different body of substantive law, depending whether they litigate in state court or federal court.  This result frustrates the purpose of Erie, which held that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent result regardless of the forum.  See 304 U.S. at 74-77.  This consideration pulls the Court in the direction of according Tenth Circuit precedent less weight and according state court decisions issued in the ensuing years more weight.  On the other hand, when the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation.  Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law.  This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law -- at least provides consistency at the federal level, so long federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the state's highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as persuasive authority, on the other.  In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges.  Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system.  More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal.  All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would.  Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency.  When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit

opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. As such, Tenth Circuit precedent can lag behind developments in state law -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively lag little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one state. See 28 U.S.C. § 131 ("Wyoming and those portions of Yellowstone National Park situated in Montana and Idaho constitute one judicial district."). It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess. A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on state court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that *x* is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is *x*. Its holdings are descriptive, not prescriptive -- interpretive, not normative. Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law is accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of state law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

- 59 -

_____

The purpose of Erie is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." Moore's § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.")(citation and internal quotation marks omitted). This formulation may not be the most precise one if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, see Abbott Laboratories v. Granite State Ins. Co., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. See Allstate Ins. Co. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play. See generally SFF-TIR, LLC v. Stephenson, 2017 WL 1487439 (N.D. Okla. 2017)(Browning, J.). The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale. New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone. The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree. In Wankier v. Crown Equipment Corp., the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus,

_____

> when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.). From this passage, it seems clear the Tenth Circuit only permits a district court to deviate from its view of state law on the basis of a subsequent case "of the state's highest court." The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that"). A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest state court was an oversight or intentional. Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts. Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition. In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of *Allen* [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

Regardless whether the decision to limit the intervening authority a district court can consider was intentional, the Tenth Circuit has picked it up and run with it. In Kokins v. Teleflex, Inc., the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law. See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir. 2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided *Biosera*[, Inc. v. Forma Scientific, Inc., 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's *highest court*.'")(emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the Erie doctrine. More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior case law. Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive." Moore's § 124.22[4] (citing State Farm Mut. Auto. Ins. Co. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)). Still, the Court is bound to abide by the Tenth Circuit's interpretation of Erie. This scheme may be inefficient,

the state supreme court would do." Wade v. EMCASCO Ins. Co., 483 F.3d at 666.  Accord Mosley v. Titus, 762 F. Supp. 2d at 1332 (citation omitted); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1188-89 (D.N.M. 2008)(Browning, J.)(quoting Wade v. EMCASCO Ins. Co., 483 F.3d at 665-66).

### NEW MEXICO LAW REGARDING FALSE CONFLICTS OF LAW

In Ferrell v. Allstate Insurance Co., 2008-NMSC-042, 188 P.3d 1156, the Supreme Court of New Mexico described the "false conflict" or "actual conflict"[37] doctrine: "Under this analysis, when the laws of the relevant states do not actually conflict, the court may avoid a conflict-of-law analysis and may apply forum law to the entire class."  2008-NMSC-042, ¶ 16, 188 P.3d at 1164 (citing Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 816 (1985)).  "If, however, the laws of the relevant states actually conflict, or if the laws of certain of the relevant states conflict, then the forum court must resolve that conflict using the choice-of-law rules contained in the forum state's conflict-of-laws doctrine."  Ferrell v. Allstate Insurance Co., 2008-NMSC-042, ¶ 16, 188 P.3d at 1164.  The doctrine's focus is "not on whether the laws are superficially identical as written, but whether the

---

because the plaintiffs may appeal, after trial, the Court's ruling.  The Tenth Circuit may certify the question to the Supreme Court of New Mexico, and the Tenth Circuit may then have to reverse the Court after a full trial on the merits.

[37]The Supreme Court of New Mexico used the term "actual conflict" to refer to what the Court of Appeals of New Mexico had called the "false conflict" doctrine, because

> "false conflict" actually has two different meanings.  See Robert A. Leflar et al., American Conflicts Law, § 92, at 270 (4th ed. 1986).  The first meaning of "false conflict" arises from the choice-of-law method advanced by Professor Brainerd Currie, "the governmental interest" analysis.  Id. at 270-71.  Under Currie's method, a false conflict arises when "only one of the involved states would be interested in applying its law."  Eugene F. Scoles et al., Conflict of Laws § 2.9, at 28 (4th ed. 2004).  The second meaning of the term "false conflict" is "no conflict of laws."  Leflar et al., supra, § 92, at 272.

Ferrell v. Allstate Ins. Co., 2008-NMSC-042, ¶ 16 n.2.

effect of laws would be identical as applied to a particular case." Fowler Brothers, Inc. v. Bounds, 2008-NMCA-091, ¶ 9, 188 P.2d 1261. See Ferrell v. Allstate Insurance Co., 2008-NMSC-042, ¶ 18, 188 P.3d at 1164.

In Fowler Brothers, Inc. v. Bounds, an unlicensed contractor that was a purported employee of a licensed contractor working on an out-of-state contractor brought action against the licensed contractor for breach of contract and unjust enrichment after the licensed contract ceased to pay for work on the project. The Court of Appeals of New Mexico, in an opinion that the Honorable Michael Bustamante wrote and in which the Honorable Lynn Pickard and Roderick T. Kennedy joined, held that Arizona and New Mexico contractor licensing law did not conflict as applied to the action. The district court had concluded that: (i) under either Arizona or New Mexico law, the plaintiff was required to have an Arizona contractor's license to perform work on the project; and (ii) under either Arizona or New Mexico law, the plaintiff is prohibited from recovering under any cause of action, including equitable remedies, for its work on the project, because it did not have such a license. See 2008-NMCA-091, ¶ 5, 188 P.2d at 1264. The district court had avoided the choice-of-law issue by determining, albeit implicitly, that the applicable law of Arizona and New Mexico were the same or would yield the same results. See 2008-NMCA-091, ¶ 8, 188 P.2d at 1265. More specifically, the district court had dismissed the plaintiff's claims on the basis of its legal conclusion that, "[u]nder either Arizona or New Mexico law, Plaintiff is prohibited from recovering under any cause of action, including equitable remedies, for its work on the Project, because it did not have [an Arizona contractor's] license." 2008-NMCA-091, ¶ 5, 188 P.2d at 1264.

The Court of Appeals of New Mexico found that implicit in the district court's conclusion was its determination that there was no conflict between Arizona and New Mexico law as it related to the case's dispositive issue, i.e., whether the plaintiff was required to have an Arizona contractor's

license to recover damages for its work on the project.  See 2008-NMCA-091, ¶ 8, 188 P.2d at 1265.

Judge Bustamante said the Court of Appeals of New Mexico would first consider whether the district

court correctly determined that no conflict existed between Arizona and New Mexico law with

respect to the case's circumstances, and concluded that no conflict existed.  See 2008-NMCA-091,

¶¶ 8-11, 188 P.2d at 1265 ("This Case Presents No Conflict Between Arizona and New Mexico

Law.")(emphasis omitted).

<h2 style="text-align:center"><u>NEW MEXICO LAW REGARDING NEGLIGENCE</u></h2>

Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff,

breach of that duty, which is typically based on a standard of reasonable care, and the breach being a

cause-in-fact and proximate cause[38] of the plaintiff's damages.  See Coffey v. United States, 870 F.

Supp. 2d 1202, 1225 (D.N.M. 2012)(Browning, J.)(citing Herrera v. Quality Pontiac, 2003-NMSC-

018, ¶ 6, 73 P.3d 181, 185-86).   "In New Mexico, negligence encompasses the concepts of

foreseeability of harm to the person injured and of a duty of care toward that person."  Ramirez v.

Armstrong, 1983-NMSC-104, ¶ 8, 673 P.2d 822, 825, overruled on other grounds by Folz v. State,

1990-NMSC-075, ¶ 3, 797 P.2d 246, 249.  Generally, negligence is a question of fact for the jury.

See Schear v. Bd. of Cnty Comm'rs, 1984-NMSC-079, ¶ 4, 687 P.2d 728, 729.  "A finding of

negligence, however, is dependent upon the existence of a duty on the part of the defendant."  Schear

v. Bd. of Cnty Comm'rs, 1984-NMSC-079, ¶ 4, 687 P.2d at 729.  "Whether a duty exists is a

question of law for the courts to decide."  Schear v. Bd. of Cnty Comm'rs, 1984-NMSC-079, ¶ 4,

687 P.2d at 729 (citation omitted).  Once courts recognize that a duty exists, that duty triggers "a

---

[38]The 2004 amendments to Uniform Jury Instruction 13-305 eliminated the word "proximate" within the instruction.  Use Note, N.M. Rul. Amend. Civ. UJI 13-305.  The drafters added, however, that the change was "intended to make the instruction clearer to the jury and do[es] not signal any change in the law of proximate cause."  Editor's Notes, N.M. Rul. Amend. Civ. UJI 13-305.

legal obligation to conform to a certain standard of conduct to reduce the risk of harm to an individual or class of persons."  Baxter v. Noce, 1988-NMSC-024, ¶ 11, 752 P.2d 240, 243.

New Mexico courts have stated that foreseeability of a plaintiff alone does not end the inquiry into whether the defendant owes a duty to the plaintiff.  See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 7, 73 P.3d at 186.  New Mexico courts have recognized that, "[u]ltimately, a duty exists only if the obligation of the defendant [is] one to which the law will give recognition and effect."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 9, 73 P.3d at 187 (internal quotation marks omitted).  To determine whether the defendant's obligation is one to which the law will give recognition and effect, courts consider legal precedent, statutes, and other principles of law.  See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 9, 73 P.3d at 186.

"As a general rule, an individual has no duty to protect another from harm."  Grover v. Stechel, 2002-NMCA-049, ¶ 11, 45 P.3d 80, 84.  "[C]ertain relationships, however, that give rise to such a duty [include]: (1) those involving common carriers, innkeepers, possessors of land; and (2) those who voluntarily or by legal mandate take the custody of another so as to deprive the other of his normal opportunities for protection."  Grover v. Stechel, 2002-NMCA-049, ¶ 11, 45 P.3d at 84. "[W]hen a person has a duty to protect and the third party's act is foreseeable, 'such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the [person who has a duty to protect] from being liable for harm caused thereby.'"  Reichert v. Atler, 1994-NMSC-056, ¶ 11, 875 P.2d 379, 382.

"[T]he responsibility for determining whether the defendant has breached a duty owed to the plaintiff entails a determination of what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d

at 194.  "The finder of fact must determine whether Defendant breached the duty of ordinary care by considering what a reasonably prudent individual would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all surrounding circumstances of the present case . . . ."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 195.

"A proximate cause of an injury is that which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195.  "It need not be the only cause, nor the last nor nearest cause."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195.  "It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes the injury."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195.

## NEW MEXICO LAW REGARDING STRICT PRODUCTS LIABILITY

"Under the 'product liability' claim, a supplier in the business of putting a product on the market is liable for harm caused by an unreasonable risk of injury resulting from a condition of the product or from a manner of its use."  N.M.R.A., Civ. UJI 13-1406.  See Stang v. Hertz Corp., 1972-NMSC-031, ¶ 6, 497 P.2d 732, 734;  Trujillo v. Berry, 1987-NMCA-072, ¶ 5 n.1, 738 P.2d at 1333 n.1 (stating that "the purpose behind the strict products liability doctrine is to allow an injured user . . . . to recover against a supplier . . . without the requirement of proving negligence.").  For a plaintiff to recover under strict products liability, the plaintiff must prove:

> (1) that the product was sold in a defective condition unreasonably dangerous to the user or consumer or to his property;
>
> (2) that the seller was engaged in the business of selling such a product; and
>
> (3) that the product was expected to and did reach the consumer without substantial

change in the condition in which it was sold.

Standhardt v. Flintkote Co., 1973-NMSC-040, ¶ 14, 508 P.2d 1283, 1290.  "Seller" is not an

exclusive, restrictive term for identifying potential defendants in a strict products liability action.

New Mexico's Uniform Jury Instructions use the term "supplier" to identify a liable party under

strict products liability, and the term is used with particular purpose.  N.M.R.A., Civ. UJI 13-1406

cmt.  The committee commentary to the jury instruction states that "certain commercial promotions

or other transactions do not involve the business of selling a product, [thus] the committee chose

'business of putting the product on the market'" rather than simply "seller."  N.M.R.A., Civ. UJI 13-

1406 cmt.  The committee stated that "supplier" captures the Supreme Court of New Mexico's

rationale for adopting strict products liability better than "seller," because holding those who put a

defective product on the market liable serves the risk-balancing goal of strict products liability.

N.M.R.A., Civ. UJI 13-1406 cmt. (citing Escola v. Coca Cola Bottling Co., 150 P.2d 436, 440-41

(Cal. 1944), for its discussion of risk-distribution, in which the Supreme Court of California states

that: "public policy demands that responsibility be fixed wherever it will most effectively reduce the

hazards to life and health inherent in defective products that reach the market").

   While the Supreme Court of New Mexico has allowed plaintiffs to recover from

manufacturers, retailers, and wholesalers, New Mexico courts have specifically declined to hold an

employer strictly liable for harm caused by a product that employees use in their course of work.

Compare AALCO Mfg. Co. v. City of Espanola, 1980-NMSC-088, ¶¶ 3-6, 618 P.2d 1230, 1231

(stating that strict liability applies to manufacturers, wholesalers, and retailers), with Trujillo v. Sonic

Drive-In/Merritt, 1996-NMCA-106, ¶ 29, 924 P.2d 1371, 1377 ("[W]e are not persuaded that, under

the doctrine of strict products liability, Employer would be considered the supplier . . . thus making it

strictly liable for injuries caused by a defect in [an ice cream machine].").  In Trujillo v. Sonic Drive-

In/Merritt, the Court of Appeals of New Mexico cited N.M.R.A., Civ. UJI 13-1406, and held that an employer could not be held strictly liable for the injuries a defective ice-cream machine caused to employees, because the employer was not a "supplier" of the machine.  1996-NMCA-106, ¶¶ 29-30, 924 P.2d at 1377-78.  The Court of Appeals of New Mexico distinguished a prior case that held that the operator of a car wash could be strictly liable for the injuries that machinery used at the car wash inflicted on a customer.  See 1996-NMCA-106, ¶¶ 29-30, 924 P.2d at 1378 (distinguishing Trujillo v. Berry (holding that a car-wash operator may be strictly liable for injuries caused by machinery used on its property, if a trial court determines that the car-wash operator was a "supplier" of the defective machine)).  The Court of Appeals of New Mexico explained that the prior case "would only have [imposed strict products liability] if the car-wash defendant was later determined by the trial court to be a supplier," a determination which the trial court did not make in that case.  1996-NMCA-106, ¶ 29, 924 P.2d at 1378.  The Court of Appeals of New Mexico ruled, therefore, that the employer was not strictly liable for owning a defective machine which inflicted injuries on an employee while the employee operated it.  See 1996-NMCA-106, ¶¶ 29-30, 924 P.2d at 1378.

The Court has interpreted New Mexico strict-products liability law to foreclose recovery against parties that do not place an allegedly defective product on the market.  See Provencio v. Ford Motor Co., 2005 WL 3662957, at *8 (D.N.M. 2005)(Browning, J.).  The Court explained that, in Arenivas v. Continental Oil Co., 1983-NMCA-104, 692 P.2d 31, an operator and part-owner of an oil field was not the supplier of a pumping unit used on the land, because it "did not in any way place the pumping unit in the stream of commerce."  Provencio v. Ford Motor Co., 2005 WL 3662957, at *8 (quoting Arenivas v. Continental Oil Co., 1983-NMCA-104, ¶ 15, 692 P.2d at 34).  The Court also explained that, in Livingston v. Begay, 1982-NMSC-121, 652 P.2d 734, the Supreme Court of New Mexico concluded that "a motel operator is not strictly liable for defects in the fixtures

and furnishings of the rooms he holds out to the public," because the motel operator has not introduced those items into the "stream of commerce." Provencio v. Ford Motor Co., 2005 WL 3662957, at *8 (quoting Livingston v. Begay, 1982-NMSC-121, ¶ 29, 652 P.2d at 739). "The thread that binds these cases is that, in each case, the alleged supplier did not sell the defective product to anyone." Provencio v. Ford Motor Co., 2005 WL 3662957, at *8. Accordingly, a party who does not sell or otherwise place an allegedly defective product in the stream of commerce may not be strictly liable for any alleged harm the product caused, and, thus, may not be jointly and severally liable for harm the product causes under New Mexico's strict products liability law. See Livingston v. Begay, 1982-NMSC-121, ¶ 29, 652 P.2d at 739.

## LAW REGARDING CONTRACT INTERPRETATION IN NEW MEXICO

In contract cases, "the role of the court is to give effect to the intention of the contracting parties." Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 21, 925 P.2d 1184, 1190. "The primary objective in construing a contract is not to label it with specific definitions or to look at form above substance, but to ascertain and enforce the intent of the parties as shown by the contents of the instrument." Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 21, 925 P.2d at 1190 (citing Shaeffer v. Kelton, 1980-NMSC-117, ¶ 8, 619 P.2d 1226, 1229). "The parol evidence rule 'bars admission of evidence extrinsic to the contract to contradict and perhaps even supplement the writing.'" Mem'l Med. Ctr., Inc. v. Tatsch Const., Inc., 2000-NMSC-030, ¶ 16, 12 P.3d 431, 437 (citation omitted). If a contract is ambiguous, however, "evidence will be admitted to aid in interpreting the parties' expressions." C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 12, 817 P.2d 238, 242 (citation omitted). "On the other hand, if the court determines that the contract is clear and unambiguous on its face, evidence of the circumstances surrounding the transaction is inadmissible to vary or modify its terms." C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 12,

817 P.2d at 242 (emphasis in original)(citation omitted).

The question whether an agreement contains an ambiguity is a matter of law.  See Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d 1232, 1235 (citing Levenson v. Mobley, 1987-NMSC-102, ¶ 7, 744 P.2d 174, 176).  If the "evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law."  Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235.  If, however, the court finds that the contract is "reasonably and fairly susceptible of different constructions, an ambiguity exists."  Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 (citing Vickers v. North Am. Land Dev., Inc., 1980-NMSC-021, ¶¶ 9-10, 607 P.2d 603, 606).  "An ambiguity exists in an agreement when the parties' expressions of mutual assent lack clarity."  Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 (citation omitted).

New Mexico courts may consider extrinsic evidence to determine "whether the meaning of a term or expression contained in the agreement is actually unclear."  Mark V., Inc., v. Mellekas, 1993-NMSC-001, ¶ 11, 845 P.2d at 1235.  See id., 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 ("New Mexico law, then, allows the court to consider extrinsic evidence to make a preliminary finding on the question of ambiguity."); C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 15, 817 P.2d at 242-43 ("We hold today that in determining whether a term or expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance.")(citation and footnote omitted).  Once a court finds an ambiguity, the resolution of that ambiguity becomes a question of fact.  See Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 13, 845 P.2d at 1235.  To decide any ambiguous terms' meaning, "the fact finder may consider extrinsic evidence of the language and conduct of the parties and the circumstances surrounding the

agreement, as well as oral evidence of the parties' intent." Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 13, 845 P.2d at 1236.  See Presbyterian Healthcare Servs. v. Goldman, Sachs & Co., 122 F. Supp. 3d 1157, 1184-85 (D.N.M. 2015)(Browning, J.).

## ANALYSIS

The Court grants the MSJ.  First, applying New Mexico choice-of-law rules, the Court concludes that Texas law governs Lopez' negligence and strict-products-liability claims.  The Court also concludes, however, that, under the Purchase Agreement's choice-of-law provision, Delaware law governs the Court's construction of the Purchase Agreement's terms.  Thus, the Court will apply Delaware law to determine whether The Black & Decker Corporation and Pentair, Inc. intended that The Black & Decker Corporation assume Delta Intl.'s liabilities in the Purchase Agreement, but will analyze Lopez' claims -- including the ultimate successor-liability issue -- under Texas substantive law.  Second, the Court concludes that the Black & Decker Defendants are entitled to judgment as a matter of law on the Amended Complaint, because: (i) they did not supply the table saw which allegedly caused Lopez' injuries; (ii) they do not control Delta Intl., the saw's original supplier, such that the Court can pierce the corporate veil to hold them liable for Lopez' injuries; and (iii) they are not liable for Lopez' injuries as successor corporations to Delta Intl., because they did not expressly assume Delta Intl.'s liabilities in the Purchase Agreement.

As for Lopez' rule 56(d) motion, the Court concludes that additional discovery will not yield facts that are material to Lopez' opposition to the MSJ.  Further discovery will not change that: (i) the Black & Decker Defendants did not assume Delta Intl.'s liabilities in the Purchase Agreement, which is already in the record; or (ii) that Delta Intl. continues to exist as a separate and distinct legal entity, which retains the historic liabilities it possessed before the Purchase Agreement's execution. With respect to Lopez' alternative request for an extension of time to respond to the MSJ, the Court

concludes that, although Lopez' stated justifications for an extension meet rule 6(b)'s "good cause" standard, his request is moot, because he has since filed several briefs in opposition to the MSJ.  The Court, accordingly, denies the requests in the MSJ Response/Motion.

**I.   UNDER NEW MEXICO CHOICE-OF-LAW RULES, TEXAS LAW GOVERNS LOPEZ' NEGLIGENCE AND STRICT-PRODUCTS-LIABILITY CLAIMS, INCLUDING THE SUCCESSOR-LIABILITY ISSUE, WHILE DELAWARE LAW GOVERNS CONSTRUCTION OF THE PURCHASE AGREEMENT'S TERMS.**

The Amended Complaint asserts products liability claims sounding in negligence and strict liability.  See Amended Complaint ¶ 6, at 2-3.  The parties devote considerable time debating which state's substantive law governs these claims.  According to the Black & Decker Defendants, New Mexico law applies to the issue whether they are liable for supplying the subject table saw, see MSJ at 4-5, while Texas law governs the issue whether they are liable as corporate successors to Delta Intl., see MSJ at 5-7.  In his MSJ Response/Motion, Lopez appears to argue that Texas law applies to the underlying supplier-liability issue, while New Mexico law governs successor liability.  See MSJ Response/Motion at 6-12.  Later, in his Suppl. Brief Reply, Lopez avers that either Delaware or New Mexico law applies to the successor-liability issue, but that "under no scenario would New Mexico courts apply Texas law . . . ."  Suppl. Brief Reply ¶ 13, at 10.  Accordingly, before deciding whether the Black & Decker Defendants are entitled to summary judgment on Lopez' claims, the Court must first determine which state's substantive law governs those claims.

**A.   THE COURT MUST CONDUCT CHOICE-OF-LAW ANALYSIS, BECAUSE THE RELEVANT STATES' LAWS ACTUALLY CONFLICT.**

The parties argue that a mishmash of state substantive laws govern this dispute.  Initially, the Court must determine whether an actual conflict exists between the application of these states' laws.  Under the "false conflict" doctrine, "when the laws of the relevant states do not actually conflict, the court may avoid a conflict-of-law analysis and may apply forum law" to a claim.  Ferrell v. Allstate

Ins. Co., 2008-NMSC-042, ¶ 16, 188 P.3d at 1164 (citing Phillips Petroleum Co. v. Shutts, 472 U.S. at 816). No actual conflict exists if "the laws of both states relevant to the set of facts are the same, or would produce the same decision in the lawsuit[.]" R. Leflar, American Conflicts Law § 93, p. 188 (3d ed. 1977). In short, the relevant inquiry is whether forum law "conflicts in any material way with any other law which could apply." Petroleum Co. v. Shutts, 472 U.S. at 816. If there is such a conflict, the Court "must resolve that conflict using the choice-of-law rules contained in the forum state's conflict-of-laws doctrine." Ferrell v. Allstate Ins. Co., 2008-NMSC-042, ¶ 16, 188 P.3d at 1164. Here, the Court concludes that choice-of-law analysis is necessary, because the relevant states' laws actually conflict on this case's central successor-liability issue.

New Mexico, the forum state, has adopted four traditional exceptions to the general rule that a successor corporation is not liable for its predecessor's obligations, including: "(1) where there is an agreement to assume those obligations; (2) where the transfer results in a consolidation or merger; (3) where there is a continuation of the transferor corporation; or (4) where the transfer is for the purpose of fraudulently avoiding liability." Garcia v. Coe Mfg. Co., 1997-NMSC-013, ¶ 12, 933 P.2d at 247 (citing Sw. Distrib. Co. v. Olympia Brewing Co., 1977-NMSC-050, ¶ 13, 565 P.2d 1019, 1022-23). New Mexico has also joined a minority of states in adopting the "product-line" exception, which "seeks to establish whether there is a substantial continuity in the products resulting from the pretransaction and posttransaction use of the predecessor's assets." Garcia v. Coe Mfg. Co., 1997-NMSC-013, ¶ 15, 933 P.2d at 247 (brackets and citation omitted). Delaware, by contrast, recognizes the four traditional exceptions to successor nonliability, see Elmer v. Tenneco Resins, Inc., 698 F. Supp. at 540-42 (applying Delaware law), but has not adopted the product-line exception, see Daniel R. Campbell, Product Liability Just Doesn't Fly, 84 Def. Counsel J. 1, 11 (2017)(conducting a fifty-state review of the product-line exception). Texas is even more restrictive in its interpretation of the

exceptions to successor nonliability.  See E-Quest Mgmt., LLC v. Shaw, 433 S.W.3d at 24 ("Texas 'strongly embraces' a 'nonliability' rule for corporate successors.")(citation omitted).  Texas law not only "explicitly rejects the product-line successor liability rule," Ford, Bacon & Davis, L.L.C. v. Travelers Ins. Co., 635 F.3d 734, 735 (5th Cir. 2011)(applying Texas law), but also rejects three of the four traditional exceptions, imposing liability on a successor corporation only where it expressly assumes its predecessor's liabilities, see Tex. Bus. Orgs. Code. § 10.254 (West 2012).

Given these variations, the Court concludes that there are material conflicts between New Mexico, Delaware, and Texas law regarding whether the Black & Decker Defendants are liable for Lopez' products liability claims as successors to Delta Intl.  See Petroleum Co. v. Shutts, 472 U.S. at 816.  For example, while Lopez might prevail on a product-line theory under New Mexico law, he is foreclosed from asserting such a theory under Delaware and Texas law.  Indeed, whereas Lopez can assert any of the four traditional exceptions to successor nonliability under New Mexico or Delaware law, Texas law allows him to assert only the express-assumption exception.  Thus, having found an actual conflict, the Court will conduct a choice-of-law analysis.  See Ferrell v. Allstate Ins. Co., 2008-NMSC-042, ¶ 16, 188 P.3d at 1164.

### B.    TEXAS SUBSTANTIVE LAW GOVERNS LOPEZ' NEGLIGENCE AND STRICT-PRODUCTS-LIABILITY CLAIMS.

The Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332.  A federal court sitting in diversity looks to the forum state's choice-of-law rules to determine which state's substantive law to apply.  See Klaxon Co. v. Stentor Elec. Mfr. Co., Inc., 313 U.S. at 496-97; Pepsi-Cola Bottling Co. v. PepsiCo, Inc., 431 F.3d at 1255 ("In a diversity action, we apply the substantive law of the forum state, including its choice of law rules.").  In New Mexico, choice-of-law analysis is a two-step process.  See Mosely v. Titus, 762 F. Supp. 2d at 1314 (citing Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 14, 142 P.3d at 377).  The Court must first characterize the "area

of substantive law" to which New Mexico law assigns a particular claim or issue. Mosely v. Titus, 762 F. Supp. 2d at 1314 (citing Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 11, 142 P.3d at 377). There are few categories within which claims may fall -- "[t]ort cases, i.e., all 'civil wrongs,' are one class; contracts, i.e., every kind of enforceable promise, is another single class." J. McLaughlin, Conflict of Laws: the Choice of Law Lex Loci Doctrine, the Beguiling Appeal of a Dead Tradition, Part One, 93 W. Va. L. Rev. 957, 989 (1991)(describing the categories as "tort, contract, or some other"). After categorizing the claim, the Court must apply the New Mexico choice-of-law rule applicable to that category to determine which state's substantive law applies. See Mosely v. Titus, 762 F. Supp. 2d at 1314 (citing Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶¶ 11-15, 142 P.3d at 377).

In personal injury cases alleging a product defect, New Mexico law recognizes both tort- and contract-based causes of action. See Badilla v. Wal-Mart Stores E. Inc., 2015-NMSC-029, ¶ 45, 357 P.3d 936, 947 (noting that, in defective products cases, plaintiffs may bring products liability tort or UCC breach-of-warranty claims)(citing Perfetti v. McGhan Med., 1983-NMCA-032, ¶¶ 45-47, 662 P.2d 646). Here, Lopez' negligence and strict-products-liability claims fall within the tort category. See Steinberg v. Coda Roberson Constr. Co., 1968-NMSC-055, ¶¶ 6-7, 440 P.2d 798, 799 (finding a tort cause of action for negligence against a supplier, regardless of privity of contract); Stang v. Hertz Corp., 1972-NMSC-031, ¶¶ 7-25, 497 P.2d at 734-37 (finding a strict-products-liability claim sounding in tort under Restatement (Second) of Torts § 402A (1965)). See also AALCO Mfg. Co. v. City of Espanola, 1980-NMSC-088, ¶¶ 9-10, 618 P.2d at 1232 (referring to negligence and strict products liability as "[t]wo different torts"). Lopez alleges that the Black & Decker Defendants supplied the subject table saw, see Amended Complaint ¶ 5, at 2, and that they supplied it in a dangerous condition, see Amended Complaint ¶ 6, at 2. Although cursory, these allegations

resemble the strict-products-liability tort's elements.  See Standhardt v. Flintkote Co., 1973-NMSC-040, ¶ 14, 508 P.2d at 1290 (noting that strict products liability requires that (i) a supplier (ii) supply a dangerous product (iii) which reaches the consumer in substantially the same condition as it was sold).  Lopez also alleges that the Black & Decker Defendants owed him a duty of care; that they breached that duty under one of sixteen alternative theories, e.g., failure to warn as to the table saw's dangerous condition, and various negligent design, marketing, and manufacturing theories; and that their breach proximately caused his injuries.  See Amended Complaint ¶ 6, at 2-3.  These allegations, which rely on a negligence theory, are consistent with textbook products liability claims sounding in tort.  See Badilla v. Wal-Mart Stores E. Inc., 2015-NMSC-029, ¶ 47, 357 P.3d at 947 ("[T]he very nature of tort-based products liability claims[ is they] rely on a theory of negligence.")(alterations added)(citation omitted).  Accordingly, the Court categorizes Lopez' claims as torts and will apply tort choice-of-law rules.

In tort actions, New Mexico courts apply "the doctrine of *lex loci delicti commissi*," or the law of the place where the wrong occurred.  Torres v. State, 1995-NMSC-025, ¶ 13, 894 P.2d at 390; Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶¶ 11-15, 142 P.3d at 377.  The place of the wrong is the location of the last act necessary to complete the injury.  See Mosely v. Titus, 762 F. Supp. 2d at 1314.  Here, it is undisputed that the place where the wrong occurred is Texas.  See MSJ ¶ 11, at 4 (asserting that "[t]he events giving rise to this lawsuit . . . occurred entirely in El Paso, Texas"); MSJ Response/Motion at 1-16 (not disputing this fact); Suppl. Brief at 1-8 (not disputing this fact).  New Mexico choice-of-law rules thus dictate that the Court apply Texas substantive law to Lopez' products liability claims.

C.    **DELAWARE LAW GOVERNS THE COURT'S INTERPRETATION OF THE PURCHASE AGREEMENT'S TERMS, BUT TEXAS LAW GOVERNS THE CONTRACT'S LEGAL EFFECTS AND ISSUES OF TORT LIABILITY UNRELATED TO THE CONTRACT.**

Lopez does not dispute that his claims sound in tort, or that the *lex loci delicti* choice-of-law rule points to Texas substantive law.  See MSJ Response/Motion at 12 ("[T]he *lex loci delicti* choice-of-law rule points to Texas law . . . ."); MSJ Surreply at 7 (same).  Lopez contends, however, that the "separate issue" of successor liability "is not controlled by *lex loci delicti* but by contract choice-of-law rules and policy considerations . . . ."  MSJ Surreply at 7.  In Lopez' view, "successor liability in a products liability claim is a 'hybrid' question that the New Mexico Supreme Court has indicated is primarily an issue of contract law and presents unique policy questions since the process is . . . a hybrid of tort and corporate/contract law."  MSJ Surreply at 4 (internal quotation marks and brackets omitted).  Consequently, Lopez argues, "New Mexico courts would likely give effect to the parties' choice-of-law provision and apply Delaware law, or alternatively apply New Mexico law to protect the interests of its citizens (if Delaware law w[ere] contrary to New Mexico public policy)."  Suppl. Brief Reply ¶ 13, at 10.  Lopez asserts, however, that "under no scenario would New Mexico courts apply Texas law to the issue of successor liability in this case."  Suppl. Brief Reply ¶ 13, at 10.

Lopez' protracted focus on the choice-of-law issue is not misplaced, as the practical effect of characterizing successor liability is likely significant.  Since the Court dismissed Delta Intl. for lack of personal jurisdiction, Lopez has attempted to maintain this litigation against the Black & Decker Defendants by arguing that they are successors to Delta Intl.'s liabilities -- including its liability for his present claims -- via the Purchase Agreement.  The Purchase Agreement contains a provision that chooses Delaware law to govern the contract, see Purchase Agreement ¶ 11.4, at 49, meaning that, should the Court characterize the issue as contractual, the Court will apply Delaware law unless it "offends New Mexico public policy," in which case it will apply New Mexico law instead, Fiser v.

Dell Computer Corp., 2008-NMSC-046, ¶ 7, 188 P.3d 1215, 1218 ("New Mexico respects party autonomy; the law to be applied to a particular dispute may be chosen by the parties through a contractual choice-of-law provision.")(citing N.M. Stat. Ann § 55-1-301(A)).  See MidAmerica Constr. Mgmt., Inc. v. MasTec N. Am., Inc., 436 F.3d 1257, 1260 (10th Cir. 2006)("[F]ederal courts must look to the forum state's choice-of-law rules to determine the effect of a contractual choice-of-law clause.").  As noted above, New Mexico, Delaware, and Texas have adopted materially different successor-liability standards; thus, the determination which state's law applies might significantly impact the Court's analysis of Lopez' claims.

### 1.    Courts Are Split on How to Characterize Successor Liability and Its Exceptions for Choice-of-Law Purposes.

"The ordinary rule of successor liability is rooted in corporate law, and it states that a firm that buys assets from another firm does not assume the liabilities of the seller merely by buying its assets." Berg Chilling Sys. v. Hull Corp., 435 F.3d 455, 464 (3d Cir. 2006)(citations omitted).  The characterization problem originates from the "mottled nature of the exceptions to the ordinary rule in successor liability law because they are not uniformly characterized as wholly based in tort, contract, or corporate law." Berg Chilling Sys. v. Hull Corp., 435 F.3d at 464 (citations omitted).  See Ruiz v. Blentech Corp., 89 F.3d 320, 326 (7th Cir. 1996)("[T]he courts of several states have struggled to decide whether [successor liability] is a part of corporate law or of tort law.").  As the United States Court of Appeals for the Third Circuit has noted, the four traditional exceptions -- express or implied assumption, merger, mere continuation, and fraud -- are "founded in corporate and contract law." Berg Chilling Sys. v. Hull Corp., 435 F.3d at 464 (citing Ruiz v. Blentech Corp., 89 F.3d at 326). For example, the traditional exception for express assumption of liabilities "is based on interpreting the terms of the parties' agreement" and is thus "characterized most strictly as contract law."  Berg Chilling Sys. v. Hull Corp., 435 F.3d at 464 (citing T.H.S. Northstar Associates v. W.R. Grace &

Co.-Conn., 840 F. Supp. 676, 677-78 (D. Minn. 1993)(Renner, J)). The traditional "*de facto* merger exception," however, "is not strictly contractual because it is an equitable principle, ultimately designed to look beyond the contract." Berg Chilling Sys. v. Hull Corp., 435 F.3d at 465.

Aside from the four traditional exceptions, some states -- including New Mexico -- have also adopted exceptions to the nonliability rule in products liability cases. See, e.g., Garcia v. Coe Mfg. Co., 1997-NMSC-013, ¶ 23, 933 P.2d at 250; Dawejko v. Jorgensen Steel Co., 434 A.2d 106, 111 (Pa. Super. 1981); Ramirez v. Amsted Industries, Inc., 431 A.2d 811, 824-25 (N.J. 1981); Ray v. Alad Corp., 560 P.2d 3 (Cal. 1977). Under the "continuing enterprise" exception, for example, the successor corporation is strictly liable for its predecessor's obligations if it uses the assets it acquires to substantially continue its predecessor's business activities. Cyr v. B. Offen & Co., Inc., 501 F.2d 1145 (1st Cir. 1974). Similarly, the "product line" exception imposes liability where the successor corporation substantially continues to manufacture its predecessor's defective products. Ray v. Alad Corp., 560 P.2d at 11.

Generally, states applying the product-line exception have characterized it as a matter of tort law. See, e.g., Ruiz v. Blentech Corp., 89 F.3d at 327 (concluding that California courts have "quite clearly established that the exception is a matter of products liability law, not corporate law"); Shorb v. Airco, Inc., 644 F. Supp. 923, 930 (E.D. Pa. 1986)(Lord, III, S.J.)(applying Pennsylvania law and characterizing the exception as a matter of tort and not contract/corporate law); Ramirez v. Amsted Industries, Inc., 431 A.2d at 819-20 (concluding that, under New Jersey law, the exception is a mechanism to preserve the system of strict liability for products liability claims). But see Ruiz v. Blentech Corp., 89 F.3d at 327 (concluding that, under Michigan law, the "exception seems to be an instrument of corporate law that defines what must pass through an asset sale")(citing Turner v. Bituminous Casualty Co., 244 N.W.2d 873, 879-80 (Mich. 1976)). These states maintain that "the

purpose of the product line exception is to compensate otherwise remediless tort victims, not to preempt the role of contract in corporate successorships[.]" 63 Am. Jur. 2d Products Liability § 136 (citing <u>Shorb v. Airco, Inc.</u>, 644 F. Supp. at 930). Whatever the rationale, this categorization has the "confusing effect of introducing an explicitly tort-based exception to a traditionally corporate- and contract-based doctrine." <u>Berg Chilling Sys. v. Hull Corp.</u>, 435 F.3d at 465.

Some federal district courts have resolved the characterization problem in personal injury actions alleging a product defect by characterizing the entire successor-liability issue as a matter of tort law, without regard to individual exceptions' classifications. The United States District Court for Eastern District of Michigan, for example, has held that, because Michigan courts characterize products liability actions as tortious, the *lex loci delicti* rule applies to successor liability questions in such cases. <u>See</u> <u>Korzetz v. Amsted Industries, Inc.</u>, 472 F. Supp. 136, 142 & n.25 (E.D. Mich. 1979)(Cook, J.). The United States District Court for the District of Ohio has similarly categorized successor liability as tortious under Ohio law based on Ohio courts' classification of the underlying products liability issue as a matter of tort law. <u>See</u> <u>Hoover v. Recreation Equip. Corp.</u>, 763 F. Supp. 210, 216-18 (N.D. Ohio 1989)(Bell, J.). Other federal district courts have criticized this approach, reasoning that cases holding that the relevant issue for choice-of-law purposes is "the underlying tortious conduct rather than the transaction which (potentially) [gives] rise to successor liability" are "wrongly decided." <u>Allstate Ins. Co. v. Countrywide Fin. Corp.</u>, 824 F. Supp. 2d 1164, 1174 (C.D. Cal. 2011)(Pfaelzer, J.)(criticizing <u>Chrysler v. Ford Motor Co.</u>, 972 F. Supp. 1097, 1102 (E.D. Mich. 1997)(Feikens, J.)). Instead, these courts "look to the transaction giving rise to potential successor liability, not the underlying tortious act." <u>Allstate Ins. Co. v. Countrywide Fin. Corp.</u>, 824 F. Supp. 2d at 1174. <u>Accord</u> <u>Bouchillon v. Deutz-Fahr</u>, 2017 U.S. Dist. LEXIS 103210, at *16-17 (N.D. Miss. 2017)(Brown, J.)("Where . . . a plaintiff seeks to impose liability based on successor liability

rather than a 'primary violation,' the 'issue' . . . is 'the transaction which (potentially) gave rise to successor liability,' not the 'underlying tortious conduct'")(quoting Allstate Ins. Co. v. Countrywide Fin. Corp., 824 F. Supp. 2d at 1173-74).

### 2.    New Mexico Case Law Offers Limited Guidance With Respect to the Characterization Problem.

Here, the relative dearth of New Mexico case law concerning successor liability compounds the characterization problem.  The Supreme Court of New Mexico first adopted the general rule of successor nonliability and its four traditional exceptions in Pankey v. Hot Springs Nat'l Bank, 1941-NMSC-060, 119 P.2d 636.  In that case, a predecessor bank's judgment creditor attempted to levy on the successor's assets based on the successor's contractual assumption of "ledger liabilities."  1941-NMSC-060, ¶¶ 1-2, 119 P.2d at 638-39.  The Supreme Court of New Mexico prohibited the levy, concluding that the judgment which furnished the basis for the levy was not a "ledger liability" under the contract.  1941-NMSC-060, ¶ 1, 119 P.2d at 638.  Subsequently, in Sw. Distrib. Co. v. Olympia Brewing Co., the Supreme Court of New Mexico held that a successor brewing company did not assume in an asset acquisition its predecessor's obligation to perform an oral distributorship agreement.  See 1977-NMSC-050, ¶¶ 10-14, 565 P.2d at 1022-23.  In reaching this conclusion, the Supreme Court of New Mexico stressed the general rule that a successor corporation is not liable for its predecessor's obligations absent a contractual provision assuming such obligations.  See 1977-NMSC-050, ¶¶ 10-14, 565 P.2d at 1022-23.  Both cases relied upon general contract and corporate law principles; neither case involved a tort claim.

In Garcia v. Coe Mfg. Co., the Supreme Court of New Mexico first considered the successor nonliability rule's application to third-party tort claims.  See 1997-NMSC-013, ¶ 12, 933 P.2d at 247 ("We have not had the opportunity to analyze the application of the rule and its exceptions in the context of a tort claim against a successor corporation.").  There, a widow brought a wrongful death

action against her deceased husband's employer, Coe Manufacturing Company ("Coe Co."), after her husband was crushed to death while operating press and forming line equipment that Coe Co.'s predecessor, Washington Iron Works, Inc. ("Washington, Inc."), manufactured. See 1997-NMSC-013, ¶¶ 1-10, 933 P.2d at 244-46. In an asset purchase, Coe Co. had acquired Washington, Inc.'s boardline division, including its boardline plants, equipment, and parts; it did not agree, however, to assume any of Washington, Inc.'s debts or liabilities. See 1997-NMSC-013, ¶ 4, 933 P.2d at 245. Coe Co. moved for summary judgment, and the trial court granted the motion, holding that, as a successor, Coe Co. was shielded from liability for its predecessor's defective equipment. See 1997-NMSC-013, ¶ 9, 933 P.2d at 246. On appeal, the Court of Appeals of New Mexico certified the issue -- one of first impression -- to the Supreme Court of New Mexico. See 1997-NMSC-013, ¶ 9, 933 P.2d at 246.

The Supreme Court of New Mexico noted that, on these facts, the "only arguable [traditional] exception that might be applicable is the third exception -- a continuation of the transferor or predecessor corporation." 1997-NMSC-013, ¶ 12, 933 P.2d at 247. The Supreme Court of New Mexico held that this exception did not apply, because Coe Co. and Washington, Inc. "did not share directors, officers or stockholders." 1997-NMSC-013, ¶ 4, 933 P.2d at 245. The Supreme Court of New Mexico decided, however, to adopt a fifth exception to the ordinary successor nonliability rule: the product-line exception. See 1997-NMSC-013, ¶¶ 16-22, 933 P.2d at 248-50. The Supreme Court of New Mexico noted, first, that the exception's underlying "rationale . . . is the necessity of protecting an injured person who may be left without a remedy if the predecessor has dissolved, is defunct, or is otherwise unavailable to respond in damages." 1997-NMSC-013, ¶ 15, 933 P.2d at 247 (citing Turner v. Bituminous Casualty Co., 244 N.W.2d at 878). The Supreme Court of New Mexico also noted, however, that "[w]hether this important policy consideration prevails depends on

a judgment made after assessing the competing policies which underlie rules of contract and tort liability consistent with products liability analysis . . . ." Garcia v. Coe Mfg. Co., 1997-NMSC-013, ¶ 15, 933 P.2d at 247 (citing Brooks v. Beech Aircraft Corp., 1995-NMSC-043, ¶ 23, 902 P.2d 54, 59). The Supreme Court of New Mexico elaborated:

> When a successor corporation continues to market many of the same products and represents to the public and its predecessor's customers that it is continuing the predecessor's enterprise, it essentially picks up where the predecessor left off. Whether liability should be imposed depends on whether the successor has the same ability as its predecessor to assess, control, and distribute the risks and costs of injuries caused by a product defect. If it does, we must still determine whether under the facts of a particular case this ability is nevertheless outweighed by the policies underlying the contract-law-based rule of successor corporation nonliability -- chiefly, promoting the alienability of corporate assets.

Garcia v. Coe Mfg. Co., 1997-NMSC-013, ¶ 17, 933 P.2d at 248 (citing Cyr v. B. Offen & Co., Inc., 501 F.2d at 1153; Ray v. Alad Corp., 560 P.2d at 9-11). Having adopted the product-line exception, the Supreme Court of New Mexico reversed the trial court's grant of summary judgment on the strict liability claim, concluding that genuine issues of material fact may exist regarding the exception's application. See Garcia v. Coe Mfg. Co., 1997-NMSC-013, ¶ 23, 933 P.2d at 250.

### 3. Successor Liability in this Third-Party Products Liability Action is a Matter of Tort Law, But Contract Law Governs Interpretation of the Purchase Agreement's Terms.

Lopez seeks to impose successor liability based on three exceptions to the nonliability rule: (i) the Black & Decker Defendants' alleged assumption of liabilities in the Purchase Agreement, see Suppl. Brief Reply ¶ 11, at 9; (ii) the Black & Decker Defendants' alleged continuation of Delta Intl.'s business, see Suppl. Brief Reply ¶ 11, at 9; and (iii) the Black & Decker Defendants' alleged continued production of the Delta Unisaw Model 36-812, see Suppl. Brief Reply ¶ 12, at 9-10. The Court, in categorizing these theories of liability, is obligated to "follow the most recent decisions of the state's highest court." Wankier v. Crown Equip. Corp., 353 F.3d at 866. Here, Garcia v. Coe

Mfg. Co. -- the Supreme Court of New Mexico's most recent successor liability decision -- does not explicitly categorize the nonliability rule or its exceptions as contractual, corporate, or tortious, nor has the Court found such an explication in any other New Mexico successor liability decision.  Thus, because "no controlling state decision exists," the Court "must attempt to predict what the state's highest court would do" by considering dicta, related decisions, analogies, and other reliable data. Wade v. EMCASCO Ins. Co., 483 F.3d at 665-66.

Although Garcia v. Coe Mfg. Co. does not explicitly categorize successor nonliability or its exceptions, it provides a useful analytical starting point.  The Supreme Court of New Mexico begins its analysis by reviewing its prior successor liability cases, all of which applied the rule in corporate- and contract-law contexts.  See Garcia v. Coe Mfg. Co., 1997-NMSC-013, ¶¶ 11-12, 933 P.2d at 246-47 (discussing Pankey v. Hot Springs Nat'l Bank and Sw. Distrib. Co. v. Olympia Brewing Co.).  The Supreme Court of New Mexico also refers to successor nonliability as a "contract-law-based rule" designed to "promot[e] the alienability of corporate assets."  Garcia v. Coe Mfg. Co., 1997-NMSC-013, ¶ 17, 933 P.2d at 248.  At the same time, the Supreme Court of New Mexico reasons that, in third-party products liability actions, the nonliability rule implicates traditional tort-based policy considerations.  See 1997-NMSC-013, ¶¶ 15-22, 933 P.2d at 247-50.  These policy considerations include providing injured persons with a viable remedy against suppliers of defective products or against their successors in interest; the fairness of imposing liability on suppliers who profit from placing defective products into commerce; and the risk that a strict liability regime could deter suppliers from producing useful and beneficial products.  See 1997-NMSC-013, ¶¶ 15-22, 933 P.2d at 247-50.  In light of these considerations, the Supreme Court of New Mexico concludes that application of the nonliability rule in third-party products liability actions requires an "assess[ment of] the competing policies which underlie rules of contract and tort liability consistent with products

- 84 -

liability analysis . . . ." 1997-NMSC-013, ¶ 15, 933 P.2d at 247-48 (citing <u>Brooks v. Beech Aircraft</u> <u>Corp.</u>, 1995-NMSC-043, ¶ 23, 902 P.2d at 59).

This analysis lends credence to Lopez' assertion that, in New Mexico, "successor liability in a products liability claim is a . . . hybrid of tort and corporate/contract law." MSJ Surreply at 4.  It does not follow, however, that successor liability in this context is "primarily an issue of contract law." MSJ Surreply at 4.  In a traditional successor liability analysis, the basic inquiry centers on the parties' bargained-for expectations in an asset acquisition, as well as the practical effects of such an acquisition, <u>e.g.</u>, whether it results in a merger or in a continuation of the seller.  <u>See Garcia v. Coe</u> <u>Mfg. Co.</u>, 1997-NMSC-013, ¶¶ 11-12, 933 P.2d at 246-47.  In a third-party products liability action, however, the inquiry necessarily looks beyond the transaction potentially giving rise to successor liability, focusing instead on ancillary conduct.  In such actions, successor liability is less concerned with protecting bargained-for expectations, because the plaintiff, who has no business relationship with the parties to the transaction, did not bargain for anything.  Put another way, a third-party tort claimant seeking to hold a successor corporation liable for its predecessor's defective products is not enforcing any contract; rather, liability turns on the viability of the underlying tort claim and not on principles of contract enforcement.

This observation is not to say that contract analysis is irrelevant to successor liability in the context of a third-party tort claim; to the contrary, <u>Garcia v. Coe Mfg. Co.</u> mandates an assessment of both tort and contract policies.  <u>See</u> 1997-NMSC-013, ¶ 15, 933 P.2d at 247.  For characterization purposes, however, the Supreme Court of New Mexico's analysis suggests that the inquiry is predominantly a matter of tort law.  The Supreme Court of New Mexico's adoption of the product-line exception in <u>Garcia v. Coe Mfg. Co.</u> illustrates this conclusion.  In adopting that exception, the Supreme Court of New Mexico purposefully departed from the majority view that corporations do

not succeed to their predecessors' liabilities merely by continuing to manufacture their products.  See 1997-NMSC-013, ¶ 20, 933 P.2d at 249 (recognizing that most courts have rejected the product-line exception).  The Supreme Court of New Mexico chose, rather, to emphasize the tort-based policy of providing injured persons with a remedy where the predecessor corporation is unavailable to respond in damages.  See 1997-NMSC-013, ¶ 20, 933 P.2d at 249.  Only after stressing this "important policy consideration" did the Supreme Court of New Mexico state that a reviewing court should assess whether, "under the facts of a particular case," contract-based policies nevertheless outweigh. 1997-NMSC-013, ¶¶ 15, 17, 933 P.2d at 246-47.

Of the three exceptions to successor liability which Lopez raises, the exception for express assumption of liabilities relies most heavily upon contract-law principles.  See Berg Chilling Sys. v. Hull Corp., 435 F.3d at 464 (noting that the express-assumption exception is "characterized most strictly as contract law").  See also Sw. Distrib. Co. v. Olympia Brewing Co., 1977-NMSC-050, ¶¶ 9-14, 565 P.2d at 1022-23 ("scrutiniz[ing]" a purchase agreement's terms to determine whether there was a contractual assumption of liabilities).  Under this exception, the Court must interpret the Purchase Agreement's terms to determine what Pentair, Inc. and The Black & Decker Corporation -- the parties to the agreement -- intended with respect to Delta Intl.'s liabilities.  Because this inquiry is contractual, the Court must effectuate the parties' bargained-for choice-of-law provision, which chooses Delaware law to govern interpretation of the agreement's terms.  See Purchase Agreement ¶ 11.4, at 49 ("This Agreement . . . shall be construed and interpreted according to the internal laws of the State of Delaware[.]").  See also Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 7, 188 P.3d at 1218 (stating that New Mexico law allows parties to choose the law to govern a contract).  The choice-of-law provision does not, however, apply to the Purchase Agreement's legal effects or to issues of tort liability ancillary to the contract.  Cf. Travis v. Harris Corp., 565 F.2d 443, 446 (7th

Cir. 1977)(stating that, with respect to successor liability, a choice-of-law provision may govern interpretation of the contract, but that "the legal effect of that agreement, and questions of traditional tort law unrelated to the contract, are to be determined in accord with the laws of . . . the situs of the injury").  Pentair, Inc. and The Black & Decker Corporation bargained for Delaware law to govern interpretation of the Purchase Agreement's terms, not to govern disputes involving third-party tort claimants.  Accordingly, although the express-assumption exception requires, in the first instance, that the Court interpret the parties' agreement, the ultimate issue whether the agreement gives rise to third-party tort liability remains a matter of tort law.

As for the second exception which Lopez raises -- the "mere continuation" exception -- the Court must determine whether the Purchase Agreement's practical effect is a "continuation of the transferor corporation," i.e., whether Delta Intl. and the Black & Decker Defendants have common officers, directors, and stockholders.  Garcia v. Coe Mfg. Co., 1997-NMSC-013, ¶ 13, 933 P.2d at 247 (citing McCarthy v. Litton Indus., 570 N.E.2d 1008, 1013 (Mass. 1991)).  This inquiry, "by its nature, looks beyond the contract," because the parties cannot control, through express contractual language, whether their agreement has the effect of continuing the transferor.  Berg Chilling Sys. v. Hull Corp., 435 F.3d at 466 (analyzing the "de facto merger exception," which, the Third Circuit explains, is identical to the mere-continuation exception).  Thus, the mere-continuation exception is an "equitable principle" under which liability may be imposed if a successor corporation effectively operates as a continuation of its predecessor, regardless whether the underlying transaction intended such a result.[39]  Berg Chilling Sys. v. Hull Corp., 435 F.3d at 465 (adding that the exception "rests

---

[39]The Court notes that, even if the issue was strictly contractual -- a conclusion which the Court does not believe the Supreme Court of New Mexico would reach -- the Purchase Agreement's choice-of-law provision would be inapposite.  The parties bargained for Delaware law to apply to interpretation of the Purchase Agreement's terms, not to their real-world effects.  Cf. Berg Chilling

somewhere in the middle" of contract and tort law).  Although the Supreme Court of New Mexico

has not explicitly categorized this exception, it has analyzed the exception under factors similar to

those which other courts have applied in "equitable" analyses.  Compare Garcia v. Coe Mfg. Co.,

1997-NMSC-013, ¶ 13, 933 P.2d at 247 (considering (i) "continuity of directors, officers, and

shareholders"; (ii) "continued existence of only one corporation"; and (iii) "inadequate consideration

for the sale of the assets")(citing McCarthy v. Litton Indus., 570 N.E.2d at 1013), with Berg Chilling

Sys. v. Hull Corp., 435 F.3d at 465-69 (calling the exception an "equitable principle" and analyzing

(i) "continuity of management, personnel, [etc.]"; (ii) "continuity of shareholders"; (iii) whether the

"seller corporation . . . dissolves"; and (iv) whether the purchasing corporation continues the "normal

business operations of the seller")(citing Philadelphia Elec. Co. v. Hercules, Inc., 762 F.2d 303, 310

(3d Cir. 1985)).  While this analysis' starting point is a fact-based evaluation of the successor

corporation's form, the issue whether equity justifies imposing third-party tort liability unrelated to

corporate form is, ultimately, a matter of tort law.

Finally, Lopez' third theory -- the product-line exception -- requires that the Court determine

whether the Black & Decker Defendants have substantially continued to manufacture Delta Intl.'s

products following the Purchase Agreement's execution.  See Garcia v. Coe Mfg. Co., 1997-NMSC-

013, ¶ 15, 933 P.2d at 247.  Courts applying this exception -- including the Supreme Court of New

Mexico -- have developed it to advance distinctly tort-based policy goals, namely, to provide injured

persons with a viable remedy where a defective product's manufacturer has dissolved, as well as to

spread the cost of compensating such persons.  See Garcia v. Coe Mfg. Co., 1997-NMSC-013, ¶ 15,

933 P.2d at 247 ("[T]he rationale . . . is the necessity of protecting an injured person who may be left

_____

Sys. v. Hull Corp., 435 F.3d at 466 ("[T]he fact remains that the[] [parties] bargained for New Jersey
law to apply to interpretation of the provisions of the contract, not to their real-world effect.").

without a remedy if the predecessor has dissolved, is defunct, or is otherwise unavailable to respond to damages."); Ramirez v. Amsted Industries, Inc., 431 A.2d at 824-25 (applying the product-line exception to (i) provide injured persons a remedy; (ii) spread the risk for defective products; and (iii) advance fairness); Ray v. Alad Corp., 560 P.2d at 39 (justifying product-line liability based on (i) the need for a remedy; (ii) the successor's "risk-spreading role"; and (iii) fairness).  "The product line exception is limited to cases in which strict tort liability is available as a theory of recovery," 63 Am. Jur. 2d Products Liability § 136, and most courts have characterized the exception as a matter of tort law, see Ruiz v. Blentech Corp., 89 F.3d at 327; Shorb v. Airco, Inc., 644 F. Supp. at 930; Ramirez v. Amsted Industries, Inc., 431 A.2d at 819-20.  See also Berg Chilling Sys. v. Hull Corp., 435 F.3d at 465 (noting that the product-line exception is "explicitly tort-based," but declining to characterize the exception's substantive law).  Although the Supreme Court of New Mexico has not explicitly characterized the exception, its analysis in Garcia v. Coe Mfg. Co. -- which focuses on traditional tort-based policies and relies upon successor-liability cases which treat the exception as a matter of tort law -- suggests that the exception is properly characterized as a matter of tort law.

In short, the Court concludes that, under New Mexico law, successor liability in this third-party products liability action is a matter of tort law.  The Court is cognizant that this conclusion is inconsistent with what appears to be the prevailing view, i.e., that, when characterizing successor liability and its exceptions for choice-of-law purposes, courts should "look to the transaction giving rise to potential successor liability, not the underlying tortious act."  Allstate Ins. Co. v. Countrywide Fin. Corp., 824 F. Supp. 2d at 1174.  See Bouchillon v. Deutz-Fahr, 2017 U.S. Dist. LEXIS 103210, at *16-17.[40]  The Supreme Court of New Mexico, however, has already staked out a minority

_____

[40]The prevailing view, rooted in the Restatement (Second) of Conflict of Laws (1971), is that, for characterization purposes, the relevant "issue" is the underlying transaction and not the

- 89 -

"underlying tortious conduct." Allstate Ins. Co. v. Countrywide Fin. Corp., 824 F. Supp. 2d at 1174. As relevant here, the Second Restatement provides:

> (1) Issues involving the rights and liabilities of a corporation, other than those dealt with in § 301, are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

> (2) The local law of the state of incorporation will be applied to determine such issues, except in the unusual case where, with respect to the particular issue, some other state has a more significant relationship to the occurrence and the parties, in which event the local law of the other state will be applied.

Restatement (Second) of Conflict of Laws § 302. Section 301, in turn, provides that "[t]he rights and liabilities of a corporation with respect to a third person that arise from a corporate act of a sort that can likewise be done by an individual are determined by the same choice-of-law principles as are applicable to non-corporate parties." Applying § 301, courts have "characterized as a contract issue the question of whether a successor corporation impliedly or expressly agreed to assume the liabilities of its predecessor," because individuals are capable of contractually assuming a business' liabilities. Bouchillon v. Deutz-Fahr, 2017 U.S. Dist. LEXIS 103210, at *16-17 (collecting cases). These courts characterize the exception as contractual, even if the underlying claim sounds in tort. See, e.g., Bonee v. L & M Const. Chems., 518 F. Supp. 375, 380 (M.D. Tenn. 1981)(Wiseman, J.). By contrast, applying § 302, courts have characterized continuity exceptions -- e.g., the mere-continuation exception -- as matters of corporate law, because individuals are not capable of continuing a corporate enterprise. See, e.g., Bouchillon v. Deutz-Fahr, 2017 U.S. Dist. LEXIS 103210, at *16-17 ("[T]he issue of whether the subsequent operation of the enterprise gave rise to successor liability . . . is properly characterized as an issue of corporate law."); Patin v. Thoroughbred Power Boats Inc., 294 F.3d 640, 649 (5th Cir. 2002)(concluding that the law of incorporation "governs . . . substantive determination whether [an entity] is subject to successor liability" under the mere-continuation exception). Again, whether the underlying claim is tortious does not change that the exception is a matter of corporate law. See, e.g., Precht v. Global Tower LLC, 2016 WL 7443139, at *3 (W.D. La. 2016)(Minaldi, J.)("The underlying tort liability of the GTP entities for which the plaintiffs seek to hold ATC liable is governed by Louisiana law. Yet applying Louisiana law to the issue of ATC's corporate structure and liability for its affiliates would undermine the high bar Delaware sets for disregarding corporate separateness.")(internal quotation marks omitted).

Despite the national trend toward adopting the Second Restatement, New Mexico continues to adhere to a traditional choice-of-law analysis under the Restatement (First) of Conflicts of Laws (1934). See Montaño v. Frezza, 2015-NMCA-069, ¶ 10, 352 P.3d 666, 669 ("[T]he New Mexico Supreme Court has continued to endorse the 'place-of-the-wrong' rule in choice of law cases.")(citing Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶¶ 12, 14, 142 P.3d at 378), rev'd on other grounds by 2017-NMSC-015, 393 P.3d 700. See also Flemma v. Halliburton Energy Servs., 2013-NMSC-022, 303 P.3d 814, 819 ("New Mexico follows the Restatement (First) of Conflict of Laws when analyzing choice of law issues."); United Wholesale Liquor Co. v. Brown-Forman Distillers Corp., 1989-NMSC-030, ¶ 9, 775 P.2d 233, 469 ("New Mexico adheres to a

position by adopting the product-line exception based on policies rooted in traditional tort law, thus

diverging from successor liability's traditional corporate- and contract-law-based formulation. See

Garcia v. Coe Mfg. Co., 1997-NMSC-013, ¶ 20, 933 P.2d at 249 (recognizing that most courts have

rejected the product-line exception).[41]    In conducting its choice-of-law analysis, the Court must

_____

traditional conflicts of law analysis contained in Restatement (First) of Conflicts of Law."). But see
Ferrell v. Allstate Insurance Co., 2008-NMSC-042, ¶ 56, 188 P.3d at 1173 (following the Second
Restatement with respect to a multi-state-contract class action, because "the rigidity of the
Restatement (First) is particularly ill-suited for the complexities present in multi-state class actions").
Unlike the Second Restatement, under which multiple states' laws may govern different issues
within single a claim, the First Restatement generally categorizes entire claims under a single state's
substantive law.  See Ferrell v. Allstate Insurance Co., 2008-NMSC-042, ¶ 56, 188 P.3d at 1172
(noting that the Second Restatement "proceeds issue by issue, rather than by an entire claim, so one
issue may be resolved under the law of one jurisdiction, while another issue may be resolved under
the law of a different jurisdiction").  In the Court's estimation the Supreme Court of New Mexico's
continued adherence to the First Restatement is wise, because, unlike the Second Restatement, which
often gives rise to confusing and ambiguous choice-of-law analysis, the First Restatement provides
bright-line, predictable rules. Here, as explained in its substantive analysis, the Court concludes that
the Supreme Court of New Mexico would treat the underlying tortious conduct as the relevant issue
for characterization purposes, and, applying the First Restatement approach, would characterize
successor liability as a whole as a matter of tort law, even if the rule's individual exceptions are more
accurately categorized as contractual or corporate.  Whatever the merits of this approach, New
Mexico's adherence to the First Restatement binds the Court in its choice-of-law analysis.

[41]Although the Supreme Court of New Mexico's decision to adopt the product-line exception binds
the Court, the Court finds persuasive the reasoning of those courts that have rejected the
exception.  While the exception's primary justification is remedial, courts have aptly noted that "it is
not the purchase by the successor corporation that deprived the plaintiff of a remedy, but rather the
demise of the predecessor." Guzman v. MRM/ELGIN, 567 N.E.2d 929, 931 (Mass. 1991).  That an
injured plaintiff lacks "a remedy against the original manufacturers is not a justification for imposing
liability on another absent fault and causation." Guzman v. Mrm/Elgin, 567 N.E.2d at 931-32 (citing
Downtowner, Inc. v. Acrometal Prods., Inc., 347 N.W.2d 118, 126 (N.D. 1984); Manh Hung
Nguyen v. Johnson Mach. & Press Co., 433 N.E.2d 1104 (Ill. App. Ct. 1982); Fish v. Amsted Indus.,
Inc., 376 N.W.2d 820 (Wis. 1985)).  Moreover, the risk-spreading rationale misstates strict liability's
purpose, which is to "place responsibility for a defective product on the manufacturer who placed
that product into commerce." Guzman v. Mrm/Elgin, 567 N.E.2d at 932 (citing Bernard v. Kee Mfg.
Co., 409 So. 2d 1047, 1050 (Fla. 1982)).  Imposing "'liability on a successor corporation which did
not manufacture, sell, or market the product would be contrary to this principle.'"  Guzman v.
Mrm/Elgin, 567 N.E.2d at 932 (quoting Simoneau v. South Bend Lathe, Inc., 543 A.2d 407 (N.H.
1988)).
    More fundamentally, the product-line exception complicates the traditionally corporate- and
contract-based nonliability rule, and risks undermining the rule's basic policy justifications, namely,

"follow the most recent decisions of the state's highest court," <u>Wankier v. Crown Equip. Corp.</u>, 353 F.3d at 866, and, if necessary, "attempt to predict what the state's highest court would do," <u>Wade v. EMCASCO Ins. Co.</u>, 483 F.3d at 665-66. For the reasons articulated above, the Court reads <u>Garcia v. Coe Mfg. Co.</u> -- the Supreme Court of New Mexico's most recent decision on successor liability -- to suggest that, in a third-party tort action, the Supreme Court of New Mexico would construe the successor liability rule as primarily a matter of tort law to which the *lex loci delicti* choice-of-law rule applies, as some courts have done. <u>See</u>, <u>e.g.</u>, <u>Korzetz v. Amsted Industries, Inc.</u>, 472 F. Supp. at 142 & n.25; <u>Hoover v. Recreation Equip. Corp.</u>, 763 F. Supp. at 216-18.

Accordingly, applying New Mexico's *lex loci delicti* choice-of-law rule, the Court concludes that Texas substantive law governs the successor liability issue. The practical effect of applying Texas law is that Lopez is foreclosed from asserting two of the three exceptions which he attempts to raise -- the mere-continuation exception and the product-line exception -- because, under Texas law, the only exception to the traditional nonliability rule is for express-assumption of liability.[42] At the

---

"promoting the alienability of corporate assets." <u>Garcia v. Coe Mfg. Co.</u>, 1997-NMSC-013, ¶ 17, 933 P.2d at 248. As one commentator noted in the wake of <u>Garcia v. Coe Mfg. Co.</u>, the exception could "temper a multi-state corporation's enthusiasm for moving into New Mexico and purchasing the assets of New Mexican businesses." Zachary Shandler, <u>Tort Law - New Mexico Adds the Product-Line Exception to Successor Company Liability - Garcia v. Co Manufacturing Co.</u>, 28 N.M. L. Rev. 653, 664 (1998). Companies could "choose to avoid dealing with" the exception, as the "lack of a national uniform standard might create too much havoc for their legal departments." Shandler, <u>supra</u>, at 664 (noting that one company "has litigated the issue of successor liability ten times, once each under the laws of California, Colorado, Michigan, Illinois, New Jersey, New York, New Hampshire, Nebraska and twice under the law of Wisconsin," and that the company has "won seven times and lost three times"). It is perhaps for these reasons, which contravene the nonliability rule's corporate and contractual policies, that the "vast majority of jurisdictions" have rejected the exception. Campbell, <u>supra</u>, at 9.

[42]As the Court explains in its analysis of Lopez' claims, <u>infra</u>, Lopez cannot prevail under any successor-liability exception. Accordingly, that Lopez cannot assert certain exceptions under Texas law is immaterial, because his claims fail under Texas, New Mexico, and Delaware law. The Court is cognizant that, ultimately, this conclusion means there is a "false conflict" between the relevant states' laws. <u>City of Raton v. Ark. River Power Auth.</u>, 611 F. Supp. 2d 1190, 1204-05 (D.N.M. 2008)(Browning, J.)("The false conflict doctrine . . . [arises] when the laws of the involved

same time, the Court will effectuate the Purchase Agreement's choice-of-law provision and interpret the contract's terms under Delaware law. Delaware law thus governs matters of contract interpretation, while Texas law governs the ultimate issue whether the Black & Decker Defendants are liable in tort as successors to Delta Intl.

### 4. Application of Texas Substantive Law Does Not Contravene New Mexico Public Policy.

Before turning to its substantive analysis, the Court notes that New Mexico public policy does not counsel against applying Texas law to Lopez' claims, as Lopez contends. See Tr. at 14:16-19 (Isaac); Suppl. Brief Reply ¶ 13, at 10. "[W]hen the choice of law rule leads to the law of another state and that law is different from the law of the forum, the forum may decline to apply the out-of-state law if it offends the public policy of New Mexico." United Wholesale Liquor Co. v. Brown-Forman Distillers Corp., 1989-NMSC-030, ¶ 11, 775 P.2d at 470 (citing Sandoval v. Valdez, 1978-NMCA-016, ¶ 15, 580 P.2d 131, 133). See Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 7, 188 P.3d at 1218 ("New Mexico courts will not give effect to another state's laws where those laws would 'violate some fundamental principle of justice.'")(citation omitted). In the context of a third-party tort action alleging successor corporation liability for a defective product, the Supreme Court of New Mexico has identified several competing policies, e.g., providing injured persons a viable remedy; ensuring fairness in imposing liability; and the risk that a strict liability regime could deter suppliers from producing useful and beneficial products. See Garcia v. Coe Mfg. Co., 1997-NMSC-013, ¶ 15, 933 P.2d at 247 (citation omitted). The Supreme Court of New Mexico has also stressed

---

states would produce identical results."). The Court does not, however, believe that it is possible to decide whether a conflict is false without first conducting a choice-of-law analysis; that is, the court must analyze competing states' laws before it can determine whether those laws actually conflict. In this respect, the idea that the false-conflict doctrine permits a court to skip choice-of-law analysis is inaccurate, because such analysis is the necessary predicate to deciding whether a conflict is false.

the contract-law-based policy of "promoting the alienability of corporate assets." Garcia v. Coe Mfg. Co., 1997-NMSC-013, ¶ 17, 933 P.2d at 248.

Here, Lopez argues that application of Texas law would violate New Mexico's strong policy interest in providing its citizens a remedy for injuries resulting from defective products. See MSJ Surreply at 4 ("New Mexico has adopted broader rules than has Texas to protect its citizens from injury due to defective products."). This case, however, does not implicate New Mexico's remedial interest. In Garcia v. Coe Mfg. Co., the Supreme Court of New Mexico provided that, in a third-party tort action alleging successor liability, the relevant analysis is whether an injured person is "left without a remedy [because] the predecessor has dissolved, is defunct, or is otherwise unavailable to respond in damages." 1997-NMSC-013, ¶ 15, 933 P.2d at 247 (citation omitted). As explained in detail, infra, Delta Intl. -- the allegedly defective table saw's manufacturer -- is not a "predecessor" corporation that is "unavailable to respond in damages." 1997-NMSC-013, ¶ 15, 933 P.2d at 247. Rather, Delta Intl. can respond in damages to a products liability action, because, since the Purchase Agreement's execution, it "continues to exist as a separate and distinct legal entity." MSJ ¶ 3, at 3 (asserting this fact). See MSJ Response/Motion at 1-16 (not disputing this fact); Suppl. Brief at 1-8 (not disputing this fact). See also Tr. at 45:7-14 (Isaac)(conceding that Delta Intl. still exists and that it may be sued in a proper jurisdiction). Accordingly, although Texas law limits Lopez' ability to recover against the Black & Decker Defenders under a successor-liability theory, Lopez is not left without a remedy, because he may sue Delta Intl. for supplying the table saw in an ordinary products liability action. The Court thus proceeds with its analysis of Lopez' negligence and strict-products-liability claims, including his successor-liability arguments, under Texas substantive law.[43]

---

[43]Even if this case implicates New Mexico's public policy interests -- primarily its remedial interest -- the Court concludes that the *lex loci delicti* choice-of-law rule nevertheless controls. The Supreme Court of New Mexico has occasionally declined to apply the place-of-the-wrong rule when

sufficiently weighty public policy considerations counsel against such application. The Supreme Court of New Mexico's leading decision in Torres v. State provides an illustrative example. In that case, a gunman killed three people in an Albuquerque bagel shop and then travelled to Los Angeles, California, where he killed two security guards with the same handgun that he used in the bagel-shop murders. See Torres v. State, 1995-NMSC-025, ¶¶ 2-6, 894 P.2d at 388. The security guards' fathers brought a wrongful-death action against the Albuquerque Police Department, arguing that the Department's negligent failure to investigate the bagel-shop killings proximately caused their sons' murders in California. See 1995-NMSC-025, ¶ 7, 894 P.2d at 388. The Supreme Court of New Mexico noted that, ordinarily, the *lex loci delicti* choice-of-law rule would point to California law, i.e., the state in which the wrongful conduct occurred. See 1995-NMSC-025, ¶¶ 13-14, 894 P.2d at 390. It held, however, that "public policy dictates that New Mexico law determine the existence of duties and immunities on the part of New Mexico officials." 1995-NMSC-025, ¶ 14, 894 P.2d at 390. In reaching this conclusion, the Supreme Court of New Mexico emphasized the nature of the underlying action -- a wrongful-death action against New Mexico officials for negligent acts in New Mexico and not an action against the gunman for murder in California. See 1995-NMSC-025, ¶ 14, 894 P.2d at 390. The Supreme Court of New Mexico reasoned that, because New Mexico statutes and case law expressly prescribe the duties of New Mexico law enforcement personnel, it would contravene public policy to hold such officials liable under a foreign jurisdiction's standard of care. See 1995-NMSC-025, ¶ 14, 894 P.2d at 390.

In a subsequent wrongful-death action involving a fatal motorcycle collision in Texas, the Court of Appeals of New Mexico considered whether to apply New Mexico law, i.e., the decedent's and his wife's domicile; Texas law, i.e., the place of the wrong; or Washington or Idaho law, i.e., the respective domiciles of the decedent's children and mother. See Gilmore v. Gilmore (in re Estate of Gilmore), 1997-NMCA-103, ¶ 2, 946 P.2d 1130, 1132. In an opinion by then-chief Judge Harris Hartz, the Court of Appeals of New Mexico interpreted Torres v. State as follows:

> *Torres* accepts the general rule that New Mexico courts will apply the tort law of the state where the wrong occurred. This makes sound policy sense, because the state where the wrong occurred ordinarily is the state with the greatest interest in having its law apply. This is particularly true when both the wrongful conduct and the injury occur in one state. In certain circumstances, however, another state may have a more significant interest in having its law apply. For example, when the misconduct and the injury are in separate states, there may be reasons for the law of the state of the misconduct to govern the question of the actor's liability. Thus, in *Torres* our Supreme Court held it to be a matter of public policy that the Albuquerque Police Department be subjected to liability for negligence regardless of the location of the resulting injury or the domicile of the victim. The Supreme Court applied New Mexico law regarding the liability in tort of the police officers not because the case was being litigated in a New Mexico court, and not even just because the immunity vel non of police officers is an important policy matter. The determining factor was that the police officers involved were New Mexico officers acting in New Mexico, so that New Mexico had a particular interest in the standard of conduct imposed on the officers.

Gilmore v. Gilmore (in re Estate of Gilmore), 1997-NMCA-103, ¶ 19, 946 P.2d at 1135-36. Thus, the Court of Appeals of New Mexico concluded, New Mexico law applied in Torres v. State, "because (1) the policy issue was an important one and (2) there were important reasons why New Mexico's policy (as opposed to that of another state) should prevail." 1997-NMCA-103, ¶ 19, 946 P.2d at 1136. The Court of Appeals of New Mexico noted that this approach is consistent with the Second Restatement's most-significant-relationship test, despite that that the Supreme Court of New Mexico continues to adhere to the First Restatement. See 1997-NMCA-103, ¶ 20, 946 P.2d at 1136 (citing Restatement (Second) of Conflict of Laws § 145). The Court of Appeals of New Mexico thus interpreted "New Mexico conflict-of-law doctrine as reflecting a desire for the greater certainty presumably provided by more traditional approaches to conflict-of-laws problems, tempered by recognition that important policy considerations cannot be ignored." Gilmore v. Gilmore (in re Estate of Gilmore), 1997-NMCA-103, ¶ 21, 946 P.2d at 1136 (citing State Farm Mut. Ins. Co. v. Conyers, 1989-NMSC-071, ¶¶ 11-13 784 P.2d 986, 989-91).

Applying this mixed approach, the Court of Appeals of New Mexico concluded that Texas law governed both the tortfeasor's liability as well as the distribution of proceeds from the resulting judgment. See Gilmore v. Gilmore (in re Estate of Gilmore), 1997-NMCA-103, ¶¶ 22-30, 946 P.2d at 1136-39. The Court of Appeals of New Mexico noted that the four relevant states' differing laws regarding apportionment implicated "important public policy" considerations, but stated that such considerations must be "compelling" to overcome the "strong presumption in favor of application of the place-of-the-wrong rule[.]" 1997-NMCA-103, ¶¶ 21, 26, 946 P.2d at 1136-38. Each state, the Court of Appeals of New Mexico noted, had an important interest in ensuring its residents' ability to recover proceeds from the judgment; it stated, however, that, "in assessing a state's interest in the application of the law, we cannot assume that the state is result-oriented." 1997-NMCA-103, ¶¶ 27-30, 946 P.2d at 1138-39. Indeed, the Court of Appeals "presume[d] that [each] state is not interested in the most favorable result for its residents, but only that each state wants the 'just' result for its residents[.]" 1997-NMCA-103, ¶ 30, 946 P.2d at 1139. In light of these considerations, the Court of Appeals of New Mexico concluded that New Mexico's interest in ensuring its residents' ability to recover from the judgment did not overcome "the presumption in favor of the law of the place of the wrong -- Texas[.]" 1997-NMCA-103, ¶ 29, 946 P.2d at 1138.

The Supreme Court of New Mexico has twice relied upon Gilmore v. Gilmore (in re Estate of Gilmore) as persuasive authority. First, in Ferrell v. Allstate Insurance Co., the Supreme Court of New Mexico cited Gilmore v. Gilmore (in re Estate of Gilmore) in support of its decision to deviate from traditional First Restatement choice-of-law analysis and, instead, apply the Second Restatement with respect to a multi-state-contract class action, emphasizing the need to "consider the competing policies of the states implicated by the suit." Ferrell v. Allstate Insurance Co., 2008-NMSC-042, ¶ 56, 188 P.3d at 1173 & n.3 (citing Gilmore v. Gilmore (in re Estate of Gilmore), 1997-NMCA-103, ¶ 20, 946 P.2d at 1136, for the proposition that "[t]he approach, if not the result, in *Torres* is consistent with the Restatement Second")). Second, in Montaño v. Frezza, 2017-NMSC-015, 393 P.3d 700 -- a case decided on comity and not choice-of-law grounds -- the Supreme Court of New Mexico relied upon Gilmore v. Gilmore (in re Estate of Gilmore) in its analysis of relevant public policy considerations. In that case, the Supreme Court of New Mexico considered whether to apply Texas or New Mexico law to a New Mexico resident's medical-malpractice action against a state-employed Texas surgeon for injuries stemming from a surgery at Texas Tech Hospital in Lubbock, Texas. See Montaño v. Frezza, 2017-NMSC-015, ¶¶ 1-5, 393 P.3d at 702-03. Because the case implicated Texas' sovereign immunity, the Supreme Court of New Mexico decided the applicable

- 96 -

law on comity grounds, thus passing on the choice-of-law question. <u>See</u> 2017-NMSC-015, ¶ 10, 393 P.3d at 703 & n.2. As relevant here, the Supreme Court of New Mexico's comity analysis required that it determine whether New Mexico or Texas had stronger policy interests in applying their law to the dispute. <u>See</u> 2017-NMSC-015, ¶¶ 25-34, 393 P.3d at 706-10. The Supreme Court of New Mexico noted that, whereas "Texas has a strong public policy interest in applying uniform standards of liability and immunity to the conduct of state-employed physicians who provide medical care at state-run facilities," New Mexico has an interest in "providing compensation or access to the courts to residents of the state." 2017-NMSC-015, ¶¶ 26, 32, 393 P.3d at 707-09. The Supreme Court of New Mexico analogized the case to <u>Torres v. State</u>, noting that the case turned "upon a Texas state employee's acts or omissions that were alleged to have occurred entirely within Texas." 2017-NMSC-015, ¶¶ 26, 32, 393 P.3d at 707-09. The Supreme Court of New Mexico then cited with approval the Court of Appeals of New Mexico's statement in <u>Gilmore v. Gilmore (in re Estate of Gilmore)</u> that the "determining factor [in *Torres*] was that the police officers involved were New Mexico officers acting in New Mexico, so that New Mexico had a particular interest in the standard of conduct imposed on the officers." <u>Montaño v. Frezza</u>, 2017-NMSC-015, ¶ 33, 393 P.3d at 709-10 (alteration in original)(quoting <u>Gilmore (in re Estate of Gilmore)</u>, 1997-NMCA-103, ¶ 19, 946 P.2d at 1136). Thus, the majority concluded, "Texas has a comparatively strong interest in determining the duties and immunities of that employee and applying a uniform standard of liability to identical conduct by Texas employees performing their duties in Texas." <u>Montaño v. Frezza</u>, 2017-NMSC-015, ¶ 33, 393 P.3d at 710.

Having reviewed the above authority, the Court concludes that New Mexico's public policy interest in providing its citizens a remedy for injuries caused by defective products is not sufficiently compelling to overcome the "strong presumption in favor of application of the place-of-the-wrong rule[.]" <u>Gilmore (in re Estate of Gilmore)</u>, 1997-NMCA-103, ¶ 21, 946 P.2d at 1136. Similar to <u>Gilmore (in re Estate of Gilmore)</u>, this case involves a New Mexico resident bringing an action in tort for injuries that he sustained in Texas. <u>Cf.</u> 1997-NMCA-103, ¶ 2, 946 P.2d at 1132. As a result, there is a "strong presumption" that Texas law, as the state where the wrong occurred, applies. 1997-NMCA-103, ¶ 21, 946 P.2d at 1136. Given that the alleged events giving rise to this action occurred entirely in Texas, the Court concludes that New Mexico's remedial public policy interest, which stems solely from Lopez' residence in the state and not from any other connection to the dispute, is insufficient to overcome the presumption in favor of Texas law. <u>Cf.</u> 1997-NMCA-103, ¶¶ 21, 26, 946 P.2d at 1136-38 (holding that, while New Mexico had a public policy interest in ensuring its residents' ability to recover proceeds from a judgment, that interest was insufficiently compelling to overcome the presumption that Texas law, the place where the wrong occurred, applied).

The Court does not assess New Mexico's public policy interest at zero; to be sure, this case implicates established New Mexico public "policies which underlie rules of contract and tort liability consistent with products liability analysis . . . ." <u>Garcia v. Coe Mfg. Co.</u>, 1997-NMSC-013, ¶ 15, 933 P.2d at 247 (citations omitted). "[T]o say that policy is a factor," however, "is not to say that New Mexico policy always governs in a New Mexico court"; if it did, "New Mexico courts would always apply New Mexico law, because New Mexico law represents New Mexico policy." <u>Gilmore (in re Estate of Gilmore)</u>, 1997-NMCA-103, ¶ 18, 946 P.2d at 1135. As Chief Judge Hartz noted in <u>Gilmore (in re Estate of Gilmore)</u>, "[s]uch a practice would render toothless the place-of-the-wrong rule." 1997-NMCA-103, ¶ 18, 946 P.2d at 1135. Here, whether New Mexico public policy interests counsel against application of Texas law is ultimately a closer question than cases such as <u>Torres v. State</u>, where a state has a strong policy interest in the standard of conduct imposed on state officials

II.    **THE BLACK & DECKER DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON LOPEZ' AMENDED COMPLAINT, BECAUSE THEY DID NOT SUPPLY THE SUBJECT TABLE SAW; THE UNDISPUTED MATERIAL FACTS DO NOT SUPPORT A VEIL-PIERCING THEORY OF LIABILITY; AND THEY ARE NOT SUBJECT TO LIABILITY AS SUCCESSORS TO DELTA INTL.**

The Court's analysis proceeds as follows.  First, the Court concludes that, because the Black & Decker Defendants did not design, manufacture, market, or sell the subject table saw, they are not primarily liable as suppliers under either a negligence or a strict-products-liability theory.  Second, construing the Purchase Agreement as a stock acquisition, the Court concludes that Lopez cannot hold the Black & Decker Defendants liable as Delta Intl.'s parent, because the undisputed material facts do not establish that the Black & Decker Defendants sufficiently control Delta Intl. such that the Court can pierce the corporate veil between them.  Third, construing the Purchase Agreement as an asset acquisition, the Court concludes that the Black & Decker Defendants are not liable under a successor-liability theory, because The Black & Decker Corporation did not expressly assume Delta Intl.'s liabilities in the Purchase Agreement.  Because there is no genuine dispute as to any material fact and because the Black & Decker Defendants are entitled to judgment as a matter of law on each of Lopez' asserted theories, the Court will grant the MSJ.

---

acting in the state and within the scope of their official duties.  See 1995-NMSC-025, ¶ 14, 894 P.2d at 390.  In such cases, strong policy considerations counsel against application of the place-of-the-wrong rule.  Here, however, New Mexico's policy interests are much more attenuated.

In conducting its choice-of-law analysis, the Court is obligated to follow controlling Supreme Court of New Mexico precedent.  See Wankier v. Crown Equip. Corp., 353 F.3d at 866.  In light of the Supreme Court of New Mexico's application of the public-policy exception to the place-of-the-wrong rule in Torres v. State, the Court of Appeals of New Mexico's interpretation of that decision in Gilmore (in re Estate of Gilmore), and subsequent Supreme Court of New Mexico cases citing favorably to Gilmore (in re Estate of Gilmore)'s analysis, the Court concludes that, on these facts, New Mexico's public policy interest in this dispute is insufficiently compelling to overcome the "strong presumption in favor of application of the place-of-the-wrong rule[.]"  Gilmore (in re Estate of Gilmore), 1997-NMCA-103, ¶ 21, 946 P.2d at 1136.  Accordingly, the Court will apply Texas law to Lopez' claims.

A.    THE BLACK & DECKER DEFENDANTS ARE ENTITLED TO JUDGMENT
       AS A MATTER OF LAW ON LOPEZ' PRODUCTS LIABILITY CLAIMS,
       BECAUSE THEY DID NOT SUPPLY THE SUBJECT TABLE SAW.

Lopez alleges that the Black & Decker Defendants "manufactured and put in the stream of commerce" the Delta Unisaw Model 36-812, Amended Complaint ¶ 5, at 2, and that they supplied it in a dangerous condition, see Amended Complaint ¶ 6, at 2. Lopez thus contends that the Black & Decker Defendants "are liable in strict products liability." Amended Complaint ¶ 6, at 3. Lopez also alleges that, in supplying the subject table saw, the Black & Decker Defendants owed him a duty of care; that they breached that duty under one of sixteen alternative theories, e.g., failure to warn about the table saw's dangerous condition, and various negligent design, marketing, and manufacturing theories; and that their breach proximately caused his injuries. See Amended Complaint ¶ 6, at 2-3. Lopez argues that these "acts or omissions . . . constituted negligence . . . ." Amended Complaint ¶ 6, at 3. Both of Lopez' products liability claims fail as a matter of law.

Texas substantive law governs Lopez' negligence and strict-products-liability claims. See Analysis, supra Part I.2. Under Texas law, "[a] manufacturer owes a duty of reasonable care to users of [its] products and must exercise care to discover dangerous propensities of the products." Toshiba Int'l Corp. v. Henry, 152 S.W.3d 774, 784 (Tex. App. 2004)(citing Gonzales v. Caterpillar Tractor Co., 571 S.W.2d 867 (Tex. 1978); Otis Elevator Co. v. Wood, 436 S.W.2d 324 (Tex. 1968)). Thus, in the products-liability context, negligence "focuses on the acts of the manufacturer to determine if those persons exercised ordinary care in the design, production, and sale of a product." Toshiba Int'l Corp. v. Henry, 152 S.W.3d at 784. As for strict liability, the Supreme Court of Texas has adopted § 402A of the Restatement (Second) of Torts, which imposes liability upon (i) sellers of unreasonably dangerous products that (ii) reach the user without substantial change in their condition and that (iii) cause the user physical injury. See Am. Tobacco Co. v. Grinnell, 951 S.W.2d 420, 426 (Tex.1997);

Firestone Steel Prods. Co. v. Barajas, 927 S.W.2d 608, 613 (Tex. 1996).  Strict liability requires, at a minimum, that a defendant "introduc[e] the product into channels of commerce."  Armstrong Rubber Co. v. Urquidez, 570 S.W.2d 374, 375 (Tex. 1978)(clarifying that the defendant "does not have to actually sell the product").  To state the obvious, under Texas law, only entities who actually supply dangerous products can be held liable in negligence or strict products liability.

Here, Lopez' negligence and strict-products-liability claims fail as a matter of law, because the Black & Decker Defendants did not supply the subject Delta Unisaw Model 36-812.  See MSJ ¶ 1, at 3 ("The Black & Decker Defendants did not design, manufacture, market or sell the subject table saw.")(asserting this fact); MSJ Response/Motion at 1-16 (not disputing this fact); Suppl. Brief at 1-8 (not disputing this fact).  It is undisputed that Delta Intl. manufactured the saw in May 2001, see MSJ ¶ 2, at 3 (asserting this fact); MSJ Response/Motion at 1-16 (not disputing this fact); Suppl. Brief at 1-8 (not disputing this fact); that Stanley Black & Decker, Inc. was not in existence in 2001, see MSJ ¶ 9, at 4 (asserting this fact); MSJ Response/Motion at 1-16 (not disputing this fact); Suppl. Brief at 1-8 (not disputing this fact); and that Black & Decker (U.S.), Inc. did not supply Delta Unisaws before October 2004, nor did it "not design, manufacture, or sell the subject Delta Unisaw Model 36-812, . . . in 2001," MSJ ¶ 10, at 4 (asserting this fact).  See MSJ Response/Motion at 1-16 (not disputing this fact); Suppl. Brief at 1-8 (not disputing this fact).  Accordingly, because there is no dispute that the Black & Decker Defendants did not supply the subject table saw, the Court concludes that they are entitled to judgment as a matter of law on Lopez' negligence and strict-products-liability claims.

   **B.   CONSTRUING THE PURCHASE AGREEMENT AS A STOCK SALE, THE BLACK & DECKER DEFENDANTS ARE NOT LIABLE AS DELTA INTL.'S PARENT, BECAUSE THE UNDISPUTED MATERIAL FACTS DO NOT SUPPORT A VEIL-PIERCING THEORY OF LIABILITY.**

Lopez ultimately concedes that Delta Intl. supplied the subject table saw, but asserts that the

Black & Decker Defendants are nonetheless liable as successors to Delta Intl.  See Suppl. Brief ¶¶ 11-22, at 3-8.  As the Court noted at the hearing, however, the successor-liability doctrine appears to be inapposite, because that doctrine pertains to asset acquisitions, whereas here, The Black & Decker Corporation acquired Delta Intl.'s stock via the Purchase Agreement.  See Tr. at 42:22-43:4 (Court). Lopez, in response, advances two arguments: (i) that the Black & Decker Defendants "control" Delta Intl. such that he can pierce the corporate veil between them, Tr. at 44:25-45:1 (Isaac); and (ii) that the Purchase Agreement is, in fact, an asset sale to which the successor-liability doctrine applies, see Suppl. Brief Reply at 5.  The Court addresses these arguments in turn, first construing the Purchase Agreement as a stock sale and then, to fully address Lopez' arguments, as an asset sale.

In the Purchase Agreement, The Black & Decker Corporation and its affiliates agree to purchase all of Pentair, Inc.'s and its affiliates' "outstanding shares of capital stock, membership interests and other ownership interests (the 'Equity Interests')" in several "Transferred Subsidiaries," Purchase Agreement at 1, including Delta Intl., see Schedule 3.1(c), at 4.  Schedule 1.1 to the Purchase Agreement specifies that Pentair Tools Group, Inc. (DE) -- Pentair, Inc.'s affiliate -- is the "Seller" of "Equity Interests" in Delta Intl., and that Delta Acquisition Corp. -- The Black & Decker Corporation's affiliate -- is the "Purchaser" of those interests.  Schedule 1.1, at 2.  Schedule 3.1(c) further specifies that Delta Intl. is a wholly owned subsidiary of Pentair Tools Group, Inc. (DE), and that Delta Intl. has 5,000 authorized shares and 1,000 outstanding shares of common stock or their "[e]quivalent." Schedule 3.1(c), at 4.  Accordingly, The Black & Decker Corporation acquired Delta Intl. as a wholly owned subsidiary by causing an affiliate to purchase all of Delta Intl.'s stock from a holding company.  Subsequently, The Black & Decker Corporation merged with a wholly owned subsidiary of The Stanley Works, which in turn changed its name to Stanley Black & Decker, Inc. See MSJ ¶ 5, at 3 (asserting this fact); MSJ Response/Motion at 1-16 (not disputing this fact); Suppl.

Brief at 1-8 (not disputing this fact).

Given the above, the Court concludes that the Purchase Agreement is structured as a stock acquisition. "'It is a general principle of corporate law that all assets and liabilities are transferred in the sale of a company effected by a sale of stock.'" TrueBlue, Inc. v. Leeds Equity Partners IV, LP, 2015 Del. Super. LEXIS 524 (Super. Ct. 2015)(brackets omitted)(quoting In re KB Toys Inc., 340 B.R. 726, 728 (D. Del. 2006)). That is, because a stock acquisition changes the acquired company's ownership and not its form, the company retains all its liabilities to the same extent as before the acquisition; the liabilities "transfer" in the sense that they remain with the acquired company under its new ownership. As one commentator has explained:

> Assuming all of the stock of the target is acquired, the target becomes a wholly owned subsidiary of the acquiring company. This means that the acquiring company effectively acquires all of the assets and all of the liabilities of the target. These assets and liabilities, however, are partitioned in the subsidiary. . . . [T]he good news is that, absent a piercing of the subsidiary's corporate veil, the other assets of the parent are not at risk and the viability of the parent is not threatened.

John H. Matheson, Successor Liability, 96 Minn. L. Rev. 371, 376 (2011). In an asset acquisition, therefore, there is no "successor liability" for the acquired company's preexisting liabilities, because there is no "successor" company; the acquired company continues to exist as a subsidiary and can be sued directly for its torts, or a claimant can attempt to pierce the corporate veil and hold the parent liable. Here, Lopez initially attempted to directly sue Delta Intl., but the Court dismissed Delta Intl. for lack of personal jurisdiction. See Delta MOO at 2. Lopez now seeks to pierce the corporate veil between Delta Intl. and Stanley Black & Decker, Inc. See Tr. at 44:25-45:1 (Isaac).

Under Texas law,[44] there are three categories in which a court may pierce the corporate veil:

---

[44]The parties have not submitted briefing regarding which state's law should govern Lopez' veil-piercing argument, nor has the Court found any New Mexico cases directing application of a particular choice-of-law rule in this context. Many jurisdictions, applying the Restatement (Second) of Conflict of Laws, hold that "[t]he law of the state of incorporation determines when the corporate

"(1) the corporation is the alter ego of its owners and/or shareholders; (2) the corporation is used for illegal purposes; and (3) the corporation is used as a sham to perpetrate a fraud." Rimade Ltd. v. Hubbard Enters., 388 F.3d 138, 143 (5th Cir. 2004)(applying Texas law)(citation and internal quotation marks omitted).  Relevant here, the alter-ego theory applies if "there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice." SEC v. Res. Dev. Int'l, LLC, 487 F.3d 295, 302 (5th Cir. 2007)(applying Texas law)(citation omitted).  That is, a parent corporation must "'exert[] such domination and control over its subsidiary that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation . . . .'" Akerblom v. Ezra Holdings Ltd., 848 F. Supp. 2d 673, 689 (S.D. Tex. 2012)(Ellison, J.)(applying Texas law)(quoting Hargrave v. Fibreboard Corp., 710 F.2d 1154, 1159 (5th Cir. 1983)).  Whether the alter-ego theory applies is a "heavily fact-specific" determination. United States v. Jon-T Chemicals, Inc., 768 F.2d 686, 694

---

form will be disregarded and liability will be imposed on shareholders." Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)(citations omitted). See Restatement (Second) of Conflict of Laws § 307 ("The local law of the state of incorporation will be applied to determine the existence and extent of a shareholder's liability to the corporation . . . and to its creditors for corporate debts."). The rationale underlying such application is that, because "'a corporation is a creature of state law whose primary purpose is to insulate shareholders from legal liability, the state of incorporation has the greater interest in determining when and if that insulation is to be stripped away.'" Kalb, Voorhis & Co. v. American Fin. Corp., 8 F.3d 130, 132 (2d Cir. 1993)(quoting Soviet Pan Am Travel Effort v. Travel Committee, Inc., 756 F. Supp. 126, 131 (S.D.N.Y. 1991)(Sweet, J.)).

New Mexico, however, follows the Restatement (First) of Conflict of Laws, see Flemma v. Halliburton Energy Servs., 2013-NMSC-022, 303 P.3d 814, 819, which focuses on the underlying cause of action when assigning a claim to a substantive area of law, see Ferrell v. Allstate Insurance Co., 2008-NMSC-042, ¶ 56, 188 P.3d at 1172. Here, Lopez' underlying products liability claims are tortious; thus, applying New Mexico's *lex loci delicti* choice-of-law rule, the Court concludes that Texas substantive law governs the issue whether the Court should pierce the corporate veil and impose tort liability on the Black & Decker Defendants. Ultimately, though, the determination which state's law applies is immaterial, because Lopez proffers no facts that would support a veil-piercing theory. As a result, Lopez' veil-piercing theory, as argued, fails regardless of the applicable law. See Pearson v. Component Technology Corp., 247 F.3d 471, 497 (3d Cir. 2001)(noting that "most jurisdictions treat veil-piercing inquiries as factual")(citing Crane v. Green & Freedman Baking Co., 134 F.3d 17, 22 (1st Cir. 1998)).

(5th Cir. 1985). Here, Lopez proffers no facts that would enable the Court to pierce the corporate veil between Delta Intl. and Stanley Black & Decker, Inc.

The extent of Lopez' veil-piercing argument is as follows. Under the Purchase Agreement, "Affiliate" is given "the meaning ascribed to such term in Rule 12b-2 of the Securities Exchange Act of 1934, as amended." Suppl. Brief ¶ 14, at 5 (quoting Purchase Agreement ¶ 11.17, at 52). Rule 12b-2 defines "Affiliate" as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified." Suppl. Brief ¶ 15, at 5 (quoting 17 C.F.R. § 240.12b-2). Thus, because Delta Intl. is now Stanley Black & Decker, Inc.'s "affiliate," Stanley Black & Decker, by definition, must "control" Delta Intl. such that Delta Intl. is its alter ego. Suppl. Brief ¶ 15, at 5 n.3. This reasoning confuses a definitional term designed to loosely clarify the organizational relationships of the Purchase Agreement's sellers and purchasers with a legal test requiring specific factual showings. Even if Delta Intl. is Stanley Black & Decker, Inc.'s "affiliate" under Rule 12b-2, thus denoting some measure of "control," that does not establish that Stanley Black & Decker Inc. "exerts such domination and control" over Delta Intl. that "they do not in reality constitute separate and distinct corporate entities but are one and the same corporation . . .'" Akerblom v. Ezra Holdings Ltd., 848 F. Supp. 2d at 689. Indeed, if simply meeting Rule 12b-2's definition of "affiliate" was sufficient to establish an alter-ego theory, veil-piercing would apply as a matter of course, because all "affiliates" would meet that definition. In short, Lopez cannot pierce the corporate veil between Delta Intl. and Stanley Black & Decker, Inc. solely by resting on a contractual -- and, by reference, a regulatory -- definition; rather, he must make a rigorous factual showing that establishes a far higher quantum of "control" than that necessary to meet Rule 12b-2's definition of "affiliate." Consequently, because there are no facts -- material or otherwise -- that would support a veil-piercing theory, the Court concludes that the Black & Decker Defendants are

entitled to judgment as a matter of law on that theory.  See Fed. R. Civ. P. 56(a).

C.    **EVEN CONSTRUING THE PURCHASE AGREEMENT AS AN ASSET SALE, THE BLACK & DECKER DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON LOPEZ' SUCCESSOR-LIABILITY THEORY, BECAUSE THEY DID NOT EXPRESSLY ASSUME DELTA INTL.'S LIABILITES IN THE PURCHASE AGREEMENT.**

Following the Court's observation at the hearing that the Purchase Agreement appears to be a stock, not an asset, acquisition, see Tr. at 42:22-43:4 (Court), Lopez filed supplement briefing noting various provisions in the Purchase Agreement which, he contends, establish that it is structured as an asset acquisition, see Suppl. Brief Reply at 5 (arguing that various provisions "make clear that assets *and* liabilities of the Parent and its Subsidiaries were transferred to Buyer/Purchasers under its control")(emphasis in original).  Lopez principally emphasizes provisions which refer to "Net Asset Values," arguing that, "[t]o state the obvious," the "'Net Asset Value' of the Subsidiaries . . . plainly includes a valuation of transferred assets *and* liabilities of the Subsidiaries."  Suppl. Brief Reply ¶ 7, at 6 (emphasis in original).  See id. ¶ 7, at 6 (emphasizing that the Purchase Agreement's "Estimated Closing Statement" and "Closing Statement" provisions say "Net Asset Value")(quoting Purchase Agreement ¶ 2.2, at 2); id. ¶ 7, at 7 (observing that a separate provision refers to a "determination or valuation of assets and liabilities")(quoting Purchase Agreement ¶ 3.1, at 10).  Curiously, Lopez does not highlight any of the assets conveyed in the Purchase Agreement, such as the laundry list of intellectual property -- including the trademark for the Delta Unisaw line -- outlined in the Schedules to the Purchase Agreement.  See Schedule 3.1(r), at 33-91.  Lopez instead focuses on the implication that "Net Asset Value" must mean that the Purchase Agreement conveys some assets.  The Black & Decker Defendants dispute this characterization, contending that, in their view, "The Black & Decker Corporation simply acquired the stock of Delta . . . ."  Suppl. Brief Response at 2 (citing Morris Aff. ¶ 8, at 2)(footnote omitted).  Ultimately, however, the distinction between stock and

asset sales is immaterial; even if construed as an asset acquisition, the Purchase Agreement does not render the Black & Decker Defendants liable for Lopez' injury.[45]

Lopez asserts that, by acquiring Delta Intl.'s assets, the Black & Decker Defendants are liable as successors to Delta Intl. under three exceptions to the traditional successor nonliability rule: (i) the Black & Decker Defendants' alleged assumption of liabilities in the Purchase Agreement, see Suppl. Brief Reply ¶ 11, at 9; (ii) the Black & Decker Defendants' alleged continuation of Delta Intl.'s business, see Suppl. Brief Reply ¶ 11, at 9; and (iii) the Black & Decker Defendants' alleged continued production of the Delta Unisaw Model 36-812, see Suppl. Brief Reply ¶ 12, at 9-10. The Court's choice-of-law analysis, supra Part I.3, establishes that Texas law governs successor liability in this third-party tort action, while Delaware law governs matters of contract interpretation. As a result, because Texas law recognizes only the express-assumption exception to the nonliability rule, Lopez must prevail on that theory to survive summary judgment.

Texas law "strongly embraces a non-liability rule for corporate successors." Moore v. Panini Am. Inc., 2016 Tex. App. LEXIS 12008, at *15 (App. 2016)(citing E-Quest Mgmt., LLC v. Shaw,

---

[45]Although the stock/asset-sale distinction is ultimately immaterial to the MSJ's resolution, the Court nonetheless notes that the conveyance of certain assets in the Purchase Agreement does not render the agreement as a whole an asset acquisition. The Purchase Agreement transfers all of Delta Intl.'s stock as well as certain of its intellectual property rights. The transaction is structured such that Delta Acquisition Corp. -- The Black & Decker Corporation's affiliate -- acquires Delta Intl.'s stock, The Black & Decker Corporation acquires Delta Intl.'s specified trademark rights, and Black & Decker (U.S.), Inc. acquires Delta Intl.'s specified patent rights. See Schedule 1.1, at 2. The Purchase Agreement thus trifurcates the transaction, causing one company to acquire all of Delta Intl.'s stock while moving certain of Delta Intl.'s assets between two corporate affiliates. The result appears to be that some affiliates, by virtue of the intellectual property acquisitions, took over certain of Delta Intl.'s product lines -- e.g., Black & Decker (U.S.), Inc. took over production of the Delta Unisaw line -- while Delta Intl. remains intact, continuing to operate under new ownership. That some assets were transferred, however, does not mean that the transaction as a whole -- including an acquisition of all of Delta Intl.'s stock -- was an asset sale. The Court concludes that, although the Purchase Agreement contains mixed conveyances of stock and assets, it is nonetheless properly construed as a stock acquisition.

433 S.W.3d at 23-24; <u>Lockheed Martin Corp. v. Gordon</u>, 16 S.W.3d at 139).  In Texas, a "successor [can] acquire the assets of a corporation without incurring any of the grantor corporation's liabilities, unless the successor expressly assumes those liabilities."  <u>Moore v. Panini Am. Inc.</u>, 2016 Tex. App. LEXIS 12008, at *15 (citing Tex. Bus. Orgs. Code. § 10.254 (West 2012); <u>E-Quest Mgmt., LLC v. Shaw</u>, 433 S.W.3d at 24; <u>Lockheed Martin Corp. v. Gordon</u>, 16 S.W.3d at 139).  As a result, under Texas law, a corporation does not succeed to its predecessor's liabilities if it does not expressly agree to assume those liabilities.  <u>See</u> <u>E-Quest Mgmt., LLC v. Shaw</u>, 433 S.W.3d at 24.  <u>See also</u> <u>Ford, Bacon & Davis, L.L.C. v. Travelers Ins. Co.</u>, 635 F.3d at 735 (noting that Texas "explicitly rejects the product-line successor liability rule"); <u>McKee v. Am. Transfer and Storage</u>, 946 F. Supp. 485, 487 (N.D. Tex. 1996)(Cummings, J.)("The Texas Business & Corporations Act eliminates the doctrine of implied successor liability."); <u>Mudgett v. Paxson Mach. Co.</u>, 709 S.W.2d 755, 758 (Tex. App. 1986)(concluding that Texas law abrogates both the de-facto-merger exception and the mere-continuation exception).

Much of the parties' debate as to express-assumption hinges on the meaning of the Purchase Agreement's "Transferred Liabilities" provision.  Suppl. Brief ¶ 20, at 7; Suppl. Brief Response at 3; Suppl. Brief Reply ¶ 2, at 2.  That provision specifies, in relevant part, that the Purchase Agreement transfers the "liabilities and obligations of the Subsidiaries arising out of bodily injury, death or other damage relating to products manufactured prior to the Closing, including all Third Party Claims relating to such bodily injury, death and other damage, whether or not such Third Party Claims are successful . . . ."  Purchase Agreement ¶ 11.17, at 60-61.  Lopez reads this language to "mean[] just what it says," <u>i.e.</u>, that Delta Intl.'s liabilities for third-party products-liability claims transferred from Delta Intl. to The Black & Decker Corporation and, by extension, to the Black & Decker Defendants.  Suppl. Brief Reply ¶ 2, at 2.  The Black & Decker Defendants, by contrast, read the

"Transferred Liabilities" provision as specifying which "liabilities simply transferred over, and remained, with the subsidiaries."  Suppl. Brief Response at 3.  The Court agrees with the Black & Decker Defendants.

In the Purchase Agreement, Pentair, Inc. and its affiliates "sell and transfer" their "ownership interests . . . in each of the Transferred Subsidiaries" to The Black & Decker Corporation and its affiliates.  Purchase Agreement at 1.  Delta Intl., one of the "Transferred Subsidiaries," Schedule 3.1(c), at 4, remains fully intact as a distinct legal entity, see MSJ ¶ 3, at 3 (asserting this fact); MSJ Response/Motion at 1-16 (not disputing this fact); Suppl. Brief at 1-8 (not disputing this fact).  Thus, here, "transfer" denotes the movement of wholly-owned subsidiaries from one holding company to another, without any alteration of the subsidiaries' corporate form.  Rhone-Poulenc Basic Chem. Co. v. American Motorists Ins. Co., 616 A.2d 1192, 1195 (Del. 1992)("Clear and unambiguous language . . . should be given its ordinary and usual meaning.").  Extrapolating from this construction, the Purchase Agreement's "Transferred Liabilities" provision simply defines which liabilities remain with the "Transferred Subsidiaries" under their new ownership.  To interpret this provision to mean that the subsidiaries' liabilities move from the subsidiaries to their new owners, rather than with the subsidiaries as they move between owners, would contravene the well-established principle that "'a word used by the parties in one sense will be given the same meaning throughout the contract in the absence of countervailing reasons.'"  Comerica Bank v. Glob. Payments Direct, Inc., 2014 Del. Ch. LEXIS 127, at *34 n.77 (Del. Ch. 2014)(quoting 28 Richard A. Lord, Williston on Contracts § 32:6 (4th ed. 1999).  See Medicis Pharm. Corp. v. Anacor Pharm., Inc., 2013 Del. Ch. LEXIS 206, at *7 (Del. Ch. 2013)("[W]here the same word . . . is used on more than one occasion in the same instrument, and in one instance its meaning is definite and clear and in another instance it is susceptible of two meanings, there is a presumption that the same meaning was intended throughout

such instrument.").  Here, there is no reason to construe "transfer" as having different meanings in these two contexts; Lopez has not identified, for example, any provision explicitly stating that The Black & Decker Corporation agrees to assume the subsidiaries' liabilities.

Reading the transferred-liabilities provision together with other provisions in the Purchase Agreement confirms the Court's construction.  In a provision entitled "Indemnification By Parent," Pentair, Inc. agrees to indemnify The Black & Decker Corporation for "Losses . . . resulting from . . . any Indemnified Liability."  Purchase Agreement ¶ 8.1, at 39-40.  In its "Definitions" section, the Purchase Agreement defines "Indemnified Liabilities" to include "all liabilities and obligations of the Subsidiaries . . . other than 'Transferred Liabilities.'"  Purchase Agreement ¶ 11.17, at 56.  Thus, the indemnification provision carves out the liabilities for which Pentair, Inc. retains responsibility; the transferred-liabilities provision simply operates to identify the liabilities over which Pentair, Inc. does not retain responsibility, because they transfer with the subsidiaries.  Indeed, it is noteworthy that the term "Transferred Liabilities" appears only in the "Definitions" section and not in any of the Purchase Agreement's substantive provisions.  Purchase Agreement ¶ 11.17, at 56 (defining the term "Indemnified Liabilities" as liabilities "other than the Transferred Liabilities"); id. at 59 (defining "Specified Liabilities" as the "liabilities and obligations of the Subsidiar[ies] other than Transferred Liabilities"); id. at 60 (defining "Transferred Liabilities").  It is not sound to read a definitional term, to which none of the contract's substantive terms refer, as effectuating an express assumption of liabilities by the acquiring corporation.

Also illustrative is that the Purchase Agreement expressly provides that the buyer acquires certain assets subject to certain liabilities.  The "Purchase and Sale" provision specifies, in relevant part, that: "Buyer shall purchase . . . the U.S. Intellectual Property, the Equity Interests, the Canadian Assets, subject to the Canadian Liabilities, and the Toolz Shares[.]"  Purchase Agreement ¶ 2.1, at 1.

Plainly, the only items explicitly acquired "subject to" any liabilities are the "Canadian Assets." Purchase Agreement ¶ 2.1, at 1. Because the Purchase Agreement identifies certain assets which the buyer acquires subject to liabilities, while remaining silent whether other items are acquired subject to liabilities, the Court concludes that the parties did not intend that the other items transfer subject to any liabilities. *Expressio unius est excusio alterius* (expression of one item excludes unmentioned associated items). See *Delmarva Health Plan, Inc. v. Aceto*, 750 A.2d 1213, 1216 (Del. Ch. 1999)(recognizing that the *expressio unius* cannon applies to contract interpretation); *Active Asset Recovery, Inc. v. Real Estate Asset Recovery Servs., Inc.*, 1999 WL 743479, at *11 (Del. Ch. 1999)(citing the *expressio unius* cannon and concluding that a term's omission "speaks volumes" when considered with included terms). See also 5 Corbin On Contracts § 24.28 (rev. ed. 1998). This reasoning reinforces the Court's prior observation that the transferred-liabilities provision appears to be a definitional term with limited significance; had the parties intended that The Black & Decker Corporation acquire any assets or interests "subject to" the "Transferred Liabilities," they could have so specified, as they did with the Canadian Assets.

The Court thus concludes that the Black & Decker Defendants are entitled to judgment as a matter of law on Lopez' successor-liability theory, because they did not expressly assume Delta Intl.'s liabilities via the Purchase Agreement. See Fed. R. Civ. P. 56(a). No genuine factual disputes exist as to express assumption; the parties agree on the language of the Purchase Agreement's terms, but disagree on the terms' meaning. Under Delaware law, however, "the interpretation of a contract is ordinarily a matter of law, which turns on the meaning that emerges from the contract's words." *Willie Gary LLC v. James & Jackson LLC*, 2006 WL 75309, at *5 (Del. Ch. 2006). The Court, affording the Purchase Agreement's terms their "clear and unambiguous meaning," *Willie Gary LLC v. James & Jackson LLC*, 2006 WL 75309, at *5, concludes that The Black & Decker Corporation

- 110 -

did not expressly assume Delta Intl.'s liabilities under that agreement. Accordingly, because Texas law recognizes only the express-assumption exception to the ordinary nonliability rule, the Court concludes that the Black & Decker Defendants are entitled to judgment as a matter of law on the successor-liability issue.

All the above notwithstanding, the Court notes that, even if New Mexico law applied, and Lopez was able to assert the mere-continuation exception, Lopez could not prevail on that exception. As the Supreme Court of New Mexico explained in Garcia v. Coe Mfg. Co., the mere-continuation exception's "key element" is a "'common identity of officers, directors and stockholders in the selling and purchasing corporations.'" 1997-NMSC-013, ¶ 13, 933 P.2d at 247 (quoting Leannais v. Cincinnati, Inc., 565 F.2d 437, 440 (7th Cir. 1977)). As a result, the exception "'has no application without proof of continuity of management and ownership between the predecessor and successor corporations.'" Garcia v. Coe Mfg. Co., 1997-NMSC-013, ¶ 13, 933 P.2d at 247 (quoting Pancratz v. Monsanto Co., 547 N.W.2d 198, 201 (Iowa 1996)). Here, there are no facts to suggest that Delta Intl. and the Black & Decker Defendants have a "continuity of management and ownership." Garcia v. Coe Mfg. Co., 1997-NMSC-013, ¶ 13, 933 P.2d at 247 (citation omitted). Lopez' sole argument in support of the mere-continuation exception is that the Purchase Agreement contemplates that The Black & Decker Corporation can "'continue to conduct the Business after Closing in the manner in which the Business has been conducted by the Subsidiaries.'" Suppl. Brief Reply ¶ 9, at 8 (citing Purchase Agreement ¶ 3.1, at 9-10). A contractual provision, however, stating that a company can continue its predecessor's operations does not prove that the company, in reality, does continue such operations. Regardless, proof of business continuity does not establish the "key element," i.e., a commonality of officers, directors, and stockholders among the selling and purchasing corporations. Garcia v. Coe Mfg. Co., 1997-NMSC-013, ¶ 13, 933 P.2d at 247 (citation omitted). Absent any

"specific facts" showing that there is a genuine issue whether Delta Intl. and the Black & Decker Defendants share common ownership, Lopez cannot survive summary judgment on this theory. Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d at 1241.

Nor could Lopez prevail on the product-line exception. This exception turns on whether the successor corporation (i) continues to market its predecessors' products; (ii) represents to the public and its predecessor's customers that it is continuing the predecessor's enterprise; and (iii) maintains "the same ability as its predecessor to assess, control, and distribute the risks and costs of injuries caused by a product defect." Garcia v. Coe Mfg. Co., 1997-NMSC-013, ¶ 17, 933 P.2d at 248. It is undisputed, here, that, at a minimum, Black & Decker (U.S.), Inc. continues to manufacture Delta Unisaws. See MSJ ¶ 10, at 4 (asserting this fact); MSJ Response/Motion at 1-16 (not disputing this fact); Suppl. Brief at 1-8 (not disputing this fact). There are no facts, however, demonstrating how Black & Decker (U.S), Inc. represents itself to the public and to Delta Intl.'s customers, or whether Black & Decker (U.S), Inc. has the same ability as Delta Intl. to "assess, control, and distribute the risks and costs of injuries caused by" any product defects. Garcia v. Coe Mfg. Co., 1997-NMSC-013, ¶ 17, 933 P.2d at 248. Moreover, the tort-based policy rationale underlying the product-line exception counsels against the exception's application. As the Supreme Court of New Mexico stated in Garcia v. Coe Mfg. Co., the exception is designed to protect persons who "may be left without a remedy if the predecessor has dissolved, is defunct, or is otherwise unavailable to respond in damages." 1997-NMSC-013, ¶ 17, 933 P.2d at 248. Here, it is undisputed that Delta Intl. continues to exist and that it is available to respond in damages, if sued in a proper forum. See Tr. at 45:7-14 (Isaac)(conceding that it "would be ideal" to sue Delta Intl. in the correct jurisdiction). The Court thus concludes that, even if New Mexico law applied, Lopez could not prevail on a product-line theory against the Black & Decker Defendants.

### III.    THE COURT DENIES LOPEZ' RULE 56(d) MOTION, BECAUSE HE HAS NOT IDENTIFIED WITH SPECIFICITY WHICH FACTS ADDITIONAL DISCOVERY WILL YIELD THAT ARE MATERIAL TO HIS OPPOSITION TO THE MSJ.

Lopez' primary strategy in opposition to the MSJ is to request that the Court, pursuant to rule 56(d)(1), deny the MSJ without prejudice to refiling after discovery concludes, thus allowing him an opportunity to uncover additional facts material to his opposition.  See MSJ Response/Motion at 1. Lopez contends that further discovery is needed as to two issues: (i) "whether the Black & Decker Defendants placed the subject table saw into the stream of commerce"; and (ii) "whether the Black & Decker Defendants may have potential successor liability."  MSJ Response/Motion at 6 (citing Isaac Aff. at 1-2).  The Black & Decker Defendants assert, in response, that Lopez fails to establish a proper basis for relief under rule 56(d), because he "does not identify the probable facts he expects to obtain in discovery but which are now unavailable to him, nor does he explain what steps he has taken to obtain these facts."  MSJ Reply at 4 (citing Garcia v. U.S. Air Force, 533 F.3d at 1179). The Black & Decker Defendants also contend that the Court should deny Lopez' request, because he "has not established how any specific evidence he seeks will create a material issue of fact . . . ." MSJ Reply at 7.  The Court agrees with the Black & Decker Defendants, and accordingly denies Lopez' rule 56(d) motion.

Rule 56(d)(1) provides that a district court may "defer considering . . . or deny" a summary judgment motion if the "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition[.]" Fed. R. Civ. P. 56(d)(1).  Whether to grant a rule 56(d) request is in the court's discretion, although such a request "should be liberally treated" unless "dilatory or lacking in merit."  Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1553-54.  A party invoking rule 56(d) must "'identify[] the probable facts not available and what steps have been taken to obtain these facts.'"  Garcia v. U.S. Air Force, 533 F.3d at 1179 (quoting

Libertarian Party of N.M. v. Herrera, 506 F.3d 1303, 1308 (10th Cir. 2007)).  A party cannot invoke rule 56(d) "by simply stating that discovery is incomplete but must 'state with specificity how the additional material will rebut the summary judgment motion.'"  Garcia v. U.S. Air Force, 533 F.3d at 1179 (quoting Libertarian Party of N.M. v. Herrera, 506 F.3d 1308-09).  See Chavez v. Perry, 142 F. App'x at 334 ("[A] party must specifically identify what facts it seeks to discover and show how those facts would materially aid its case on the dispositive issues.").

Here, Lopez contends that summary judgment is premature, because he has not had sufficient time to discover essential facts regarding (i) supplier liability; or (ii) successor liability.  See MSJ Response/Motion at 6.  As for supplier liability, Lopez ultimately acquiesces -- as he must -- to the fact that Delta Intl., not the Black & Decker Defendants, supplied the subject table saw.  See MSJ Response/Motion at 1-16 (not disputing that Delta Intl. supplied the saw in 2001, that Stanley Black & Decker, Inc. was not in existence in 2001, and that Black & Decker (U.S.), Inc. did not supply Delta saws before 2004); Suppl. Brief at 1-8 (same); Suppl. Brief Reply at 1-12 (same).  Lopez maintains, however, that "full discovery on the merits" is necessary to uncover facts regarding successor liability.  Suppl. Brief Reply ¶¶ 17-16, at 11-12.  The Court disagrees.

A rule 56(d) movant must provide specific reasons why it has not yet had the opportunity to discover facts essential -- i.e., material -- to its opposition.  See Price ex rel. Price v. W. Res., Inc., 232 F.3d at 783.  Lopez' original rule 56(d) motion relies on the Isaac Aff., which asserts that Lopez has not had an opportunity to depose witnesses, or to study "relevant documents" in the Black & Decker Defendants' "possession, custody, and/or control."  Issac Aff. at 1.  The Black & Decker Defendants counter -- and the Court agrees -- that significant discovery has already been conducted. See MSJ Reply at 4-5 (noting that Lopez served twenty-one interrogatories and seventy-one requests for production, and that the Black & Decker Defendants have already responded); Tr. at 18:5-24

(Court)(noting that lengthy discovery has already been conducted). More important, Lopez fails to "'identify[] the probable facts not available and what steps have been taken to obtain these facts.'" Garcia v. U.S. Air Force, 533 F.3d at 1179 (quoting Libertarian Party of N.M. v. Herrera, 506 F.3d at 1308). The Isaac Aff. asserts, in conclusory fashion: "I believe the evidence obtained in discovery will create material facts to demonstrate that the Black & Decker Defendants . . . may have potential successor liability." Isaac Aff. at 2. A vague belief, however, that additional discovery will uncover unnamed material facts is insufficient; Lopez must specifically identify those material facts. See Garcia v. U.S. Air Force, 533 F.3d at 1179.

It is likely that the "relevant documents" which Lopez purports to seek in discovery, Issac Aff. at 1, are the Purchase Agreement and its Schedules, which, when Lopez filed his rule 56(d) motion, were not in the record, see Suppl. Brief ¶ 5, at 2 (asserting that, "[b]ecause Defendant[s] . . . failed to produce these highly relevant documents, . . . Plaintiff filed his Rule 56([d]) Motion"). To the extent Lopez sought a delay to discover these central documents, his rule 56(d) motion had some force; however, after the Black & Decker Defendants produced the Purchase Agreement and its Schedules, Lopez' request became moot as to those documents. Nevertheless, Lopez maintains that the Court should deny the MSJ "and allow the parties to engage in full discovery on the merits . . . ." Suppl. Brief at 8; Suppl. Brief Reply ¶ 17, at 12. Again, Lopez does not identify any specific facts which he expects to discover and which are essential to his opposition to the MSJ. See Garcia v. U.S. Air Force, 533 F.3d at 1179. As the Tenth Circuit has said, a party cannot invoke rule 56(d) "by simply stating that discovery is incomplete but must 'state with specificity how the additional material will rebut the summary judgment motion.'" Garcia v. U.S. Air Force, 533 F.3d at 1179 (citation omitted). Lopez' vague request for further discovery is thus insufficient.

Finally, the Court concludes that, even if Lopez identified any "probable facts," Garcia v.

U.S. Air Force, 533 F.3d at 1179, further discovery would not yield facts that are material to Lopez' opposition to the MSJ.  Further discovery will not change that: (i) the Black & Decker Defendants did not assume Delta Intl.'s liabilities in the Purchase Agreement, which is already in the record; or (ii) that Delta Intl. continues to exist as a separate and distinct legal entity, which retains the historic liabilities it possessed before the Purchase Agreement's execution.  Accordingly, the Court denies Lopez' rule 56(d) motion.

## IV.    THE COURT DENIES LOPEZ' RULE 6(b) REQUEST AS MOOT.

Should the Court deny his rule 56(d) motion, Lopez requests, in the alternative, that the Court grant him a two-week extension of time to respond to the MSJ's merits.  See MSJ Response/Motion at 13.  Lopez lists several reasons for an extension which, he asserts, constitute "good cause" under rule 6(b), including: that the MSJ was filed during the holiday season; that his lead counsel is leaving his law firm; and that he would be "unfairly prejudiced" by having to invoke his rule 56(d) rights and drafting a "full-blown response on the merits . . . based only on partial discovery completed to date."   MSJ Response/Motion at 14.  The Court concludes that, although these justifications may constitute "good cause" under rule 6(b), Lopez' request is ultimately moot.

Rule 6(b)(1) provides: "When an act may or must be done within a specified time, the court may, for good cause, extend the time[.]" Fed. R. Civ. P. 6(b)(1)(A).  "This rule should be liberally construed to advance the goal of trying each case on the merits," Rachel v. Troutt, 820 F.3d 390, 394 (10th Cir. 2016)(citation omitted), although "an enlargement of the time period is by no means a matter of right," Eller v. Trans Union, LLC, 739 F.3d 467, 478 n.10 (10th Cir. 2013)(internal quotation marks omitted).  Here, Lopez' asserted reasons for an extension resemble those that courts have found to constitute good cause.  The Court, for example, has found good cause for an extension of time where "impediments to timely filing a response . . . were the result of poor decision-making

on the part of" counsel, while "others were seasonal circumstances that a party filing a dispositive motion on Christmas Eve might foresee the opposing party raising." United States v. Bd. of Cnty. Comm'rs, 2010 WL 965607, at *4. Similarly, here, Lopez asserts impediments such as his counsel's departure from his law firm as well as the difficulty of drafting a full response in the middle of the holiday season. See MSJ Response/Motion at 14. The Court concludes that these reasons meet rule 6(b)'s liberal good-cause standard.

This analysis notwithstanding, the Court will deny Lopez' rule 6(b) request as moot. Lopez requests a two-week extension of time. See MSJ Response/Motion at 13. Significantly more time than that has already elapsed since Lopez made his request on January 15, 2016. Moreover, Lopez has since filed several briefs in opposition to the MSJ, including the MSJ Surreply on February 16, 2016; the Suppl. Brief on July 12, 2016; and the Suppl. Brief Reply on August 12, 2016. In short, Lopez has already received -- and taken advantage of -- ample time to respond to the MSJ; the Court thus concludes that his two-week-extension request is moot and will deny the request on that basis.

**IT IS ORDERED** that: (i) the requests in Defendants Black & Decker (U.S.) Inc. and Stanley Black & Decker, Inc.'s Motion and Brief for Summary Judgment, filed December 29, 2015 (Doc. 48), are granted; (ii) the Plaintiff's Rule 56(f) Motion in Opposition to Defendant Black & Decker (U.S.) Inc. and Stanley Black & Decker, Inc.'s Motion for Summary Judgment (Doc. 48), or Alternative Motion to Extend Time to File Response, filed January 15, 2016 (Doc. 53), are denied; and (iii) the Plaintiff's Rule 56(f) Motion in Opposition to Defendant Black & Decker (U.S.) Inc. and Stanley Black & Decker, Inc.'s Motion for Summary Judgment (Doc. 48), or Alternative Motion to Extend Time to File Response, filed January 15, 2016 (Doc. 54), are denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

James Daniel Tawney
Joseph G. Isaac
Scherr & Legatae, P.L.L.C.
El Paso, Texas

     *Attorneys for the Plaintiff*

Donald A. DeCandia
Tomas J. Garcia
Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Albuquerque, New Mexico

     *Attorneys for Defendants Delta International Machinery Corporation, Stanley Black &*
       *Decker, Inc., Black & Decker (U.S.) Inc., Rockwell Automation, Inc., and Pentair, Inc.*

Stephen Simone
Simone, Roberts & Weiss, P.A.
Albuquerque, New Mexico

     *Attorneys for Defendant GLH, L.L.C.*