# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

ISMAEL LOPEZ,

      Plaintiff,

vs.                                           CIV 15-0193 JB/GBW

DELTA INTERNATIONAL MACHINERY
CORPORATION; DELTA MACHINE
COMPANY, INC.; ROCKWELL
INTERNATIONAL CORPORATION;
ROCKWELL AUTOMATION, INC.;
STANLEY BLACK & DECKER, INC.;
BLACK & DECKER (U.S.), INC.;
PENTAIR, INC.; KEARNEY & TRECKER
CORPORATION and GLH, LLC,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Plaintiff's Rule 59 Motion for New Trial
and/or to Alter or Amend the Judgment, filed August 23, 2017 (Doc. 107)("Motion"). The
primary issues are: (i) whether the Court clearly erred when it relied on a contract that Plaintiff
Ismael Lopez submitted in supplemental briefing in granting Stanley Black & Decker Inc.'s
Motion and Brief for Summary Judgment, filed December 29, 2015 (Doc. 48)("MSJ"); and
(ii) whether the Court abused its discretion in denying Lopez' request to dismiss Defendants
Black & Decker (U.S.) Inc. and Stanley Black & Decker, Inc. (collectively "Black & Decker
Defendants")'s MSJ despite Lopez' assertions that he needed further discovery to oppose the
MSJ. The Court concludes that it did not err in either granting the MSJ or in denying Lopez
additional time for discovery. Under rule 56(c) of the Federal Rules of Civil Procedure, the
Court must consider the records that parties cite, and may consider other documents that are in
the record. Thus, it did not err when it reviewed and relied upon a contract that is in the record

and that the parties cited in supplemental briefing.  Moreover, the Court did not err under rule 56(f)(2), because it gave notice to Lopez at the hearing that it would use the contract in its opinion.  The contract comports with rules 901 and 106 of the Federal Rules of Evidence, so it is admissible evidence, and the Court's consideration of it on summary judgment is proper.  Finally, the Court did not abuse its discretion in denying Lopez a chance for additional discovery, because Lopez does not identify any material that would affect the Court's ruling.  Accordingly, the Court denies Lopez' Motion.

## FACTUAL BACKGROUND

The Court draws its facts from its previous Memorandum Opinion, 2017 WL 3142028, filed July 24, 2017 (Doc. 105)("MOO") and its Order, filed September 16, 2016 (Doc. 102)("Order") disposing of the MSJ.  In his Motion, Lopez does not assert that the Court erred factually in its MOO or Order, so the Court omits its footnotes from the MOO analyzing the parties' factual arguments.  See Motion at ¶¶ 18-39, 8-21.  See also MOO at 3-14, 2017 WL 3142028, at *2-7.  The Court also relays some factual allegations from the pleadings for context.

### 1.     The Amended Complaint's Factual Allegations.

Lopez resides in Sunland Park, New Mexico.  See Plaintiff's First Amended Complaint for Personal and Injury Damages ¶ 1, at 1, filed December 18, 2015 (Doc. 45)("Amended Complaint").  On August 23, 2012, Lopez was sawing wood for 84 Lumber[1] in El Paso, Texas with an unguarded table power saw.  See Amended Complaint ¶ 5, at 2.  While he was sawing, the blade jumped, and severed Lopez' left middle and left index fingers.  See Amended

---

[1]84 Lumber is a "privately held supplier of building materials, building supplies, manufactured components and industry-leading services for single- and multi-family residences and commercial buildings," with over 250 stores in 30 states.  84 Lumber Company, About 84 Lumber Company, available at http://www.84lumber.com/About/About.aspx.  84 Lumber is not a named party in this case.

Complaint ¶ 5, at 2.  Lopez accordingly brings product liability claims against the Black & Decker Defendants.  See Amended Complaint ¶ 6, at 2-3.

## 2. **Undisputed Facts.**

"The events giving rise to this lawsuit . . . occurred entirely in El Paso, Texas."  MSJ ¶ 11, at 4 (asserting this fact).  See the Plaintiff's Rule 56(f) Motion in Opposition to Defendant Black & Decker (U.S.) Inc. and Stanley Black & Decker, Inc.'s Motion for Summary Judgment (Doc. 48), or Alternative Motion to Extend Time to File Response at 1-16, filed January 15, 2016 (Doc. 53), and the Plaintiff's Rule 56(f) Motion in Opposition to Defendant Black & Decker (U.S.) Inc. and Stanley Black & Decker, Inc.'s Motion for Summary Judgment (Doc. 48), or Alternative Motion to Extend Time to File Response at 1-16, filed January 15, 2016 (Doc. 54)(collectively, the "MSJ Response/Motion")(not disputing this fact);[2] Plaintiff's Supplemental Brief in Support of Rule 56(f) Motion in Opposition to Defendant Black & Decker (U.S.) Inc. and Stanley Black & Decker, Inc.'s Motion for Summary Judgment (Doc. 48), or Alternative Motion to Extend Time to File Response at 1-8, filed July 12, 2016 (Doc. 90)("Suppl. Brief")(not disputing this fact).

The Black & Decker Defendants "did not design, manufacture, market or sell the subject table saw."  MSJ ¶ 1, at 3 (asserting this fact).  See MSJ Response/Motion at 1-16 (not disputing this fact); Suppl. Brief at 1-8 (not disputing this fact).  "The subject table saw, a Delta Unisaw Model 36-812, serial number 01E31821, was manufactured by Delta International Machinery

_____

[2]CM/ECF -- the Court's electronic filing system -- lists Document 53 as a "Response" to the MSJ, and Document 54 as a "Motion" for an extension of time.  Documents 53 and 54, however, are identical.  Accordingly, to avoid redundancy, the Court will refer to these documents collectively as the "MSJ Response/Motion."

Corp. [] in May of 2001." MSJ ¶ 2, at 3 (asserting this fact). <u>See</u> MSJ Response/Motion at 1-16 (not disputing this fact); Suppl. Brief at 1-8 (not disputing this fact).

Delta Intl. was a subsidiary of Pentair, Inc., a Minnesota corporation. <u>See</u> MSJ ¶ 3, at 3 (asserting this fact); MSJ Response/Motion at 1-16 (not disputing this fact); Suppl. Brief at 1-8 (not disputing this fact). On July 16, 2004, the Black & Decker Corp. executed an agreement with Pentair, Inc. to acquire Pentair, Inc.'s and its affiliates' "Intellectual Property" and "all of the[ir] outstanding shares of capital stock, membership interests and other ownership interests (the 'Equity Interests')" in several "Transferred Subsidiaries." Suppl. Brief ¶ 12, at 4 (asserting this fact)(quoting Purchase Agreement between the Black & Decker Corporation and Pentair, Inc. at 1 (dated July 16, 2004), filed July 12, 2016 (Doc. 90-1)("Purchase Agreement")). One of the transferred subsidiaries in which The Black & Decker Corp. acquired equity interests is Delta Intl. <u>See</u> MSJ ¶ 3, at 3 (asserting this fact); MSJ Response/Motion at 1-16 (not disputing this fact); Suppl. Brief at 1-8 (not disputing this fact). As of 2004, "Delta continues to exist as a separate and distinct legal entity," but "as an indirect subsidiary of The Black & Decker Corporation." MSJ ¶ 3, at 3 (asserting this fact). <u>See</u> MSJ Response/Motion at 1-16 (not disputing this fact); Suppl. Brief at 1-8 (not disputing this fact).

In the Purchase Agreement, the Black & Decker Corp. and its "Affiliates" agree to purchase from Pentair, Inc. and its "Affiliates designated on Schedule 1.1 (each a 'Seller'[)] . . . the Equity Interests" and "the U.S. Intellectual Property." Suppl. Brief ¶ 13, at 4-5 (asserting this fact)(emphases omitted)(quoting Purchase Agreement § 1.1, at 1). <u>See</u> Black and Decker Defendants' Response to Plaintiff's Supplemental Brief [Doc 90] (Filed Under Seal) at 1-5, filed July 29, 2016 (Doc. 94)("Suppl. Brief Response")(not disputing this fact). Schedule 1.1, in turn, lists Pentair Tools Group, Inc. (DE) -- Pentair, Inc.'s affiliate -- as the "Seller" of "Equity

Interests" in Delta Intl., and Delta Acquisition Corp. -- The Black & Decker Corp.'s affiliate -- as the "Purchaser" of those interests. Schedules to Purchase Agreement Between The Black & Decker Corp. and Pentair, Inc. (the "Agreement") at 2, filed July 12, 2016 (Doc. 90-2)("Schedules"). Schedule 3.1(c) specifies that Delta Intl. is a wholly owned subsidiary of Pentair Tools Group, Inc. (DE). See Schedule 3.1(c), at 4. The Schedules, moreover, outline the intellectual property -- including trademark and patent rights -- that transfers with the Purchase Agreement. See Schedule 3.1(r), at 33-91. Schedule 1.1 names The Black & Decker Corp. as the "Purchaser" of the "U.S. Trademark Rights" from "All Holders of U.S. Trademark Rights," and Black & Decker (U.S.), Inc. as the "Purchaser" of the "U.S. Patent Rights" from "All U.S. Holders of U.S. Patent Rights." Schedule 1.1, at 2.

Also in the Purchase Agreement, The Black & Decker Corp., as the "Buyer," makes certain "Representations and Warranties" to Pentair, Inc., the transferred subsidiaries' "Parent," including that it has "'Authority' to make the 'valid and binding agreements enforceable in accordance with their respective terms.'" Suppl. Brief ¶ 16, at 5-6 (asserting this fact)(emphases omitted)(quoting Purchase Agreement § 3.2, at 14). See Suppl. Brief Response at 1-5 (not disputing this fact). The Purchase Agreement provides that The Black & Decker Corp. shall "indemnify" Pentair, Inc. for "all Losses . . . resulting from [] the breach of the representations and warranties of [The Black & Decker Corp.]. . . ." Suppl. Brief ¶ 18, at 6 (asserting this fact)(alterations added)(emphasis omitted)(quoting Purchase Agreement § 8.2, at 41). See Suppl. Brief Response at 1-5 (not disputing this fact). Pentair, Inc. also makes "Representations and Warranties" to The Black & Decker Corporation. Purchase Agreement § 3.1, at 5-13. For example, in the event of "[l]osses . . . resulting from [] any breach of any of the representations and warranties of [Pentair, Inc.] . . . or [] any Indemnified Liability," the Purchase Agreement

provides that Pentair, Inc. shall indemnify The Black & Decker Corp. Purchase Agreement § 8.1, at 39-40 (alterations added). In its "Definitions" section, the Purchase Agreement defines "Indemnified Liabilities" to include "all liabilities 'of the Subsidiaries' other than 'Transferred Liabilities.'" Suppl. Brief Response at 3 (asserting this fact)(quoting Purchase Agreement § 11.17, at 56). See Plaintiff's Reply in Support of His Supplemental Brief in Support of His Rule 56(f) Motion in Opposition to the Black & Decker Defendants' Motion for Summary Judgment (Doc. 48), or Alternative Motion to Extend Time to File Response (Doc. 54) at 1-12, filed August 12, 2016 (Doc. 95)("Suppl. Brief Reply")(not disputing this fact).

The Purchase Agreement defines "Transferred Liabilities" to include, among other things, any "liabilities and obligations of the Subsidiaries arising out of bodily injury, death or other damage relating to products manufactured prior to the Closing, including all Third Party Claims relating to such bodily injury, death and other damage, whether or not such Third Party Claims are successful . . . ." Suppl. Brief ¶ 19, at 6-7 (asserting this fact)(emphases omitted)(quoting Purchase Agreement § 11.17, at 60-61). See Suppl. Brief Response at 1-5 (not disputing this fact). The "Subsidiaries" whose liabilities transfer with the Purchase Agreement include "any corporation or entity engaged in the Business of which securities or other ownership interests having ordinary voting power to elect a majority of directors or other persons performing similar functions are directly or indirectly owned by [Pentair, Inc.] . . . ." Suppl. Brief ¶ 21, at 7 (asserting this fact)(alteration added)(emphases omitted)(quoting Purchase Agreement § 11.17, at 59). See Suppl. Brief Response at 1-5 (not disputing this fact). With respect to these subsidiaries' businesses, the Purchase Agreement provides that The Black & Decker Corp. "will be able to continue to conduct the Business after Closing in the manner in which the Business has been conducted by the Subsidiaries." Purchase Agreement § 3.1, at 9-10.

The Purchase Agreement provides that its provisions "shall be construed and interpreted according to the internal laws of the State of Delaware, excluding any choice of law rules that may direct the application of the laws of another jurisdiction." Purchase Agreement § 11.4, at 49.

In March 2010, "The Black & Decker Corporation merged with a wholly owned subsidiary of The Stanley Works and The Black & Decker Corporation became a wholly owned subsidiary of The Stanley Works." MSJ ¶ 5, at 3 (asserting this fact). See MSJ Response/Motion at 1-16 (not disputing this fact); Suppl. Brief at 1-8 (not disputing this fact). "The Stanley Works changed its name to Stanley Black & Decker, Inc. on March 12, 2010." MSJ ¶ 5, at 3 (asserting this fact). See MSJ Response/Motion at 1-16 (not disputing this fact); Suppl. Brief at 1-8 (not disputing this fact). "Stanley Black & Decker, Inc. does not design, manufacture or sell Delta Unisaws, it was not [in] existence in 2001, and it did not design, manufacture, or sell the subject Delta Unisaw Model 36-812, which was manufactured in 2001." MSJ ¶ 9, at 4 (asserting this fact). See MSJ Response/Motion at 1-16 (not disputing this fact); Suppl. Brief at 1-8 (not disputing this fact).

"Black & Decker (U.S.) Inc. has no corporate relationship with Delta other than that, as of October of 2004, both of these separate and distinct entities are both subsidiaries of The Black & Decker Corporation." MSJ ¶ 7, at 3 (asserting this fact). See MSJ Response/Motion at 1-16 (not disputing this fact); Suppl. Brief at 1-8 (not disputing this fact). "Black & Decker (U.S.) Inc. did not design, manufacture or sell Delta Unisaws at any time prior to October of 2004 and it did not design, manufacture, or sell the subject Delta Unisaw Model 36-812, which was manufactured in 2001." MSJ ¶ 10, at 4 (asserting this fact). See MSJ Response/Motion at 1-16 (not disputing this fact); Suppl. Brief at 1-8 (not disputing this fact).

# PROCEDURAL BACKGROUND

Lopez commenced this action in the Third Judicial District Court, Doña Ana County, State of New Mexico, on January 13, 2015. See Plaintiffs['] Original Complaint at 1, Lopez v. Delta International Machinery Corp., D-307-CV-215-00077, (Third Judicial District Court, County of Doña Ana, State of New Mexico), filed in federal court on March 5, 2015 (Doc. 1-1)("Original Complaint"). The Original Complaint appears to assert two claims: (i) strict products liability, see Original Complaint ¶ 14, at 7-8; and (ii) negligence, including one or more of sixteen alternative theories, see Original Complaint ¶ 23, at 9-10. Lopez seeks compensatory damages for medical care, lost wages, inability to perform household duties, and pain and suffering. See Complaint ¶¶ 24-26, at 10. On March 5, 2015, the Black & Decker Defendants removed the case to federal district court. See Notice of Removal at 1, filed March 5, 2015 (Doc. 1).

On September 18, 2015, the Court dismissed from the case all Defendants -- except for the two Black & Decker Defendants -- for lack of personal jurisdiction. See Sept. 18, 2015, Hearing Minutes at 1. See also Memorandum Opinion at 26, 2016 WL 1408152, at *14, filed March 15, 2016 (Doc. 77). On December 23, 2015, Lopez moved to file an Amended Complaint asserting claims against only the Black & Decker Defendants, see Motion to Amend at 1, and, on January 8, 2016, the Court granted that motion, see Amendment Order at 1. The Amended Complaint asserts the same two claims as the original Complaint: (i) negligence, including sixteen alternative theories; and (ii) strict products liability.[3] See Amended Complaint ¶ 6, at 2-

---

[3]In a section entitled "Facts," the original Complaint alleges that the "Defendants are strictly liable." Complaint ¶ 14, at 7-8. Later, the original Complaint alleges sixteen alternative theories of negligence under the heading "Negligence of Defendants." Complaint ¶ 23, at 9-10. The Amended Complaint, by contrast, groups these two claims under the heading "Count 1-Product Liability of the Black & Decker Defendants." Amended Complaint at 2. The Amended

3.  The Amended Complaint also seeks the same compensatory and punitive remedies as the Original Complaint.  <u>See</u> Amended Complaint ¶¶ 7-11, at 3-4.

The Black & Decker Defendants subsequently moved for summary judgment.  <u>See</u> MSJ at 1.  They argued, in the MSJ, that they are not liable to Lopez, because (i) they did not design, manufacture, market, or sell Lopez the table saw; and (ii) they could not be liable under a successor liability theory, even though The Black & Decker Corp. -- Stanley Black & Decker's predecessor -- had acquired Delta Intl. -- the table saw manufacturer.  <u>See</u> MSJ at 4-7.  They argued that successor liability could not attach, because Black & Decker (U.S.) Inc. has no legally significant corporate relationship with Delta Intl., and because Stanley Black and Decker Inc. did not expressly assume Delta Intl.'s liability with respect to the table saw.  <u>See</u> MSJ at 4-7.  Lopez responded, in the MSJ Response/Motion, that summary judgment was premature, because he had not yet been able to depose the Black & Decker Defendants' rule 30(b)(6) witnesses nor had he been able to conduct discovery about whether the Black & Decker Defendants had placed the table saw into the stream of commerce.  <u>See</u> MSJ Response/Motion ¶¶ 16, 18, at 4-6.  He also argued that the Black & Decker Defendants had incorrectly applied Texas' successor liability law, because New Mexico's choice-of-law rules and public policy dictated a different outcome.  <u>See</u> MSJ Response/Motion ¶ 19, at 6.  He added that more discovery could demonstrate that application of Texas successor liability law is contrary to New Mexico public policy.  <u>See</u> MSJ Response/Motion ¶¶ 25-26, at 12-13.  Accordingly, he requested that the Court dismiss the MSJ

---

Complaint also switches the order of these claims, alleging negligence first, <u>see</u> Amended Complaint ¶ 6, at 2-3, and then strict liability, <u>see</u> Amended Complaint ¶ 6, at 3.

without prejudice under rule 56(d)[4] until discovery could be completed.  <u>See</u> MSJ Response/Motion ¶ 35, at 16.

Subsequently, the parties produced the Purchase Agreement, and Lopez argued the Purchase Agreement's "Transferred Liabilities" section demonstrates that the Black & Decker Corp. expressly assumed Delta Intl.'s liability when the former acquired the latter's equity interests.  <u>See</u> Suppl. Brief ¶ 19, at 6-7.  The Black & Decker Defendants rejoined that Lopez misreads the Transferred Liabilities section, because the Purchase Agreement states that the liabilities stay with the transferred subsidiaries and not that the liabilities are transferred to the acquiring corporation.  <u>See</u> Suppl. Brief Response at 3.  The Defendants added that Lopez' attempts to pierce the corporate veil, but that there is no evidence that the Black & Decker Defendants dominate Delta Intl.  <u>See</u> Suppl. Brief Response at 4.

The Court then granted the MSJ.  <u>See</u> Order at 1-2; MOO at 71, 117, 2017 WL 3142028, at *30, *48.  It ruled that, under New Mexico choice-of-law rules, Texas law governed Lopez' negligence and strict liability claims, because New Mexico choice-of-law rules follow "the doctrine of lex loci delicti commissi"[5] for tort claims, and the harm occurred in Texas.  MOO at 76, 2017 WL 3142028, at *32.  The Court also concluded that the successor liability issue, in this case's particular context, was "predominantly a matter of tort law."  MOO at 85, 2017 WL 3142028, at *36.  Accordingly, it concluded that Texas law governs the successor liability issue, so "the only exception" to the traditional nonliabilty rule for successors in interest is the "express assumption of liability" exception.  MOO at 92, 2017 WL 3142028, at *39.  Because contract

---

[4]Lopez referenced rule 56(f) in his MSJ Response/Motion, but says that he meant rule 56(d).  <u>See</u> Motion ¶ 2, at 2. Rule 56(f) had been recodified in 2010 as rule 56(d).  <u>See</u> Fed R. Civ. P. 56(d) (2010 advisory committee notes).

[5]Lex loci delicti commissi means the court will apply the law of the place where the harm took place.  <u>See</u> <u>Mosley v. Titus</u>, 762 F. Supp. 2d 1298, 1314 (D.N.M. 2010)(Browning, J.).

principles required the Court to analyze whether the Black & Decker Defendants expressly assumed liability, the Court effected the Purchase Agreement's choice-of-law provision and interpreted its terms under Delaware law. <u>See</u> MOO at 93, 2017 WL 3142028, at *38. After disposing with the choice-of-law issues, the Court determined that the Black & Decker Defendants were entitled to summary judgment on Lopez' claims, because: (i) they did not supply the table saw; (ii) Lopez could not pierce the corporate veil, because being an "affiliate" does not "establish an alter ego theory" and because there is no evidence that the Black & Decker Defendants controls Delta Intl.; and (iii) the Purchase Agreement transfers liabilities to the existing subsidiaries and not to the Black & Decker Defendants. <u>See</u> MOO at 98-110, 2017 WL 3142028, at *40-45. The Court also denied Lopez' rule 56(d) request, because Lopez offered a conclusory affidavit that asserted that there are more relevant facts to be discovered, but did not "identify[] the probable facts not available and what steps have been taken to obtain these facts." MOO at 115, 2017 WL 3142028, at *47 (citing <u>Garcia v. U.S. Air Force</u>, 533 F.3d 1170, 1179 (10th Cir. 2008)). Because there were no additional claims or parties before it, the Court subsequently entered Final Judgment. <u>See</u> Final Judgment at 1-2, filed July 26, 2017 (Doc. 106)("Final Judgment").

### 1.     The Motion.

Lopez requests the Court to vacate, alter, or amend the MOO and Final Judgment, arguing that the Court erred in granting the MSJ, and that the Court erroneously denied his 56(d) request as "moot by simply reviewing and interpreting the Purchase Agreement -- submitted by *Plaintiff* . . . and <u>never</u> submitted by the Black & Decker Defendants." Motion ¶¶ 1-2, at 1-2 (underline and italics in original). He argues that the Court erred, because it should not have relied on the Purchase Agreement in the MOO. <u>See</u> Motion ¶ 22-24, at 9-10. He contends that

relying on the Purchase Agreement was error, because: (i) the Black & Decker Defendants represented that the Court could grant their MSJ without reference to the Purchase Agreement; (ii) Lopez -- and not the Black & Decker Defendants -- provided the Purchase Agreement to the Court and proffered it to demonstrate why further discovery is needed; (iii) the Black and Decker Defendants did not establish to Lopez that the Purchase Agreement "was a full and complete copy of all documents reflecting the purchase agreement"; and (iv) the Black & Decker Defendants "provided no evidence . . . to explain or interpret the meaning of any provisions in the PA.[6]" Motion ¶¶ 22-26, at 9-11. Lopez adds that the Court should have required the Black & Decker Defendants "like any defendant, to provide appropriate evidence to establish the PA reflected a true and correct copy of the entire agreement." Motion ¶ 27, at 11-12.

Lopez argues that the Court should interpret the Purchase Agreement's "Transferred Liabilities" provision as transferring all liabilities to the Black & Decker Defendants. See Motion ¶¶ 28-35, at 12-19.[7] Lopez also argues that Delaware or New Mexico law and not Texas law applies to the successor liability issue, because product liability issues "are grounded in *contract*, not tort law." Motion ¶¶ 36-39, at 19-21. Thus, according to Lopez, the Court should

---

[6]In his Motion, Lopez abbreviates Purchase Agreement to "PA." Motion ¶ 13, at 6.

[7]This argument is largely copy-pasted from Lopez' Suppl. Brief Reply ¶¶ 1-9, at 1-8. See also Defendants' Response to Plaintiff's Rule 59 Motion for New Trial And/Or to Alter or Amend the Judgment at 6, filed September 6, 2017 (Doc. 108)("Response")("Plaintiff devotes over 10 pages of his Motion to copying and pasting verbatim the near entirety of Plaintiff's Suppl. Brief Reply."). The Court has summarized Lopez' argument before and declines to detail it again. See MOO at 42-44, 2017 WL 3142028, at *19.

either effect the parties' intention that Delaware law applies or should apply New Mexico law for public policy reasons. See Motion ¶¶ 36-39, at 19-21.[8]

## 2.    **The Response.**

The Black & Decker Defendants respond that Lopez' rule 59 motion fails, because he largely "revisit[s] issues already addressed" without "new arguments" or with "supporting facts . . . available at the time of the original motion." Response at 3 (citing Servants of the Paraclete, 204 F.3d 1005, 1012 (10th Cir. 2000)). See Response at 6 ("Plaintiff devotes over 10 pages of his Motion to copying and pasting verbatim the near entirety of Plaintiff's Supp. Brief Reply."). The Black & Decker Defendants also argue that Lopez has not shown error, because the Court properly relied on the Purchase Agreement, as Lopez "is the one who placed the entire Purchase Agreement into the record." Response at 4. They add that, even if they had some burden to put the Purchase Agreement into the record themselves, they did so by "plac[ing] the controlling excerpts into the record." Response at 4 (citing Purchase Agreement, filed July 29, 2016 (Doc. 94-2)). They also add that the Court may, under rule 56(c)(3), look to materials that are in the record even if the parties do not cite them. See Response at 4 (citing Fed. R. Civ. P. 56(c)).

The Black & Decker Defendants also argue that the Court is "fully capable of interpreting contractual language" even absent "an affidavit from a contract-reader." Response at 4. They contend that, even if there is some requirement that a Court receive an expert opinion to interpret a contract, the Black & Decker Defendants provided such an affidavit explaining their position. See Response at 4-5 (citing Affidavit of Theodore C. Morris at 1 (executed December 17, 2015),

---

[8]This argument is also largely copy pasted from Lopez' Suppl. Brief Reply. See Suppl. Brief Reply ¶¶ 10-13, at 8-10. See also MOO at 44-45, 2017 WL 3142028, at *20 (detailing this argument).

filed December 29, 2015 (Doc. 48-2)). They also argue that there is no legal authority for Lopez' contention that, before the Court may review the Purchase Agreement, the Black & Decker Defendants must affirmatively prove that the Purchase Agreement "was a full and complete copy of all documents" reflecting the Purchase Agreement. Response at 5. The Black & Decker Defendants conclude that the Court should disregard Lopez' repeated arguments concerning contract interpretation and choice-of-law as the Court has already considered and rejected them. <u>See</u> Response at 6.

**3.** <u>**The Reply**</u>**.**

Lopez replies that the Court erred under rule 56(f)(2), because it granted the MSJ on a "ground[] not raised by a party." Plaintiff's Reply in Support of Plaintiff's Rule 59 Motion for New Trial and/or to Alter or Amend the Judgment (Doc. 107) at ¶ 3, at 2, filed September 20, 2017 (Doc. 109)("Reply"). According to Lopez, because the Black & Decker Defendants did not produce the entire Purchase Agreement nor use it in their MSJ, and because the Court did not give Lopez "notice and a reasonable time to respond" to the Purchase Agreement, the Court erred. Reply ¶ 3, at 2. He adds that the Court erred, because it did not allow him discovery on the Purchase Agreement. <u>See</u> Reply at ¶¶ 4-5, at 3. He concludes that there are issues of fact regarding "the existence, meaning and interpretation of provisions of the Purchase Agreement," so the Court erred in granting the MSJ. Reply ¶ 6, at 4.

<u>LAW REGARDING SUMMARY JUDGMENT</u>

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving

party's case.'" Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013) (Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d at 891). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex Corp. v. Catrett, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[9]

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993) ("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519

---

[9]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law. See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

(10th Cir. 1980)("However, once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.")(citation omitted). Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, 2008 U.S. Dist. LEXIS 45838, at *1 (D. Kan. 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249. Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court

must "bear in mind the actual quantum and quality of proof necessary to support liability." Anderson v. Liberty Lobby, Inc., 477 U.S. at 254. Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Fourth, the court cannot decide credibility issues. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified immunity arena. In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court of the United States of America concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts. 550 U.S. at 378-81. The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

Scott v. Harris, 550 U.S. at 380 (emphases in original). Applying these standards to a factual dispute over whether the plaintiff-respondent "was driving in such fashion as to endanger human

life," the Supreme Court held that the plaintiff-respondent's "version of events is so utterly discredited by the record that no reasonable jury could have believed him." 550 U.S. at 380. Thus, the Supreme Court concluded, "[t]he Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by [a] videotape," which showed the plaintiff-respondent driving extremely dangerously. 550 U.S. at 381.

The United States Court of Appeals for the Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (brackets omitted). "The Tenth Circuit, in Rhoads v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),] explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony[.]" Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.)(citation omitted), aff'd, 499 F. App'x 771 (2012).

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury." Scott v. Harris, 550 U.S. 372, 377 (2007). "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380. In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events. 550 U.S. at 379. Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony. There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury. And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility . . . . Mr. Rhoads

> alleges that his injuries resulted from a beating rendered without resistance or provocation. If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92.[10]  See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92).   In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes, United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal question of qualified immunity and "determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court," before inquiring into whether there are genuine issues of material fact for resolution by the jury.   584 F.3d at 1326-27 (Holmes, J., concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts").

The Court has recently ruled on several summary judgment motions.  In Simon v. Taylor, 252 F. Supp. 3d 1196 (D.N.M. 2017) the Court considered whether horse trainers and owners were entitled to summary judgment on various New Mexico tort claims for purportedly contaminating a race-winning horse with caffeine. See Simon v. Taylor, 252 F. Supp. 3d at 1240-

---

[10]Rhoads v. Miller is an unpublished Tenth Circuit opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. . . .  However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision."  United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Rhoads v. Miller, Douglass v. United Auto Workers Local Union 31, Chavez v. Perry, and Lounds v. Torres, have persuasive value with respect to a material issue, and will assist the Court in its preparation of this Memorandum Opinion and Order.

41 (Browning, J.).  It concluded that the horse trainers and owners were entitled to summary judgment, largely because the only evidence of caffeine contamination was a horse-urine sample, but there was little to no evidence that the defendants had intentionally contaminated the horse, or even knew that the horse had caffeine in him.  See Simon v. Taylor, 252 F. Supp. 3d at 1246, 1248, 1253.  In Parrish v. Roosevelt County Board of County Commissioners, 2017 WL 6759103 (D.N.M. December 31, 2017)(Browning, J.), the Court concluded that Roosevelt County was entitled to summary judgment on a FLSA overtime claim, because the prison official suing for overtime qualified as an overtime-exempt prison administrator or executive.  See Parrish v. Roosevelt County Board of County Commissioners, 2017 WL 6759103, at *19-20 ("Parrish's primary duty is directly related to Roosevelt Detention's management.")

## LAW REGARDING RULE 56(d)

Rule 56(d) provides:

(d) When Facts Are Unavailable to the Nonmovant.

If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

    (1) defer considering the motion or deny it;

    (2) allow time to obtain affidavits or declarations or to take discovery; or

    (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).[11]  "A party who seeks relief under subdivision (d) may seek an order deferring the time to respond to the summary-judgment motion."  Fed. R. Civ. P. 56(d) advisory committee committee's note to the 2010 amendments.  The rule permits a nonmovant to show by affidavit or declaration the need for additional discovery; a formal affidavit is thus not required.

---

[11]Before 2010, this rule was rule 56(f); rule 56(d) "carries forward without substantial change the provisions of former subdivision (f)."  Fed. R. Civ. P. 56(d) advisory committee committee's note to the 2010 amendments.

<u>See</u> Fed. R. Civ. P. 56(d).  The rule permits a "written unsworn declaration, certificate, verification, or statement subscribed in proper form as true under penalty of perjury to substitute for an affidavit."  Fed. R. Civ. P. 56(c) advisory committee committee's note to the 2010 amendments.

When a party files an affidavit or declaration, and moves for additional discovery time under rule 56(d), the party invokes the court's discretion.  <u>See</u> <u>Jensen v. Redevelopment Agency of Sandy City</u>, 998 F.2d 1550, 1553-54 (10th Cir. 1993).  "Unless dilatory or lacking in merit," a party's 56[(d)] application "should be liberally treated."  <u>Jensen v. Redevelopment Agency of Sandy City</u>, 998 F.2d at 1554 (internal quotation marks and citations omitted).  "The general principle of Rule 56(d) is that summary judgment should be refused where the nonmoving party has not had the opportunity to discover information that is essential to [its] opposition."  <u>Price ex rel. Price v. W. Res., Inc.</u>, 232 F.3d 779, 783 (10th Cir. 2000).  Rule 56(d) does not require, however, that summary judgment not be entered until discovery is complete.  <u>See</u> <u>Price ex rel. Price v. W. Res., Inc.</u>, 232 F.3d at 784.

"Rule 56[(d)] is not a license for a fishing expedition . . . ."  <u>Lewis v. Ft. Collins</u>, 903 F.2d 752, 758 (10th Cir. 1990).  To invoke rule 56(d), the party filing the affidavit or declaration must state with specificity how the desired time would allow it to meet its burden in opposing summary judgment.  <u>See</u> <u>Jensen v. Redevelopment Agency of Sandy City</u>, 998 F.2d at 1554. Rule 56(d) may not be invoked based solely upon the assertion that discovery is incomplete or that specific facts necessary to oppose summary judgment are unavailable.  <u>See</u> <u>Jensen v. Redevelopment Agency of Sandy City</u>, 998 F.2d at 1554.  Moreover, while the summary judgment movant's exclusive control of information weighs heavily in favor of relief under 56(d), <u>see</u> <u>Price ex rel. Price v. W. Res., Inc.</u>, 232 F.3d at 783, merely asserting such is

insufficient to justify denial of summary judgment, see Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554. Furthermore, "if the party filing the Rule 56[(d)] affidavit has been dilatory, or the information sought is either irrelevant to the summary judgment motion or merely cumulative, no extension will be granted." Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554 (denying a 56(d) request stating "the record reflects that plaintiffs were dilatory in pursuing discovery prior to the filing of their 56[(d)] affidavit"). See Johnson v. Holmes, 377 F. Supp. 2d 1039, 1044-45 (D.N.M. 2004)(Browning, J.)(denying a 56(d) request where plaintiff did not explain why, during the discovery period that the court allowed, he did not obtain the discovery sought in his motion). The Tenth Circuit has summarized rule 56(d)'s requirements as follows:

> A prerequisite to granting relief pursuant to Rule 56[(d)] is an affidavit furnished by the nonmovant. Although the affidavit need not contain evidentiary facts, it must explain why facts precluding summary judgment cannot be presented. This includes identifying the probable facts not available and what steps have been taken to obtain these facts. In this circuit, the nonmovant also must explain[, with specificity,] how additional time will enable him to rebut movant's allegations of no genuine issue of fact.

Price ex rel. Price v. W. Res., Inc., 232 F.3d at 783 (citations and internal quotation marks omitted). See Tadlock v. Lahood, 2013 WL 6284428, at *5 (10th Cir. 2013)(unpublished)(citing Price ex rel. Price v. W. Res., Inc. for the rule 56(d) requirements after the 2010 amendment); Douglass v. United Auto Workers Local Union 31, 188 F. App'x 656, 658 (10th Cir. 2006)(stating that the affidavit must state how additional time will enable the party to meet its burden "with specificity"). A rule 56(d) affidavit or declaration must state, with specificity, exactly what additional discovery is believed necessary. See Burke v. Utah Transit Auth. and Local 382, 462 F.3d 1253, 1264 (10th Cir. 2006); Chavez v. Perry, 142 F. App'x 325, 334 (10th Cir. 2005)("To resist summary judgment on this basis (56[(d)]), a party must specifically identify

what facts it seeks to discover and show how those facts would materially aid its case on the dispositive issues.").  If a party does not file an affidavit or declaration, a district court does not abuse its discretion in denying discovery.  See Tadlock v. Lahood, 2013 WL 6284428, at *5.

The Court has previously denied rule 56(d) motions where the information sought does not relate to a relevant legal question.  See Martinez v. Lucero, 2012 WL 2175772, at *30 (D.N.M. May 31, 2012)(Browning, J.)("Because the information sought would not alter the Court's decision on either absolute or qualified immunity, the Court will deny the request for discovery pursuant to rule 56(d).").  Similarly it has denied 56(d) requests where the party seeks duplicative information.  See Todd v. Montoya, 877 F. Supp. 2d 1048, 1099 (D.N.M. 2012)(Browning, J.)("There is little difference between the discovery he seeks and what he would seek if Montoya had not raised a qualified-immunity defense.").  Finally the Court has dismissed rule 56(d) motions where the proponent does not submit a rule 56(d) affidavit.  See Chavez v. County of Bernalillo, 3 F. Supp. 3d 933, 991 (D.N.M. 2014)(Browning, J.)("He did not submit a rule 56(d) affidavit or declaration.")

## LAW REGARDING 56(f)

Rule 56(f) reads:

After giving notice and a reasonable time to response, the court may:

(1)     Grant summary judgment for a nonmovant;

(2)     Grant the motion on grounds not raised by a party; or

(3)     Consider summary judgment on its own after identifying for the parties materials facts that may not be genuinely in dispute.

Fed. R. Civ. P. 56(f).  The advisory committee notes that "[s]ubdivision (f) brings into Rule 56 text a number of related procedures that have grown up in practice. . . .  In many cases it may prove useful first to invite a motion; the invited motion will automatically trigger the regular

procedure of subdivision (c)." Fed. R. Civ. P. 56(f) (2010 advisory committee notes). Generally the Tenth Circuit does not "favor granting of summary judgment *sua sponte*," but "a district court may do so if the losing party was on notice that she had to come forward with all of her evidence." Oldham v. O.K. Farms, Inc., 871 F.3d 1147, 1150 (10th Cir. 2017). See Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). "[E]ven if such notice is lacking, we will still affirm a grant of summary judgment if the losing party suffered no prejudice from the lack of notice." Oldham v. O.K. Farms, Inc., 871 F.3d at 1150 (quoting Johnson v. Weld County, 594 F.3d 1202, 1214 (10th Cir. 2010)). The Tenth Circuit has suggested that a Court grants a motion on grounds not raised by a party when neither party has briefed it. See Oldham v. O.K. Farms, Inc., 871 F.3d at 1150. See also Tabura v. Kellogg USA, 880 F.3d 544, 558 (10th Cir. 2018)(concluding that a district court erred in granting summary judgment on a ground that the movant did not raise, when the nonmovant only addressed the argument obliquely and did not marshal "all of their evidence" against it). A court is not required to give explicit notice to a party that it will rule on a particular ground, but a party must be sufficiently "aware that the district court planned to rule on the issue" A.M. v. Holmes, 830 F.3d 1123, 1137 (10th Cir. 2016).

### LAW REGARDING MOTION TO ALTER OR AMEND UNDER RULE 59(e)

Motions to reconsider in civil cases fall into three categories:

(i) a motion to reconsider filed within twenty-eight[12] days of the entry of judgment is treated as a motion to alter or amend the judgment under rule 59(e);

---

[12]Former rule 59 provided for a ten-day period after entry of judgment to file motions to reconsider. In 2009, the rule was amended, extending the filing period to twenty-eight days:

Experience has proved that in many cases it is not possible to prepare a satisfactory post-judgment motion in 10 days, even under the former rule that excluded intermediate Saturdays, Sundays, and legal holidays. These time periods are particularly sensitive because Appellate Rule 4 integrates the time to appeal with a timely motion under these rules. Rather than introduce the prospect

> (ii) a motion to reconsider filed more than [twenty-eight] days after judgment is considered a motion for relief from judgment under rule 60(b); and (iii) a motion to reconsider any order that is not final is a general motion directed at the Court's inherent power to reopen any interlocutory matter in its discretion.

Pedroza v. Lomas Auto Mall, Inc., 258 F.R.D. 453, 462 (D.N.M. 2009)(Browning, J.). See Price v. Philpot, 420 F.3d 1158, 1167 & n.9 (10th Cir. 2005); Computerized Thermal Imaging, Inc. v. Bloomberg. L.P., 312 F.3d 1292, 1296 n.3 (10th Cir. 2002).

Whether a motion for reconsideration should be considered a motion under rule 59 or rule 60 is not only a question of timing, but also "depends on the reasons expressed by the movant." Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc., 680 F.3d 1194, 1200 (10th Cir. 2011). Where the motion "involves 'reconsideration of matters properly encompassed in a decision on the merits,'" a court considers the motion under rule 59(e). Phelps v. Hamilton, 122 F.3d 1309, 1323-24 (10th Cir. 1997)(citation omitted). In other words, if the reconsideration motion seeks to alter the district court's substantive ruling, then it should be considered a rule 59 motion and be subject to rule 59's constraints. See Phelps v. Hamilton, 122 F.3d at 1324. In contrast, under rule 60,

> [o]n motion and just terms, the court may relieve a party or its legal representatives from a final judgment, order, or proceeding for the following reasons:
>
> (1)  mistake, inadvertence, surprise, or excusable neglect;
>
> (2)  newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3)  fraud (whether previously called intrinsic or extrinsic),

---

of uncertainty in appeal time by amending Rule 6(b) to permit additional time, the former 10-day periods are expanded to 28 days.

Federal Rules of Civil Procedure, Rule 59, Legal Information Institute, https://www.law.cornell.edu/rules/frcp/rule_59.

misrepresentation, or misconduct by an opposing party;

(4)     the judgment is void;

(5)     the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6)     any other reason that justifies relief.

Fed. R. Civ. P. 60(b).   Neither a rule 59 nor a rule 60 motion for reconsideration are appropriate vehicles to reargue an issue previously addressed by the court when the motion merely advances new arguments, or supporting facts which were available at the time of the original motion. . . .   Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice.

Servants of Paraclete v. Does, 204 F.3d at 1012.   "[A] motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law."

Servants of Paraclete v. Does, 204 F.3d at 1012.   A motion for alter or amend under rule 59(e), however, is an "inappropriate vehicle[] to reargue an issue previously addressed by the court when the motion merely advances new arguments, or supporting facts which were available at the time of the original motion."   Servants of Paraclete v. Does, 204 F.3d at 1012.   A district court has considerable discretion in ruling on a motion to reconsider.   See Phelps v. Hamilton, 122 F.3d at 1324.

The Tenth Circuit reviews a district court's ruling on a motion to alter or amend "under an abuse of discretion standard."   Phelps v. Hamilton, 122 F.3d at 1324.   Under that standard "a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances."   122 F.3d at 1324.   "The purpose [of a Rule 59(e)] motion is to correct manifest errors of law or to present newly discovered evidence."   Monge v.

RG Petro-Machinery (Group) Co. Ltd., 701 F.3d 598, 611 (10th Cir. 2012). "Where the motion requests a substantive change in the district court's judgment or otherwise questions its substantive correctness, the motion is a Rule 59 motion, regardless of its label." Yost v. Stout, 607 F.3d 1239, 1243 (10th Cir. 2010).

The Tenth Circuit has determined that the "law of the case doctrine has no bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another." Rimbert v. Eli Lilly & Co., 647 F.3d 1247, 1252 (10th Cir. 2011)(emphasis added)(citing Been v. O.K. Indus., Inc., 495 F.3d at 1225 (10th Cir. 2007). In this context, "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.'" Been v. O.K. Indus., Inc., 495 F.3d at 1225 (quoting Avitia v. Metro. Club of Chi., Inc., 49 F.3d 1219, 1227 (7th Cir. 1995)). "[D]istrict courts generally remain free to reconsider their earlier interlocutory orders." Been v. O.K. Indus., 495 F.3d at 1225. In short, a district court can use whatever standard it wants to review an earlier interlocutory order. It can review the earlier ruling de novo and essentially reanalyze the earlier motion from scratch, it can review the ruling de novo but limit its review, it can require parties to establish one of the law-of-the-case grounds, or it can refuse to entertain motions to reconsider altogether.

The best approach, in the Court's eyes, is to analyze motions to reconsider differently depending on three factors. Cf. Been v. O.K. Indus., Inc., 495 F.3d at 1225 ("[T]he doctrine is merely a 'presumption, one whose strength varies with the circumstances.'")(citation omitted). First, the Court should restrict its review of a motion to reconsider a prior ruling in proportion to how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider challenges. How "thoroughly" a point was addressed depends both on the amount of time and energy the Court spent on it, and on the amount of time and energy that the parties

spent on it -- in briefing and orally arguing the issue, but especially if they developed evidence on the issue. A movant for reconsideration thus faces a steeper uphill challenge when the prior ruling was on a criminal suppression motion, class certification motion, or preliminary injunction,[13] than when the prior ruling is, e.g., a short discovery ruling. The Court should also look, not to the prior ruling's overall thoroughness, but to the thoroughness with which the Court addressed the exact point or points that the motion to reconsider challenges. A movant for reconsideration thus faces an easier task when he or she files a targeted, narrow-in-scope motion asking the Court to reconsider a small, discrete portion of its prior ruling than when he or she files a broad motion to reconsider that rehashes the same arguments from the first motion, and essentially asks the Court to grant the movant a mulligan on its earlier failure to present persuasive argument and evidence.

Second, the Court should consider the case's overall progress and posture, the motion for reconsideration's timeliness relative to the ruling it challenges, and any direct evidence that the parties may produce, and use those factors to assess the degree of reasonable reliance which the opposing party has placed in the Court's prior ruling. See 18B Charles Alan Wright, Arthur R.

---

[13]The Court typically makes findings of fact and conclusions of law in ruling on these motions. At first glance, it appears that the Federal Rules of Civil Procedure set forth additional standards -- beyond that which applies to other interlocutory orders -- for amending findings of fact and conclusions of law: "**Amended or Additional Findings.** On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings -- or make additional findings -- and may amend the judgment accordingly. The motion may accompany a motion for a new trial under Rule 59." Fed. R. Civ. P. 52(b). This rule appears to limit motions to reconsider orders with findings of fact and conclusions of law to twenty-eight days. The rule's use of the term "entry of judgment," its reference to rule 59, and its adoption of the same time period that applies to motions to alter or amend a judgment, all lead the Court to conclude, however, that rule 52(b) -- and its 28-day time limit -- does not apply to interlocutory orders. The time limit applies only to findings of fact and conclusions of law supporting a case-ending judgment -- such as those entered after a bench trial -- and to those giving rise to an interlocutory appeal that, if filed, divests the district court of its jurisdiction -- such as those entered in support of a preliminary injunction.

Miller, Edward H. Cooper, Vikram David Amar, Richard D. Freer, Helen Hershkoff, Joan E. Steinman & Catherine T. Struve, Federal Practice & Procedure § 4478.1 (2d ed.)("Stability becomes increasingly important as the proceeding nears final disposition . . . . Reopening should be permitted, however, only on terms that protect against reliance on the earlier ruling.").  For example, if a defendant (i) spends tens of thousands of dollars removing legacy computer hardware from long-term storage; then (ii) obtains a protective order in which the Court decides that the defendant need not produce the hardware in discovery; then (iii) returns the hardware to long-term storage, sustaining thousands more in expenses; and (iv) several months pass, then the plaintiffs should face a higher burden in moving the Court to reconsider its prior ruling than they faced in fighting the motion for protective order the first time.

Third, the Court should consider the factors from Servants of the Paraclete v. Does.  The Court should be more inclined to grant motions for reconsideration if the movant presents (i) new controlling authority -- especially if the new authority overrules prior law or sets forth an entirely new analytical framework; (ii)  new evidence -- especially if the movant has a good reason why the evidence was not presented the first time around; or (iii) a clear indication -- one that manifests itself without the need for in-depth analysis or review of the facts -- that the Court erred.

These three factors should influence the degree to which the Court restricts its review of a prior ruling, but they do not necessarily mean that the Court should always apply a deferential standard of review.  The Court should pause before applying a standard of review to its own interlocutory orders that is more deferential than the standard that the Court of Appeals will apply to it, unless the Court concludes that the alleged error in the prior ruling was harmless, or the party moving for reconsideration waived its right to appeal the alleged error by not raising

the appropriate argument. Even in circumstances where the Court concludes that it is insulated from reversal on appeal, there are principled reasons for applying a de novo standard. After all, if the Court was wrong in its earlier decision, then, generally speaking, it is unjust to maintain that result -- although the Court should weigh this injustice against any injustice that would result from upending the parties' reliance on the earlier ruling, which is the balancing test that the three factors above represent.

What the Court means by "restricting its review" is less about applying a deferential standard of review -- although that may be appropriate in some circumstances -- and more about reducing (i) the depth of the Court's analysis the second time around -- thus conserving judicial resources; and (ii) the impositions that relitigation of the prior ruling will impose on the party opposing the motion for reconsideration. The Court should consider the time and expense that the party opposing reconsideration spent in winning the earlier ruling, and should try to prevent that party from having to bear the same impositions again. Basically, even if the Court ultimately analyzes a motion to reconsider under the same standard which it analyzed the motion that produces the earlier ruling, it should analyze the motion in a different way -- one focused on reducing the litigation burdens of the party opposing reconsideration. For example, when a party moves the Court for a preliminary injunction, standard practice is that the Court holds an evidentiary hearing as a matter of course, regardless whether it looks as if the party has a good chance of prevailing. If the party loses and the Court denies the injunction, however, and the party moves for reconsideration, the party should not be entitled to the presumption of an evidentiary hearing merely because he or she received that presumption the first time the Court considered the motion.

In light of these statements, it is perhaps better to characterize the increased burden that a movant for reconsideration faces as one of production and not of persuasion. The Court analyzes motions to reconsider by starting where it ended in the prior ruling -- not by starting anew. Parties opposing reconsideration can do the same, and they may stand on whatever evidence and argument they used to win the earlier ruling. Movants for reconsideration, on the other hand, carry the full burden of production: they must persuade the Court, using only the evidence and argument they put before it, that it should change its prior ruling; they must do all of the legwork, and not rely on the Court to do any supplemental fact-finding or legal research; and they must convincingly refute both the counterarguments and evidence that the opposing party used to win the prior ruling and any new arguments and evidence that the opposing party produces while opposing the motion to reconsider. Unlike the motion that produced the prior ruling, a motion to reconsider is not -- and is not supposed to be -- a fair fight procedurally. The deck is stacked against a movant for reconsideration, and if such a movant hopes to prevail, he or she must have not only a winning legal position, but the work ethic and tenacity to single-handedly lead the Court to his or her way of thinking.

The Court has recently commented on parties rearguing the same issues on a rule 59(e) motion:

> Under rule 59(e)'s framework, the Court is not restricted to rule 50(b)'s remedies and may alter the judgment when there is: "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, [or] (3) the need to correct clear error or prevent manifest injustice." Servants of Paraclete v. Does, 204 F.3d at 1012. The Tenth Circuit has noted that motions to alter, amend, or reconsider should not rehash old arguments, or advance new arguments or facts that could have been raised earlier. See United States v. Amado, 841 F.3d [867], 871 [(10th Cir. 2016)]("A proper motion to reconsider does not simply state facts previously available or make arguments previously made."); Servants of Paraclete v. Does, 204 F.3d at 1012 ("Thus, a motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law. It is not appropriate to revisit issues already addressed or

advance arguments that could have been raised in prior briefing.").  As the Court has already noted, the Defendants' Motion raises the same arguments that the Defendants previously argued during their Motion to Alter.  The Court, however, also concludes that <u>Servants of Paraclete v. Does</u> does not force the Court to deny a motion to amend or alter, simply because it raises identical issues; rather, it affords the Court the option to deny that motion for reasons of judicial efficiency.  A court need not review a motion to alter or amend with the same rigor if the motion raises issues already considered, because it would waste time by forcing a judge to rewrite an opinion already rendered.  If, on the other hand, a party raises an identical issue on a motion to alter, and, upon the district judge's reflection, perhaps after passions have cooled, he or she concludes that he or she erred previously, <u>Servants of Paraclete v. Does</u> does not chain that district judge to an erroneous legal conclusion.  There is no sound reason for a district judge to be unable to change a ruling he or she has made if he or she has become concerned that he or she is wrong.

<u>Nelson v. City of Albuquerque</u>, __ F. Supp. 3d __, 2017 WL 4776730, at *35 (D.N.M. 2017)(Browning, J.)(altering a judgment, because officers were entitled to qualified immunity).

## LAW REGARDING THE RULE OF COMPLETENESS

"Rule 106 sets forth the rule of completeness." <u>United States v. Christy</u>, 2011 WL 5223024, at *3 (D.N.M. Sept. 21, 2011)(Browning, J.).  Rule 106 states: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."  Fed. R. Evid. 106. <u>Accord</u> <u>Kangley v. United States</u>, 788 F.2d 521, 533 (9th Cir. 1986).  By allowing the other party to present the remainder of the writing or recorded statement immediately rather than later on cross-examination, this rule avoids the situation where a statement taken out of context "creates such prejudice that it is impossible to repair by a subsequent presentation of additional material." <u>Beech Aircraft Corp. v. Rainey</u>, 488 U.S. 153, 171 n.14 (1988). <u>Accord</u> <u>United States v. Cruz–Calixto</u>, 39 F. App'x 565, 567 (9th Cir. 2002)(unpublished); <u>United States v. Oseby</u>, 148 F.3d 1016, 1025 (8th Cir. 1998)("The advisory committee notes to Rule 106 state that one of the

considerations for this rule is to avoid the misleading impression created by taking matters out of context."); <u>United States v. Rubin</u>, 609 F.2d 51, 63 (2d Cir. 1979)("The notes had been used extensively and quoted from copiously by Rubin's counsel on his cross-examination of Cox, possibly leaving a confusing or misleading impression that the portions quoted out of context were typical of the balance."); <u>United States v. Young</u>, 2010 WL 1461558, at *3 (D. Me. Apr. 9, 2010). "Rule 106 by its terms does not apply to oral conversations, but only to writings and recorded statements." <u>United States v. Christy</u>, 2011 WL 5223024, at *3 (citing Fed. R. Evid. 106). As the Tenth Circuit has stated: "The rule of completeness, however, does not necessarily require admission of [an entire statement, writing or recording]. Rather, only those portions which are relevant to an issue in the case and necessary 'to clarify or explain the portion already received' need to be admitted." <u>United States v. Lopez–Medina</u>, 596 F.3d 716, 735 (10th Cir. 2010). The United States Court of Appeals for the Seventh Circuit has applied a four-part test to determine whether to allow evidence under rule 106: "(1) does [the evidence] explain the admitted evidence, (2) does it place the admitted evidence in context, (3) will admitting it avoid misleading the trier of fact, and (4) will admitting it insure a fair and impartial understanding of all of the evidence." <u>United States v. Velasco</u>, 953 F.2d 1467, 1475 (7th Cir. 1992). Discussing the rule of completeness, the United District Court for the Central District of California provided guidance on when a related statement should be admitted to rebut a misleading impression:

> The Rule of Completeness "does not compel admission of otherwise inadmissible hearsay evidence." However, the Rule of Completeness was designed to prevent the Government from offering a "misleadingly-tailored snippet." The Rule of Completeness warrants admission of statements in their entirety when the Government introduces only a portion of inextricably intertwined statements.
>
> Statements are inextricably intertwined when the meaning of a statement, if divorced from the context provided by the other statement, is different than the

meaning the statement has when read within the context provided by the other statement. Under those circumstances, a court must take care to avoid distortion or misrepresentation of the speaker's meaning, by requiring that the statements be admitted in their entirety and allowing the jury to determine their meaning.

United States v. Castro-Cabrera, 534 F. Supp. 2d 1156, 1160 (C.D. Cal. 2008). Accord United States v. Coughlin, 821 F. Supp. 2d 8, 30 (D.D.C. 2011)("Coughlin is correct, however, that regardless of whether this evidence is inadmissible hearsay or not, he can introduce it under the rule of completeness."); United States v. Peeples, 2003 WL 57030, at *3 (N.D. Ill. Jan. 7, 2003).

A related concept to the rule of completeness is the principle that, "[w]hen a party opens the door to a topic, the admission of rebuttal evidence on that topic becomes permissible." Tanberg v. Sholtis, 401 F.3d 1151, 1166 (10th Cir. 2005). "Permissible does not mean mandatory, however; the decision to admit or exclude rebuttal testimony remains within the trial court's sound discretion." Tanberg v. Sholtis, 401 F.3d at 1166. This principle reflects the general proposition that "[c]ross examination may embrace any matter germane to the direct examination, qualifying or destroying, or tending to elucidate, modify, explain, contradict, or rebut testimony given in chief by the witness." United States v. Burch, 153 F.3d 1140, 1144 (10th Cir. 1998). "[W]hether or not rebuttal evidence is admissible depends on whether the initial proof might affect the case and whether the rebuttal evidence fairly meets the initial proof." Richie v. Mullin, 417 F.3d 1117, 1138 (10th Cir. 2005)(alteration in original). The Tenth Circuit has recognized that, when the rebuttal evidence is "otherwise inadmissible," it must both: (i) "be reasonably tailored to the evidence it seeks to refute"; and (ii) "[t]here must be a nexus between the purported rebuttal evidence and the evidence that the purported rebuttal evidence seeks to rebut." Richie v. Mullin, 417 F.3d at 1138 (quoting United States v. Stitt, 250 F.3d 878, 897 (4th Cir. 2001)). In a case where a wife was seeking damages for loss of companionship in the context of an excessive force claim, the Tenth Circuit stated that the wife's

claim for damages opened the door to evidence of the deceased husband's prior domestic abuse conviction and arrest. See Lounds v. Torres, 217 F. App'x 755, 758 (10th Cir. 2007)(unpublished)("[E]vidence of Alford's 2002 conviction and 2003 arrest for domestic abuse of Ms. Fuston-Lounds was offered not to show his character, but for the proper purpose of rebutting Ms. Fuston-Lounds' claim for damages.").

## LAW REGARDING THE AUTHENTICATION OF EVIDENCE

Rule 901 of the Federal Rules of Evidence governs the authentication of evidence:

(a) In General. To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.

(b) Examples. The following are examples only—not a complete list—of evidence that satisfies the requirement:

(1) Testimony of a Witness with Knowledge. Testimony that an item is what it is claimed to be.

(2) Nonexpert Opinion About Handwriting. A nonexpert's opinion that handwriting is genuine, based on a familiarity with it that was not acquired for the current litigation.

(3) Comparison by an Expert Witness or the Trier of Fact. A comparison with an authenticated specimen by an expert witness or the trier of fact.

(4) Distinctive Characteristics and the Like. The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.

(5) Opinion About a Voice. An opinion identifying a person's voice—whether heard firsthand or through mechanical or electronic transmission or recording—based on hearing the voice at any time under circumstances that connect it with the alleged speaker.

(6) Evidence About a Telephone Conversation. For a telephone conversation, evidence that a call was made to the number assigned at the time to:

(A) a particular person, if circumstances, including self–identification, show that the person answering was the one called; or

(B) a particular business, if the call was made to a business and the call related to business reasonably transacted over the telephone.

(7) Evidence About Public Records. Evidence that:

(A) a document was recorded or filed in a public office as authorized by law; or

(B) a purported public record or statement is from the office where items of this kind are kept.

(8) Evidence About Ancient Documents or Data Compilations. For a document or data compilation, evidence that it:

(A) is in a condition that creates no suspicion about its authenticity;

(B) was in a place where, if authentic, it would likely be; and

(C) is at least 20 years old when offered.

(9) Evidence About a Process or System. Evidence describing a process or system and showing that it produces an accurate result.

(10) Methods Provided by a Statute or Rule. Any method of authentication or identification allowed by a federal statute or a rule prescribed by the Supreme Court.

Fed. R. Evid. 901. Professors Charles Alan Wright and Victor James Gold explain:

Rule 901 has two purposes. First, the provision acknowledges the requirement of authentication and provides examples. Second, Rule 901 allocates responsibilities between the judge and jury for determining whether an item of evidence is what its proponent claims it to be. The rule allocates most of those responsibilities to the jury.

31 C. Wright & V. Gold, Federal Practice and Procedure: Evidence § 7102, at 12 (2000).

## LAW REGARDING DIVERSITY JURISDICTION AND CHOICE OF LAW

When a court's jurisdiction rests on diversity of citizenship under 28 U.S.C. § 1332, the court should look to the forum state's choice-of-law rules to determine which state's substantive law to apply. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. at 496-97; Pepsi-Cola Bottling Co. v. PepsiCo., Inc., 431 F.3d 1241, 1255 (10th Cir. 2005). In New Mexico, choice-of-law

analysis is a two-step process. See Mosely v. Titus, 762 F. Supp. 2d 1298, 1314 (D.N.M. 2010)(Browning, J.)(citing Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 14, 142 P.3d 374, 377). "First, the Court must characterize the 'area of substantive law -- e.g., torts, contracts, domestic relations -- to which the law of the forum assigns a particular claim or issue.'" Mosely v. Titus, 762 F. Supp. 2d at 1314 (quoting Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 11, 142 P.3d at 377). The next step is to apply New Mexico's choice-of-law rule. See Mosely v. Titus, 762 F. Supp. 2d at 1314 (citing Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 15, 142 P.3d at 377).[14]

"In tort actions, New Mexico courts follow the doctrine of lex loci delicti commissi and apply the law of the place where the wrong took place." Mosely v. Titus, 762 F. Supp. 2d at 1314 (citing Torres v. State, 1995-NMSC-025, ¶ 13, 894 P.2d 386, 390). The place of the wrong is the location of the last act necessary to complete the injury. See Mosely v. Titus, 762 F. Supp. 2d at 1314 (citing Torres v. State, 1995-NMSC-025, ¶ 13, 894 P.2d at 390). "Where the elements of the underlying claim include harm, the place of the wrong is the place where the harm occurred." Mosely v. Titus, 762 F. Supp. 2d at 1314 (citing First Nat'l Bank v. Benson, 1976-NMCA-072, ¶ 6, 553 P.2d 1288, 1289).

Under Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"), a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007). Accord Mem. Hosp. v. Healthcare Realty Trust Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme

---

[14]The Court concludes that the Supreme Court of New Mexico would follow Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 15, 142 P.3d at 377, as the Supreme Court of New Mexico has cited it with approval. See Freeman v. Fairchild, __ P.3d __, 2018 WL 1149563, at * 9 (N.M. March 5, 2018).

Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance Endodontics, LLC v. Dentsply Intern., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.). "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an Erie prediction should look first to the words of the state supreme court." Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[15] If the Court finds only an opinion from the Court of Appeals of New Mexico, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." Mosley v. Titus, 762 F. Supp. 2d at 1332

---

[15]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M. 2014) (Browning, J.). Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with state-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme court precedent usually binds state trial courts. The factors to which a federal court should look before making an Erie prediction that a state supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the state supreme court decision from which the federal court is considering departing -- the younger the state case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state courts -- especially the state supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the state supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times. See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17. See also Spurlock v. Townes, 2016-NMSC-014, ¶¶ 16-20, 368 P.3d 1213, 1217-18 (adopting the Court's Erie prediction in Peña v. Greffet). In short, a state supreme court case that a federal court Erie predicts will be overruled is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

(noting that, where the only opinion on point is "from the Court of Appeals, [] the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it")(citing Wade v. EMCASCO Ins. Co., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state")).[16]

---

[16]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State. An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question. We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day. It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

> . . . We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

> . . . .

> The question has practical aspects of great importance in the proper administration of justice in the federal courts. It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship. In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether

The Court may also rely on decisions by the Tenth Circuit interpreting New Mexico law.  See

Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d at 1243 & n.30.[17]

---

believed to be sound or unsound, it should have been followed by the Circuit
Court of Appeals.

Fid. Union Trust Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).
The Supreme Court has softened this position over the years; federal courts are no longer bound
by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where
the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S.
at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See
17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed.
1999)("Moore's")("Decisions of intermediate state appellate courts usually must be
followed . . . [and] federal courts should give some weight to state trial courts
decisions.")(emphasis and title case omitted).


[17]In determining the proper weight to accord Tenth Circuit precedent interpreting New
Mexico law, the Court must balance the need for uniformity between federal court and state
court interpretations of state law with the need for uniformity among federal judges.  If the Court
adheres too rigidly to Tenth Circuit case law, ignoring changes that a state's law in the ensuing
years have undergone, then parties litigating state law claims will be subject to a different body
of substantive law, depending whether they litigate in state court or federal court.  This result
frustrates the purpose of Erie, which held that federal courts must apply state court
interpretations of state law, rather than their own, in part so that parties achieve a consistent
result regardless of the forum.  See Erie, 304 U.S. at 74-77.  This consideration pulls the Court in
the direction of according Tenth Circuit precedent less weight and according state court
decisions issued in the ensuing years more weight.  On the other hand, when the state law is
unclear, it is desirable for there to at least be uniformity among federal judges as to its proper
interpretation.  Otherwise, different federal judges within the same circuit -- or even the same
district, as district courts' decisions are not binding, even upon themselves -- would be free to
adopt differing interpretations of a state's law.  This consideration pulls the Court towards a
stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless
whether it accurately reflects state law -- at least provides consistency at the federal level, so
long federal district judges are required to follow it.
        The Court must decide how to weigh Tenth Circuit case law against more-recent state
court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to
Tenth Circuit precedent unless there is intervening case law directly on point from the state's
highest court, on one end; and independently interpreting the state law, regarding the Tenth
Circuit precedent as persuasive authority, on the other.  In striking this balance, the Court notes
that it is generally more concerned about systemic inconsistency between the federal courts and
the state courts than it is about inconsistency among federal judges.  Judges, even those within a
jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law
differently from one another; this inconsistency is part and parcel of a common-law judicial
system.  More importantly, litigants seeking to use forum selection to gain a substantive legal

advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal. All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would. Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency. When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' decisions are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. As such, Tenth Circuit precedent can lag behind developments in state law -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one state. See 28 U.S.C. § 131 ("Wyoming and those portions of Yellowstone National Park situated in Montana and Idaho constitute one judicial district."). It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess. A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on state court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that *x* is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is *x*. Its holdings are descriptive, not prescriptive -- interpretive, not normative. Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both

reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law is accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of state law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

The purpose of Erie is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." Moore's § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.")(citation and internal quotation marks omitted). This formulation may not be the most precise one if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, see Abbott Laboratories v. Granite State Ins. Co., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. See Allstate Ins. Co. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play. See generally SFF-TIR, LLC v. Stephenson, 2017 WL 1487439 (N.D. Okla. 2017)(Browning, J.). The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption),

expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale. New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone. The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree. In Wankier v. Crown Equipment Corp., the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.). From this passage, it seems clear the Tenth Circuit permits a district court to deviate from the Tenth Circuit's view of state law only on the basis of a subsequent case "of the state's highest court." The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that"). A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest state court was an oversight or intentional. Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts. Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition. In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of *Allen* [*v. Minnstar, Inc.*, 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

Ultimately, "the Court's task is to predict what the state supreme court would do." Wade v.

EMCASCO Ins. Co., 483 F.3d at 666. Accord Mosley v. Titus, 762 F. Supp. 2d at 1332 (citation

omitted); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1188-89 (D.N.M. 2008)(Browning,

J.)(quoting Wade v. EMCASCO Ins. Co., 483 F.3d at 665-66).

## NEW MEXICO LAW REGARDING FALSE CONFLICTS OF LAW

In Ferrell v. Allstate Insurance Co., 2008-NMSC-042, 188 P.3d 1156, the Supreme Court

of New Mexico described the "false conflict" or "actual conflict"[18] doctrine: "Under this

---

Regardless whether the decision to limit the intervening authority a district court can consider was intentional, the Tenth Circuit has picked it up and run with it. In Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir. 2010)(Holmes, J.), the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law. See Kokins v. Teleflex, Inc., 621 F.3d at 1297 ("[T]he Colorado Court of Appeals decided *Biosera[, Inc. v. Forma Scientific, Inc.*, 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's *highest court*.'")(emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the Erie doctrine. More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior case law. Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive." Moore's § 124.22[4] (citing State Farm Mut. Auto. Ins. Co. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)). Still, the Court is bound to abide by the Tenth Circuit's interpretation of Erie. This scheme may be inefficient, because the plaintiffs may appeal, after trial, the Court's ruling. The Tenth Circuit may certify the question to the Supreme Court of New Mexico, and the Tenth Circuit may then have to reverse the Court after a full trial on the merits.

[18]The Supreme Court of New Mexico used the term "actual conflict" to refer to what the Court of Appeals of New Mexico had called the "false conflict" doctrine, because

"false conflict" actually has two different meanings. See Robert A. Leflar et al., American Conflicts Law, § 92, at 270 (4th ed. 1986). The first meaning of "false conflict" arises from the choice-of-law method advanced by Professor Brainerd Currie, "the governmental interest" analysis. Id. at 270-71. Under Currie's method, a false conflict arises when "only one of the involved states would be interested in applying its law." Eugene F. Scoles et al., Conflict of Laws § 2.9, at 28 (4th ed. 2004). The second meaning of the term "false conflict" is "no conflict of laws." Leflar et al., supra, § 92, at 272.

analysis, when the laws of the relevant states do not actually conflict, the court may avoid a conflict-of-law analysis and may apply forum law to the entire class." 2008-NMSC-042, ¶ 16, 188 P.3d at 1164 (citing Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 816 (1985)). "If, however, the laws of the relevant states actually conflict, or if the laws of certain of the relevant states conflict, then the forum court must resolve that conflict using the choice-of-law rules contained in the forum state's conflict-of-laws doctrine." Ferrell v. Allstate Insurance Co., 2008-NMSC-042, ¶ 16, 188 P.3d at 1164. The doctrine's focus is "not on whether the laws are superficially identical as written, but whether the effect of laws would be identical as applied to a particular case." Fowler Brothers, Inc. v. Bounds, 2008-NMCA-091, ¶ 9, 188 P.2d 1261. See Ferrell v. Allstate Insurance Co., 2008-NMSC-042, ¶ 18, 188 P.3d at 1164.

In Fowler Brothers, Inc. v. Bounds, 2008-NMCA-091, 188 P.3d 1261, an unlicensed contractor that was a purported employee of a licensed contractor working on an out-of-state contractor brought action against the licensed contractor for breach of contract and unjust enrichment after the licensed contract ceased to pay for work on the project. Fowler Brothers, Inc. v. Bounds, 2008-NMCA-091, ¶¶ 2-4, 188 P.3d at 1263-64. The Court of Appeals of New Mexico, in an opinion that the Honorable Michael Bustamante wrote and in which the Honorable Lynn Pickard and Roderick T. Kennedy joined, held that Arizona and New Mexico contractor licensing law did not conflict as applied to the action. Fowler Brothers, Inc. v. Bounds, 2008-NMCA-091, ¶ 20, 188 P.3d at 1267. The district court had concluded that: (i) under either Arizona or New Mexico law, the plaintiff was required to have an Arizona contractor's license to perform work on the project; and (ii) under either Arizona or New Mexico law, the plaintiff is prohibited from recovering under any cause of action, including equitable remedies, for its work

---

Ferrell v. Allstate Ins. Co., 2008-NMSC-042, ¶ 16 n.2.

on the project, because it did not have such a license.  See 2008-NMCA-091, ¶ 5, 188 P.2d at 1264.  The district court had avoided the choice-of-law issue by determining, albeit implicitly, that the applicable law of Arizona and New Mexico were the same, or would yield the same results.  See 2008-NMCA-091, ¶ 8, 188 P.2d at 1265.  More specifically, the district court had dismissed the plaintiff's claims on the basis of its legal conclusion that, "[u]nder either Arizona or New Mexico law, Plaintiff is prohibited from recovering under any cause of action, including equitable remedies, for its work on the Project, because it did not have [an Arizona contractor's] license."  2008-NMCA-091, ¶ 5, 188 P.2d at 1264.

The Court of Appeals of New Mexico found that implicit in the district court's conclusion was its determination that there was no conflict between Arizona and New Mexico law as it related to the case's dispositive issue, i.e., whether the plaintiff was required to have an Arizona contractor's license to recover damages for its work on the project.  See 2008-NMCA-091, ¶ 8, 188 P.2d at 1265.  Judge Bustamante said that the Court of Appeals of New Mexico would first consider whether the district court correctly determined that no conflict existed between Arizona and New Mexico law with respect to the case's circumstances, and concluded that no conflict existed.  See 2008-NMCA-091, ¶¶ 8-11, 188 P.2d at 1265 ("This Case Presents No Conflict Between Arizona and New Mexico Law.")(emphasis omitted).

## DELAWARE LAW REGARDING CONTRACT INTERPRETATION

Under Delaware law "[w]hen interpreting a contract, the Court will give priority to the parties' intentions as reflected in the four corners of the agreement."  GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P., 36 A.3d 776, 779 (Del. 2012).  "The Court will interpret clear and unambiguous terms according to their ordinary meaning."  GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P., 36 A.3d at 780.  "Contract terms

themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." <u>GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.</u>, 36 A.3d at 780. "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, an ambiguity exists '[w]hen the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings.'" <u>GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.</u>, 36 A.3d at 780 (quoting <u>Eagle Ind., Inc. v. DeVilbiss Health Care, Inc.</u>, 702 A.2d 1228, 1232 (Del. 1997)). "Where a contract is ambiguous, 'the interpreting court must look beyond the language of the contract to ascertain the parties' intentions.'" <u>GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.</u>, 36 A.3d at 780 (quoting <u>Eagle Ind., Inc. v. DeVilbiss Health Care, Inc.</u>, 702 A.2d at 1232). "In construing an ambiguous contractual provision, a court may consider evidence of prior agreements and communications of the parties as well as trade usage or course of dealing" <u>Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.</u>, 702 A.2d at 1233.

## <u>ANALYSIS</u>

The Court will not alter or amend its Final Judgment. Lopez' arguments are unavailing, largely because the Federal Rules of Civil Procedure permit the Court to properly consider the Purchase Agreement in deciding the MSJ. To the extent that Lopez attacks the Court's choice-of-law decisions, the Court determines that it did not previously err. Finally, the Court concludes that it properly denied Lopez' rule 56(d) motion, as additional discovery is highly unlikely to alter the case's outcome. Accordingly, the Court denies the Motion.

I.    **THE COURT DID NOT ERR IN GRANTING THE MSJ.**

Lopez' four new arguments do not demonstrate error.  First, he argues that the Court improperly considered the Purchase Agreement, because Lopez and not the Defendants offered the Purchase Agreement as evidence.  See Motion ¶ 23, at 9-10.  Under rule 56(c), however, the Court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c).  Both parties cited the Purchase Agreement -- albeit at a hearing and in supplemental briefing -- so, according to rule 56(c)'s plain text, the Court "need consider" that agreement.  Fed. R. Civ. P. 56(c).  See Suppl. Brief at 2-8; Supp. Brief Response at 2-3; Transcript of Motion Proceedings 5:3-4 (taken March 15, 2016)(DeCandia), filed July 20, 2016 (Doc. 92)("Tr.").  Even if that provision did not apply, however, the Purchase Agreement is in the record, see Purchase Agreement at 1-66, filed July 12, 2016 (Doc. 90-1), so the Court "may consider" it, Fed. R. Civ. P. 56(c).

Second, Lopez asserts that the Court should not have relied upon the Purchase Agreement, because the Black & Decker Defendants did not attest that they provided "a full and complete" copy of the Purchase Agreement during discovery.  Motion ¶¶ 23, 26, at 9-11.  The Court interprets Lopez' position as an argument that the Purchase Agreement is inadmissible under rule 901 of the Federal Rules of Evidence -- the authentication rule -- or, alternatively, is admissible, but was incomplete under rule 106, so cannot be considered in an order granting summary judgment.  See Fed. R. Civ. P. 56(c)(2); Law Co., Inc. v. Mohawk Const. and Supply Co., Inc., 577 F.3d 1164, 1170 (10th Cir. 2009)("Mohawk Const.").

The Tenth Circuit does "not require an affidavit to authenticate every document submitted for consideration at summary judgment."  Mohawk Const., 577 F.3d at 1170.  Indeed, it has held that "documents produced during discovery that are on letterhead of the producing

party are authentic per se for purposes of Federal Rule of Evidence 901." <u>Mohawk Const.</u>, 577 F.3d at 1170. Typically, however, authentication is satisfied "by evidence sufficient to support a finding that the matter in question is what its proponent claims." <u>Mohawk Const.</u>, 577 F.3d at 1170 (citing Fed. R. Evid. 901). Satisfactory authentication evidence can come from the document's face. <u>See</u> <u>Mohawk Const.</u>, 577 F.3d at 1170 ("Mohawk's submitted exhibits might be sufficiently authenticated taking into consideration the '[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.'")(quoting Fed. R. Evid. 901(b)(4)).

That the Black & Decker Defendants did not produce an affidavit attesting to the Purchase Agreement's authenticity is no obstacle to the Court's consideration of such an agreement. <u>See</u> <u>Mohawk Const.</u>, 577 F.3d at 1170 ("We do not require an affidavit to authenticate every document."). Authentication is not a high threshold, especially where Lopez gives the Court no evidence to question the Purchase Agreement's genuineness. Moreover, the Purchase Agreement appears to be what it purports to be: an acquisition-of-stock agreement between the Black & Decker Corp. and Pentair, Inc. The document is entitled "Purchase Agreement between the Black & Decker Corporation and Pentair, Inc., dated as of July 16, 2004." Purchase Agreement at 1. It is labeled "Execution Copy" and contains terms consistent with a stock acquisition. Purchase Agreement at 1. <u>See</u>, <u>e.g.</u>, <u>id.</u> §§ 1.1-3.4, at 2, 9-20 (detailing the representations and warranties of the Parent). The Black & Decker Defendants, at least one of whom is a successor to the corporate entity that signed the contract, provides the Purchase Agreement. <u>See</u> Suppl. Brief. ¶ 7, at 2-3. The circumstances surrounding its production and the document's contents thus sufficiently authenticate it for the Court to have considered the document when granting the MSJ. <u>See</u> <u>Denison v. Swaco Geolograph Co.</u>, 941 F.2d 1416, 1423

(10th Cir. 1991)(concluding a document was authenticated under rule 901(b)(4), because it had a defendant's letterhead and was produced by a former defendant); Krystal Inc. v. China United Transport, Inc., 2017 WL 4339343, at *4 (C.D. Cal. 2017)(Lew, J.)(holding a sales contract authentic, because "it names Dalian and the Chinese buyer and appears to be what Ms. Wang claims it to be").

To the extent that Lopez invokes the rule of completeness, see Fed. R. Evid. 106, the Court also concludes that there was no error. The rule of completeness appears to be uniquely applicable in a trial setting. See United States v. Lopez-Medina, 596 F.3d 716, 735 (10th Cir. 2010). "The purpose of Rule 106 is to prevent a party from misleading the jury," United States v. Lopez-Medina, 596 F.3d at 735, but there is no jury on a summary judgment motion. Nevertheless, the general principle animating the rule of completeness -- guarding against deception -- is appropriate at the summary judgment phase. A judge, just like a jury, should not be misled, especially on a dispositive motion. See United States v. Williston, 862 F.3d 1023, 1038 (10th Cir. 2017)("[T]he rule functions as a defensive shield against potentially misleading evidence proffered by an opposing party."). See also Fed. R. Civ. P. 32(b)(6) ("If a party offers in evidence only part of a deposition, an adverse party may require the offeror to introduce other parts that in fairness should be considered with the part introduced."). The rule of completeness' remedy, however, is introduction of the missing material and not exclusion of the partial material. See Fed. R. Evid. 106 ("If a party introduces all or part of a writing . . . an adverse party may require the introduction, at that time, of any other part . . . that in fairness ought to be considered."). Lopez has, therefore, already been afforded the rule of completeness' remedy, because it introduced the full Purchase Agreement into the record. See Purchase Agreement at 1-66; Schedules at 1-110.

To the extent that Lopez argues that the Court erred, because the Black & Decker Defendants provided no evidence that the Purchase Agreement given to Lopez is complete, see Motion ¶ 23, at 9-10, the Court concludes that there is enough evidence to conclude that the Purchase Agreement, as admitted, is sufficiently complete. The Purchase Agreement's table of contents lists several sections, schedules, and three exhibits. See Purchase Agreement at 2-4. The Purchase Agreement and the Schedules include each listed section and schedule, and are consecutively paginated, thus indicating completeness. The admitted evidence does not include the three exhibits, but those three exhibits' titles suggest that they are irrelevant. See Purchase Agreement at 4 (listing the exhibits as "Canadian Assumption Agreement," "Asia Water Lease Contract," and "Asia Enclosure Lease Contract"). Because the case has nothing to do with Canada or Asia, the Court concludes that the Purchase Agreement is sufficiently complete.[19] Thus, the Court committed no error when it considered the entire Purchase Agreement.

---

[19]To the extent that Lopez argues that the Court erred in denying its rule 56(d) request, because the Black & Decker Defendants have not proffered evidence that the Purchase Agreement is complete, the Court disagrees for the same reason as articulated above. Moreover, the Court has already ruled:

> Lopez does not identify any specific facts which he expects to discover which are essential to his opposition to the MSJ. See Garcia v. U.S. Air Force, 533 F.3d [1170], 1179 [(10th Cir. 2008)]. As the Tenth Circuit has said, a party cannot invoke rule 56(d) 'by simply stating that discovery is incomplete but must state with specificity how the additional material will rebut the summary judgment motion." Garcia v. U.S. Air. Force, 533 F.3d at 1179.

MOO at 115, 2017 WL 3142028, at *47 (alterations added). Lopez' Motion still does not identify what additional material he expects to find that would rebut the summary judgment motion. See Motion ¶¶ 23-24, at 9-10. The Reply suggests that he expects to find documents explaining "the meaning and interpretation of a number of relevant provisions" in the Purchase Agreement, Reply ¶ 4, at 2-3, but, as the Court explains infra, the Court may not look to extrinsic evidence to interpret this contract. Accordingly, allowing discovery for those documents would not "justify [Lopez'] position," Fed. R. Civ. P. 56(d), so the Court does not disturb its original 56(d) ruling.

Third, Lopez argues that the Court erred, because the Black & Decker Defendants "provided no evidence . . . to explain or interpret the meaning of any provisions in the PA." Motion ¶ 23, at 10. This argument misunderstands Delaware law.[20] Under Delaware law, the

---

[20]The Court previously concluded that Delaware law applies to the Purchase Agreement's interpretation. See MOO at 86, 2017 WL 3142028, at *36 ("Because this inquiry is contractual, the Court must effectuate the parties' bargained-for choice-of-law provision, which chooses Delaware law to govern interpretation of the agreement's terms."). Lopez, in fact, argued that Delaware law should control. See Tr. at 21:16-18 (Isaac). The Court sees no reason to upend that decision.

The Supreme Court of New Mexico has repeatedly indicated that it would honor contracts' choice-of-law provisions. See Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 7, 188 P.3d 1215, 1218 ("New Mexico respects party autonomy; the law to be applied to a particular dispute may be chosen by the parties through a contractual choice-of-law provision."); Burge v. Mid-Continent Cas. Co., 1997-NMSC-009, ¶ 11, 933 P.2d 210, 214 ("New Mexico law recognizes the validity of choice of law provisions contained in contract."); Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 6, 811 P.2d 1308, 1309 ("[P]arties are free to choose by contract a law to govern the performance and enforcement of contractual arrangements between them."); United Wholesale Liquor Co. v. Brown-Forman Distillers Corp., 1989-NMSC-030, ¶ 11, 775 P.2d 233, 236. The Court notes, however, that the New Mexico UCC requires a court to effect a contract's choice-of-law provision, and all of these decisions but one involve a contract for a sale of goods. See N.M. Stat. Ann. § 55-1-301(A); Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 2, 188 P.3d at 1217 (construing a computer sale contract); Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 3, 811 P.2d at 1309 (interpreting a cattle-sale contract); United Wholesale Liquor Co. v. Brown-Forman Distillers Corp., 1989-NMSC-030, ¶ 2, 775 P.2d at 234 (construing an alcohol-distribution contract). But see Burge v. Mid-Continent Cas. Co., 1997-NMSC-009, ¶ 4, 933 P.2d at 212 (interpreting an insurance contract).

For choice-of-law decisions that the UCC does not govern, New Mexico follows the Restatement (First) of Conflict of Laws. See Flemma v. Haliburton Energy Serv., Inc., 2013-NMSC-022, ¶ 14, 303 P.3d 814, 819 (citing Restatement (First) of Conflict of Laws, § 332(c)). In recently exploring the Restatement (First) of Conflict of Laws, the Supreme Court of New Mexico has noted:

> The Restatement (Second), unlike the Restatement (First), acknowledges the realities of modern contracts and respects party autonomy by allowing the parties to choose the law that will govern the dispute. Restatement (Second) § 187, at 561; *see also* Symeon C. Symeonides, *Oregon's Choice–of–Law Codification for Contract Conflicts: An Exegesis,* 44 Willamette L. Rev. 205, 222 (2007) ("[T]he drafters of the First Restatement rejected party autonomy. . . . Recognizing this reality, the Restatement (Second) formally sanctioned and codified the principle of party autonomy."). If the contract has a valid choice-of-law provision, that law presumptively applies. Restatement (Second) § 187, at 561.

Ferrell v. Allstate Ins. Co., 2008-NMSC-042, ¶ 54, 188 P.3d 1156, 1172 (ellipses in original).  In so noting, the Supreme Court of New Mexico might have been suggesting that, because it follows the Restatement (First) of the Conflict of Laws, it would not honor choice-of-law provisions for non-UCC contracts.  Cf. Flemma v. Haliburton Energy Serv., Inc., 2013-NMSC-022, ¶ 14, 303 P.3d at 819 ("[T]he DRP's forum selection clause is not helpful to our determination of which state law to apply.  New Mexico follows the Restatement (First) of Conflict of Laws when analyzing choice of law issues.").  Nevertheless, the Supreme Court of New Mexico has never expressly held it will not honor choice-of-law provisions in non-UCC contracts, nor has it repudiated its holding from Burge v. Mid-Continent Cas. Co., in which it honored the parties' choice-of-law provision in an insurance contract, which the UCC does not govern.  1997-NMSC-009, ¶ 4, 933 P.2d at 212.  Furthermore, the Supreme Court of New Mexico has relaxed its adherence to the Restatement (First) of the Conflict of Laws in other areas.  Ferrell v. Allstate Ins. Co., 2008-NMSC-042, ¶ 56, 188 P.3d at 1173 (concluding that the First Restatement is "ill-suited" for complex lawsuits, so ruling that the Second Restatement "is a more appropriate approach for multi-state contract class actions").  The Court concludes that, given Burge v. Mid-Continent Cas. Co. and its loose faithfulness to the First (Restatement) of the Conflict of Laws, the Supreme Court of New Mexico would apply the Purchase Agreement's choice-of-law provision.

If the Supreme Court of New Mexico did not honor the choice-of-law clause, however, the Court concludes that Delaware law would still apply. The Purchase Agreement is not a sale of goods.  See N.M. Stat. Ann. § 55-2-105(1) ("Goods means all things . . . which are movable at the time of identification to the contract for sale other than . . . investment securities.").  It is a contract to acquire another company's stock and that company's intellectual property.  See Purchase Agreement § 1.1, at 5 ("Buyer shall purchase . . . the U.S. Intellectual property, [and] the Equity interests."); Schedules at 2 (listing the "Equity Interests" to be purchased).  See also Stewart v. Lucero, 1996-NMSC-027, ¶ 9, 918 P.2d 1, 3 ("Article 2 of the New Mexico Uniform Commercial Code does not apply to the sale of a business as a going concern.").  The Supreme Court of New Mexico has not determined whether contracts to purchase intellectual property are sales of goods under the UCC, but the Tenth Circuit, construing similar language in Oklahoma's UCC, which exists in New Mexico's UCC, has ruled that the sale of intellectual property is not a sale of a good, because "[i]ntellectual property is not a movable thing."  Eureka Water Co. v. Nestle Waters N. Am., Inc., 690 F.3d 1139, 1147 (10th Cir. 2012).  See Sys. Unlimited, Inc. v. Cisco Sys., Inc., 228 F. App'x 854, 859 (11th Cir. 2007)(unpublished)("The sale of intellectual property, which is what is involved here, is not a transaction in goods."); Architectronics, Inc. v. Control Sys., Inc., 935 F. Supp. 425, 432 (S.D.N.Y. 1996)(Mukasey, J.)("However, copyrights, patents, and trademarks are classified as general intangibles under the UCC and are distinguished from goods.").  The Court concludes that the Supreme Court of New Mexico would follow those jurisdictions.  At bottom, intellectual properties are ideas.  See Eureka Water Co. v. Nestle Waters N. Am., Inc., 690 F.3d at 1147.  Even though the ideas can be expressed in a "movable medium" such as in a trademark, "the intellectual property remains intangible." Eureka Water Co. v. Nestle Waters N. Am., Inc., 690 F.3d at 1147.  In that way, intellectual property is analogous to investment securities, which the New Mexico UCC expressly excludes.  See N.M. Stat. Ann. § 55-2-105(1) ("Goods means all things . . . which are movable at the time of identification to the contract for sale other than . . . investment securities.").  Investment securities are sometimes expressed in a movable medium -- for example, a stock certificate -- but

- 53 -

Court is not only allowed to interpret a contract without extrinsic evidence; it is required to

interpret a contract without extrinsic evidence, unless the contract terms are ambiguous.  <u>See</u>

---

the actual ownership interest is an intangible right.  Accordingly, the Court rules that the Supreme Court of New Mexico would conclude that New Mexico's UCC does not encompass the sale of intellectual property.

Even if the Supreme Court of New Mexico concluded that the sale of intellectual property is a good, however, the Supreme Court of New Mexico would still rule that the Purchase Agreement is a non-UCC contract.  In a mixed contract of goods and other items, New Mexico courts ask the contract's "primary purpose" to determine whether the UCC applies. <u>Stewart v. Lucero</u>, 1996-NMSC-027, ¶ 12, 918 P.2d at 4-5.  Reviewing the Purchase Agreement, the primary purpose is not the acquisition of intellectual property, but the acquisition of stock. Indeed, only one paragraph of a sixty-six page document speaks about the intellectual property. <u>See</u> Purchase Agreement § 3.1(r), at 16.  Accordingly, the primary purpose is the sale of stock, so the UCC does not apply.  <u>See</u> <u>Stewart v. Lucero</u>, 1996-NMSC-027, ¶ 12, 918 P.2d at 4-5.

Because the Purchase Agreement is a non-UCC contract, the contracting location would control what law to apply.  There is little evidence, however, where the contract came into effect. The only evidence in the record is that one contracting party is a Maryland corporation, and the other is incorporated in Minnesota.  <u>See</u> Purchase Agreement at 5.  That provision would seem to suggest that Minnesota or Maryland might be the place of contracting.  Nevertheless, as sophisticated entities, the final act creating the contract could be in any number of states.  For example, agents for the corporations could have signed the papers in Delaware or New York. The Court concludes, however, that it is highly unlikely that the place of contracting is New Mexico.  New Mexico is not, shall we say, known for abundant corporate commerce.  Were this a contract between two green chile distributors, for example, the Court might conclude that New Mexico was likely the state of contracting.  The Court knows, however, of no connection between these two corporations and New Mexico, and, given that the Purchase Agreement indicates none, it concludes that the contract did not come into effect in New Mexico.

The Restatement (First) of Conflict of Laws is silent about the default law to apply if there is no evidence of the contracting location, <u>see</u> Restatement (First) of Conflict of Laws §§ 311-331, and the Supreme Court of New Mexico has not considered the issue.  The Court, however, has previously determined that, if there is no evidence about the place of contracting, the Supreme Court of New Mexico would look to the choice-of-law provision -- if any exists -- and public policy concerns, which might indicate that the forum's law is more appropriate.  <u>See</u> <u>City of Raton v. Arkansas River Power Authority</u>, 760 F. Supp. 2d 1132, 1151-52 (D.N.M. 2009)(Browning, J.).    Here, the contracting parties chose Delaware law.    <u>See</u> Purchase Agreement § 11.4, at 53.  Neither litigation party has argued that another body of law should apply to the Purchase Agreement's interpretation.  <u>See</u> Tr. at 21:16-18 (Isaac)("[I]f they have a choice of law provision, it's going to be that, which is Delaware."); Suppl. Brief Response at 1-6; Motion ¶¶ 36-39, at 19-21.  Moreover, the Court can discern no strong policy reason to apply New Mexico contract interpretation rules to an acquisition contract where the contracting parties chose Delaware law, one party is a Maryland corporation, and the other is incorporated in Minnesota.  <u>See</u> Purchase Agreement at 5. Accordingly, Delaware law remains the appropriate law to interpret the Purchase Agreement.

GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P., 36 A.3d at 779-80.

Reviewing the Purchase Agreement's terms, the Court discerns no ambiguity requiring a resort to extrinsic evidence. The Court previously explained:

> In the Purchase Agreement, Pentair, Inc. and its affiliates "sell and transfer" their "ownership interests . . . in each of the Transferred Subsidiaries" to The Black & Decker Corporation and its affiliates. Purchase Agreement at 1. Delta Intl., one of the "Transferred Subsidiaries," Schedule 3.1(c), at 4, remains fully intact as a distinct legal entity . . . . Thus, here, "transfer" denotes the movement of wholly owned subsidiaries from one holding company to another, without any alteration of the subsidiaries' corporate form. Rhone-Poulenc Basic Chem. Co. v. American Motorists Ins. Co., 616 A.2d 1192, 1195 (Del. 1992)("Clear and unambiguous language . . . should be given its ordinary and usual meaning."). Extrapolating from this construction, the Purchase Agreement's "Transferred Liabilities" provision simply defines which liabilities remain with the "Transferred Subsidiaries" under their new ownership. To interpret this provision to mean that the subsidiaries' liabilities move from the subsidiaries to their new owners, rather than with the subsidiaries as they move between owners, would contravene the well-established principle that "'a word used by the parties in one sense will be given the same meaning throughout the contract in the absence of countervailing reasons.'" Comerica Bank v. Glob. Payments Direct, Inc., 2014 Del. Ch. LEXIS 127, at *34 n.77 (Del. Ch. 2014)(quoting 28 Richard A. Lord, Williston on Contracts § 32:6 (4th ed. 1999). See Medicis Pharm. Corp. v. Anacor Pharm., Inc., 2013 Del. Ch. LEXIS 206, at *7 (Del. Ch. 2013)("[W]here the same word . . . is used on more than one occasion in the same instrument, and in one instance its meaning is definite and clear and in another instance it is susceptible of two meanings, there is a presumption that the same meaning was intended throughout such instrument."). Here, there is no reason to construe "transfer" as having different meanings in these two contexts; Lopez has not identified, for example, any provision explicitly stating that The Black & Decker Corporation agrees to assume the subsidiaries' liabilities.

> Reading the transferred-liabilities provision together with other provisions in the Purchase Agreement confirms the Court's construction. In a provision entitled "Indemnification By Parent," Pentair, Inc. agrees to indemnify The Black & Decker Corporation for "Losses . . . resulting from . . . any Indemnified Liability." Purchase Agreement ¶ 8.1, at 39-40. In its "Definitions" section, the Purchase Agreement defines "Indemnified Liabilities" to include "all liabilities and obligations of the Subsidiaries . . . other than 'Transferred Liabilities.'" Purchase Agreement ¶ 11.17, at 56. Thus, the indemnification provision carves out the liabilities for which Pentair, Inc. retains responsibility; the transferred-liabilities provision simply operates to identify the liabilities over which Pentair, Inc. does not retain responsibility, because they transfer with the subsidiaries.

> Indeed, it is noteworthy that the term "Transferred Liabilities" appears only in the "Definitions" section and not in any of the Purchase Agreement's substantive provisions. Purchase Agreement ¶ 11.17, at 56 (defining the term "Indemnified Liabilities" as liabilities "other than the Transferred Liabilities"); id. at 59 (defining "Specified Liabilities" as the "liabilities and obligations of the Subsidiar[ies] other than Transferred Liabilities"); id. at 60 (defining "Transferred Liabilities"). It is not sound to read a definitional term, to which none of the contract's substantive terms refer, as effectuating an express assumption of liabilities by the acquiring corporation.

MOO at 108-09, 2017 WL 3142028, at *44. Lopez does not offer new arguments against the Court's interpretation; instead, he copies and pastes the majority of his Suppl. Reply Brief into his Motion. Compare Suppl. Reply Brief ¶¶ 2-13, at 2-10, with Motion ¶¶ 28-39, at 12-21. The Court concludes that its prior reasoning is sound, so extrinsic evidence to interpret the Purchase Agreement is superfluous. See GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P., 36 A.3d at 780 ("Contract terms themselves will be controlling when they establish the parties' common meaning."). Accordingly, the Court did not err when it granted the Black & Decker Defendants' MSJ without requiring those defendants to provide extrinsic evidence to interpret the contract.

Fourth, Lopez argues that the Court erred, because it granted summary judgment on grounds that a party did not raise without giving Lopez "notice and a reasonable time to respond." Reply ¶ 3, at 2 (citing Fed. R. Civ. P. 56(f)(2)). Lopez raises this argument for the first time in reply, so the Court need not consider it. See Martinez v. Salazar, 2016 WL 9724833, at *1 (D.N.M. November 7, 2016)(Gonzalez, J.). The Court is, however, allowed to consider new arguments in a reply, so long as it affords the opposing party a long enough interval to "request time to file a surreply." Pippin v. Burlington Resources Oil and Gas Co., 440 F.3d 1186, 1192 (10th Cir. 2006). The Black & Decker Defendants have had six months since Lopez filed his Reply to request time to file a surreply. They have not responded or requested

the time to file such a surreply.  The Court thus may consider the Reply's new arguments, although it is not required to consider them.

The Court concludes that it did not violate rule 56(f)(2).  Under rule 56(f)(2), a court may grant a summary judgment motion "on grounds not raised by a party" so long as it gives the affected party "notice and a reasonable opportunity time to respond."  Fed. R. Civ. P. 56(f)(2).  Lopez contends that the Court relied on the Purchase Agreement in deciding the MSJ without giving Lopez notice or an opportunity to respond.  See Reply ¶¶ 1-3 at 1-2.  The Court disagrees.  At the hearing, it received the Purchase Agreement for the first time and, after review and some argument, the Court and Lopez' attorney had the following exchange:

> The Court: Well, you know, it looks like to me that I should grant the motion.  I need to study this new document here, and make sure I understand it.  This is the first time I've looked at it. . . .  How do you feel about what you want to do in this case?
>
> Mr. Isaac: That's a fair point, your honor.  I would like an opportunity to have somebody look at these, this lengthy agreement and the schedules.
>
> . . . .
>
> The Court: Well, look, I'm barreling toward granting this thing.  So if you get anything and you want to send it to me.  I'm not going to -- I can't get an opinion out today realistically.  I need to look at this material. . . .  If you get something, send it to me."
>
> Mr. Isaac: Yes, sir.

Tr. at 45:23-48:18 (Court, Isaac).  After the Black & Decker Defendants asked for some clarification on expert deadlines, given the Court's inclination, this exchange took place:

> The Court: What if I did this: Would this work for you, Mr. Isaac?  They don't put any more money into the experts, because that's probably going to have nothing to do with this issue.  It's only having to do with the products liability side.  So I just slide that.  If I get into this case, you find something, you send it to me, and it changes dramatically the landscape that I'm seeing this morning, we'll get back together and set a new deadline for setting experts.  But stop the clock a little bit on --

Mr. Isaac: Sure.

Tr. at 49:7-18 (Court, Isaac).  These exchanges were sufficient to put Lopez on notice that the Court would rely upon the Purchase Agreement in an opinion and invited Lopez, at least twice, to send the Court argument on the Purchase Agreement if it chose.  See Tr. at 48:16-17 (Court)("If you get something, send it to me."); id. at 49:16-17 ("[Y]ou find something, you send it to me.").  Indeed, Lopez accepted the Court's invitation and submitted supplemental briefing addressing the Purchase Agreement's applicability to the MSJ.  See Supp. Brief. ¶¶ 11-22, at 3-8. The Court also concludes that it gave Lopez a reasonable time to respond about the Purchase Agreement's relevance to the pending MSJ.  The Court did not rule on the MSJ until September 16, 2016 see Order at 1, six months after March 15, 2016 hearing, and two months after Lopez had supplied supplemental briefing, see Supp. Brief at 9 (dated July 12, 2016).  Accordingly, the Court did not err under rule 56(f)(2).

The Court also notes that, even if Lopez did not have notice, he marshaled arguments against the Purchase Agreement, so he was not prejudiced.  See Oldham v. O.K. Farms, Inc., 871 F.3d at 1150 ("[E]ven if such notice is lacking, we will still affirm a grant of summary judgment if the losing party suffered no prejudice from the lack of notice.").  A party is not prejudiced under rule 56(f)(2) if he has had a meaningful opportunity to address a court's sua sponte reasoning.  See Tabura v. Kellogg USA, 880 F.3d at 558; Oldham v. O.K. Farms, Inc., 871 F.3d at 1151-52.  Here, Lopez submitted supplemental briefing on the Purchase Agreements months before the Court granted the MSJ, and the Court took into account those arguments when ruling. See Suppl. Brief ¶¶ 11-22, at 3-8; MOO at 39-45, 100-12, 2017 WL 3142028, at *17-20, *41-46. Indeed, Lopez argues that his supplemental briefing "discussed in detail why the PA showed there were issues of fact."  Motion ¶ 13, at 6.  Because Lopez had an opportunity to "discuss in

detail" why the Purchase Agreement created a genuine issue, a lack of notice that the Court would consider the Purchase Agreement did not prejudice him.

In addition to Lopez' new arguments, Lopez asserts an old one: that the Court should amend the judgment, because New Mexico or Delaware law -- and not Texas law -- applies to the successor liability issue. See Motion ¶¶ 22, 27, 36-39 at 9, 11, 19-21. The Court will not, however, amend the Final Judgment, because the Court previously determined that the successor liability doctrine is inapplicable, as the Purchase Agreement embodies a stock acquisition and not an asset acquisition. See MOO at 100-02, 2017 WL 3142028, at *41 ("As the Court noted at the hearing, however, the successor-liability doctrine appears to be inapposite, because that doctrine pertains to asset acquisitions, whereas here, The Black & Decker Corporation acquired Delta Intl.'s stock via the Purchase Agreement."). Accordingly, whether the Court erred on the successor liability issue would not change the case's outcome, so the Court need not amend the Final Judgment.

Moreover, Lopez overlooks that the Court concluded that, even if New Mexico law applies to the successor liability issue, Lopez' claim would still fail. See MOO at 111-12, 2017 WL 3142028, at *45-46. New Mexico law, unlike Texas law, recognizes two additional exceptions to the traditional rule that successor corporations do not assume the liability of the acquired corporation: the mere-continuation and the product line exceptions. See Garcia v. Coe Mfg. Co., 1997-NMSC-013, ¶ 13, 21, 933 P.2d 243, 247, 249. Lopez does not challenge the Court's determination that the mere continuation exception does not apply, as there is no evidence of a "common identity of officers, directors, and stockholders" between the Black & Decker Defendants and Pentair Inc. MOO at 111, 2017 WL 3142028, at *45 (citing Garcia v. Coe Mfg. Co., 1997-NMSC-013, ¶ 13, 933 P.2d at 247). See Motion ¶¶ 36-39 at 19-21.

Similarly, he does not rebut the Court's determination that the product-line exception is inapplicable:

> There are no facts, however, demonstrating how Black & Decker (U.S), Inc. represents itself to the public and to Delta Intl.'s customers, or whether Black & Decker (U.S), Inc. has the same ability as Delta Intl. to 'assess, control, and distribute the risks and costs of injuries caused by' any product defects.

MOO at 112, 2017 WL 3142028, at *46 (quoting Garcia v. Coe Mfg. Co., 1997-NMSC-013, ¶ 17, 933 P.2d at 248); See Motion ¶¶ 36-39 at 19-21. Indeed, it remains "undisputed that Delta Intl. continues to exist and that it is available to respond in damages, if sued in a proper forum." MOO at 112, 2017 WL 3142028, at *46.

The Court also concludes that, under Delaware law, Lopez would not have a viable claim under a successor-liability theory. The Supreme Court of Delaware has concluded that successor liability attaches if the transaction is a de-facto merger. See Drug, Inc. v. Hunt, 168 A. 87, 96 (Del. 1933).

> The elements necessary to create a *de facto* merger under Delaware law are the following: (1) one corporation transfers all of its assets to another corporation; (2) payment is made in stock, issued by the transferee directly to the shareholders of the transferring corporation; and (3) in exchange for their stock in that corporation, the transferee agreeing to assume all the debts and liabilities of the transferor."

Magnolia's at Bethany, LLC v. Artesian Consulting Engineers, Inc., 2011 WL 4826106, at *3 (Del. Super. Ct. Sept. 19, 2011)(citing Drug, Inc. v. Hunt, 168 A. at 96)(italics in Magnolia's at Bethany, LLC v. Artesian Consulting Engineers, Inc.).[21] The transaction between Black & Decker (U.S) and Pentair Inc. is not a de facto merger, because payment was made in cash and not in stock. See Purchase Agreement § 2.1, at 5 ("The purchase price . . . shall be in the amount

---

[21]The Court concludes that the Supreme Court of Delaware would adopt these elements as they are, largely, a summation of the doctrine outlined in Drug Inc. v. Hunt, and there is no indication that the Supreme Court of Delaware would retreat from its prior, albeit New-Deal era, holding.

of $775,000,000."). Furthermore, as previously determined, Black & Decker did not agree to assume Pentair Inc.'s debts and liabilities. See MOO at 108-09, 2017 WL 3142028, at *44.

The Supreme Court of Delaware has not adopted any other successor liability theory, although some Delaware lower courts recognize a version of the mere-continuation theory. See Magnolia's at Bethany, LLC v. Artesian Consulting Engineers, Inc., 2011 WL 4826106, at *3; Fountain v. Colonial Chevrolet Co., 1988 WL 40019, at *8-9 (Del. Super. Ct. April 13, 1988)("The continuation theory of corporate successor liability has been narrowly construed by the Delaware courts. . . . [I]t must appear that the former is the same legal entity as that whose obligation is sought to be charged upon it as one of its own."). But see Spring Real Estate, LLC v. Echo/RT Holdings, LLC, 2013 WL 6916277, at *5 (Del. Ch. December 31, 2013)("Even if the Court adopts the continuation theory here . . . ."). The Court could also find no Delaware decision adopting the product-line exception, but it found at least two lower court decisions critiquing it. See The O'Brien Corp. v. Hunt-Wesson, Inc., 1999 WL 126996, at *7 n.3 (Del. Ch. February 25, 1999)(noting that the court "agree[s] with those who criticize" the product line exception as "being not particularly well-thought out"); Mullen v. Alarmguard of Delmarva, Inc., 1993 WL 258696, at *5 (Del. Super. Ct. June 16, 1993)(concluding that Maryland would not adopt the product-line exception and noting that "the same problem exists with the product line theory as exists with the continuity of enterprise exception: it imposes liability on entities that have no connection with the acts causing injury"). Because Delaware typically assumes a pro-business approach to corporate law, see Hollis v. Hill, 232 F.3d 460, 473 (5th Cir. 2000), the Court concludes that it is unlikely that the Supreme Court of Delaware would adopt the product-line and the continuation exception, see also MOO at 91 n.41, 2017 WL 3142028, at *38 n.41 ("[T]he vast majority of jurisdictions have rejected the [product-line] exception.") Even if it

adopted those exceptions, however, Lopez' arguments would fail for the same reasons that they did under New Mexico law.  See Magnolia's at Bethany, LLC v. Artesian Consulting Engineers, Inc., 2011 WL 4826106, at *3 (Del. Super. Ct. September 19, 2011)("The primary elements of continuation include the common identity of the officers, directors, or stockholders of the predecessor and successor corporations, and the existence of only one corporation at the completion of the transfer.").  Accordingly, the Court did not err, and it will not amend the Final Judgment.[22]

## II.    THE COURT DID NOT ERR IN DENYING LOPEZ' 56(d) MOTION.

Lopez requests, in the alternative, that the Court vacate, alter, or amend its MOO and Final Judgment under rule 56(d), and allow him to pursue additional discovery on the successor liability issue.  See Motion ¶ 2, at 2; Reply ¶¶ 4-5, at 3.  He argues that the Court abused its discretion in denying his original rule 56(d) motion "by simply reviewing and interpreting the Purchase Agreement -- submitted by *Plaintiff* to the Court in July 2016 to show further discovery was needed in order to resolve the potential successor liability issue, and never submitted by the

---

[22]If Maryland or Minnesota law applied, the outcome would be the same.  Maryland and Minnesota have both rejected the mere-continuity rule.  See Nissen Corporation v. Miller, 594 A.2d 564, 573 (Md. 1991); Niccum v. Hydra Tool Corp., 438 N.W.2d 96, 99 (Minn. 1989). Minnesota has also rejected the product-line exception.  See Niccum v. Hydra Tool Corp., 438 N.W.2d at 100.  The Court concludes that the Court of Appeals of Maryland -- that state's highest court -- would also decline to adopt the product-line exception.  In rejecting the mere-continuity rule, it noted that it so held, because, "in order to impose tort liability, there must be fault," but "[t]he continuity of enterprise exception is largely one of public or social policy under which it has been determined that, irrespective of fault, a party should be held to respond for the acts of another." Nissen Corporation v. Miller, 594 A.2d at 574.  Similar reasoning would lead the Court of Appeals of Maryland to reject the product-line rule.  The product-line rule is not concerned with fault, but is designed to protect consumers who "may be left without a remedy if the predecessor has dissolved, is defunct, or is otherwise unavailable to respond in damages." Garcia v. Coe Mfg. Co., 1997-NMSC-013, ¶ 17, 933 P.2d at 248.  The product-line exception, thus grounded in "public or social policy." Nissen Corporation v. Miller, 594 A.2d at 574. Accordingly, the Court concludes that the Court of Appeals of Maryland would reject the product-line rule.  Consequently, Lopez' claims would also fail under Maryland or Minnesota law.

Black & Decker Defendants as grounds to support their motion for summary judgment." Motion ¶ 2, at 2 (italics and underline in original). The Court disagrees.

"The general principle of Rule 56(d) is that summary judgment should be refused where the nonmoving party has not had the opportunity to discover information that is essential to [its] opposition." Price ex rel. Price v. W. Res., Inc., 232 F.3d 779, 783 (10th Cir. 2000). Rule 56(d) does not require, however, that summary judgment not be entered until discovery is complete. See Price ex rel. Price v. W. Res., Inc., 232 F.3d at 784. "Rule 56[(d)] is not a license for a fishing expedition . . . ." Lewis v. Ft. Collins, 903 F.2d 752, 758 (10th Cir. 1990). To invoke rule 56(d), the party filing the affidavit or declaration must state with specificity how the desired time would allow it to meet its burden in opposing summary judgment. See Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554. Rule 56(d) may not be invoked based solely upon the assertion that discovery is incomplete or that specific facts necessary to oppose summary judgment are unavailable. See Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554.

> The Court has already ruled:
>
> Lopez does not identify any specific facts which he expects to discover which are essential to his opposition to the MSJ. See Garcia v. U.S. Air Force, 533 F.3d at 1179. As the Tenth Circuit has said, a party cannot invoke rule 56(d) 'by simply stating that discovery is incomplete but must state with specificity how the additional material will rebut the summary judgment motion." Garcia v. U.S. Air Force, 533 F.3d at 1179.

MOO at 115, 2017 WL 3142028, at *47. Lopez' Motion still does not identify what additional material he expects to find that would rebut the summary judgment motion. See Motion ¶¶ 23-24, at 9-10. As already explained, his request for more time to discover materials to interpret the contract is unnecessary as a matter of law. See supra at 53, n.19. Moreover, because the Court concludes that the Purchase Agreement unambiguously indicates it is a stock-acquisition

agreement, there is almost no chance that additional discovery will alter the case's outcome. Thus, the Court will not alter, amend, or vacate the Final Judgment or the MOO on rule 56(d) grounds.

**IT IS ORDERED** that the Plaintiff's Rule 59 Motion for New Trial and/or to Alter or Amend the Judgment, filed August 23, 2017 (Doc. 107), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Joseph Cervantes
Cervantes Law Firm
Las Cruces, New Mexico

-- and --

Joseph G. Isaac
Scherr & Legate, P.L.L.C.
El Paso, Texas

    *Attorneys for the Plaintiff*

Donald A. DeCandia
Tomas J. Garcia
Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Albuquerque, New Mexico

    *Attorneys for Defendants Delta International Machinery Corporation, Stanley Black & Decker, Inc., Black & Decker (U.S.) Inc., Rockwell Automation, Inc., and Pentair, Inc.*

Stephen Simone
Chapman and Priest, P.C.
Albuquerque, New Mexico

    *Attorneys for Defendant GLH, L.L.C.*